Thomas S. Waldo
Olivia Glasscock
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751
E: twaldo@earthjustice.org
E: oglasscock@earthjustice.org

*Attorneys for Plaintiffs Southeast Alaska Conservation Council; Alaska Rainforest
Defenders; Center for Biological Diversity; Sierra Club; Defenders of Wildlife; Alaska
Wilderness League; National Audubon Society; and Natural Resources Defense Council.*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SOUTHEAST ALASKA CONSERVATION COUNCIL; ALASKA RAINFOREST DEFENDERS; CENTER FOR BIOLOGICAL DIVERSITY; SIERRA CLUB; DEFENDERS OF WILDLIFE; ALASKA WILDERNESS LEAGUE; NATIONAL AUDUBON SOCIETY; and NATURAL RESOURCES DEFENSE COUNCIL, )))))))) | Case No. 1:19-cv-00006-SLG |
| *Plaintiffs*, ))) | |
| v. )) | |
| UNITED STATES FOREST SERVICE; UNITED STATES DEPARTMENT OF AGRICULTURE; DAVID SCHMID, in his official capacity as United States Forest Service Region 10 Regional Forester; and EARL STEWART, in his official capacity as Forest Supervisor for the Tongass National Forest, )))))))) | |
| *Defendants*. )) | |

**PLAINTIFFS' OPENING BRIEF UNDER LOCAL RULE 16.3(C)**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................... 1

FACTS ............................................................................................................... 2

I.    The Tongass National Forest is a rare and globally significant temperate rainforest that has been depleted by decades of old-growth logging. ....................... 2

II.   In the Prince of Wales Project, the Forest Service adopted the planning approach of the defunct long-term contracts. .............................................. 6

III.  Prince of Wales Island and the surrounding areas contain vital old-growth habitat relied upon by many communities. ................................................ 8

IV.  The Forest Service has begun implementation of the Project and plans to proceed with a timber sale this fall ............................................................ 11

ARGUMENT ..................................................................................................... 12

I.    Plaintiffs have standing ........................................................................... 12

II.   Standard of review. ................................................................................. 14

III.  The Forest Service violated NEPA by failing to provide site-specific information in the EIS ............................................................................. 14

    A.    NEPA requires site-specific information be provided in an EIS before the agency makes its decision. ..................................................... 14

    B.    "Condition-based" management does not save the FEIS. ............................ 17

    C.    The impacts of logging and road construction on Prince of Wales Island will vary greatly depending on where the activities are located. ...................................................................................... 20

        1.    The landscape varies. ..................................................... 21

        2.    Use of the landscape—by humans and by wildlife—varies. ........... 23

    D.    Lacking site-specific information, the FEIS contains no meaningful analysis of impacts and alternatives. ......................................... 26

*Southeast Alaska Conservation Council et al. v. U.S. Forest Service et al.,*      i
Case No. 1:19-cv-00006-SLG

IV.    The failure to include site-specific information violates section 810 of
ANILCA. ..................................................................................................28

V.    The Forest Service violated its forest plan, and hence NFMA, by failing to
provide unit cards with the EIS. ...............................................................31

RELIEF........................................................................................................... 35

I.    The Court should vacate the portions of the ROD authorizing vegetation
management and road construction...........................................................35

II.    In the alternative, the Court should issue a permanent injunction against the
vegetation management activities and road construction in the ROD....................36

    A.    Plaintiffs will suffer irreparable injury if the Project proceeds.................. 37

    B.    The remedies at law are inadequate. .......................................... 38

    C.    The balance of hardships supports an injunction. ...................................... 38

    D.    An injunction would serve the public interest............................................ 39

CONCLUSION ............................................................................................... 39

CERTIFICATE OF COMPLIANCE WITH WORD LIMIT........................................... 41

# TABLE OF AUTHORITIES

## CASES

*Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*,
  67 F.3d 723 (9th Cir. 1995) .................................................................. 28, 29

*All. for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ............................................................ 37, 39

*Amoco Prod. Co. v. Vill. of Gambell, AK*,
  480 U.S. 531 (1987).............................................................................. 38

*Burlington Truck Lines, Inc. v. United States*,
  371 U.S. 156 (1962).............................................................................. 14

*Cal. Cmties. Against Toxics v. EPA*,
  688 F.3d 989 (9th Cir. 2012) ............................................................. 35, 36

*California v. Block*,
  690 F.2d 753 (9th Cir. 1982) ................................................................ 16

*City of Tenakee Springs v. Block*,
  778 F.2d 1402 (9th Cir. 1985) ........................................... 2, 3, 4, 15, 16, 17

*City of Tenakee Springs v. Clough*,
  750 F.Supp. 1406 (D. Alaska 1990) ...................................................... 29

*City of Tenakee Springs v. Clough*,
  915 F.2d 1308 (9th Cir. 1990) .............................................................. 29

*City of Tenakee Springs v. Courtright*,
  No. J86-024-CIV, 1987 WL 90272 (D. Alaska June 26, 1987) ................... 4

*Confederated Tribes & Bands of Yakima Indian Nation v. F.E.R.C.*,
  746 F.2d 466 (9th Cir. 1984) ................................................................ 32

*Conservation Cong. v. U.S. Forest Serv.*,
  803 F. Supp. 2d 1126 (E.D. Cal. 2011)................................................... 37

*Earth Island Inst. v. U.S. Forest Serv.*,
  351 F.3d 1291 (9th Cir. 2003) .............................................................. 37

*East Bay Sanctuary Covenant v. Trump*,
909 F.3d 1219 (9th Cir. 2018) ........................................................ 39

*Ecological Rights Found. v. Pac. Lumber Co.*,
230 F.3d 1141 (9th Cir. 2000) ........................................................ 14

*Enyart v. Nat'l Conference of Bar Examiners, Inc.*,
630 F.3d 1153 (9th Cir. 2011) ........................................................ 39

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
528 U.S. 167 (2000) ........................................................................ 12

*Friends of Southeast's Future v. Morrison*,
153 F.3d 1059 (9th Cir. 1998) ................................................... 5, 31

*Humane Soc'y of U.S. v. Locke*,
626 F.3d 1040 (9th Cir. 2010) ........................................................ 35

*Idaho Farm Bureau Fed'n v. Babbitt*,
58 F.3d 1392 (9th Cir.1995) ........................................................... 35

*Idaho Sporting Cong. v. Alexander*,
222 F.3d 562 (9th Cir. 2000) .......................................................... 38

*Kisor v. Wilkie*,
588 U.S. ___, 139 S. Ct. 2400 (2019) ............................................ 33

*Klamath-Siskiyou Wildlands Ctr. v. BLM*,
387 F.3d 989 (9th Cir. 2004) .......................................................... 17

*Lands Council v. Martin*,
529 F.3d 1219 (9th Cir. 2008) ........................................................ 34

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
752 F.3d 755 (9th Cir. 2014) .......................................................... 38

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ........................................................................ 14

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) ........................................................................ 36

*Southeast Alaska Conservation Council et al. v. U.S. Forest Service et al.*,      iv
Case No. 1:19-cv-00006-SLG

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ................................................................................ 14

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
   668 F.3d 1067 (9th Cir. 2011) .............................................................. 20

*Nat'l Parks & Conservation Ass'n v. Babbitt*,
   241 F.3d 722 (9th Cir. 2001) ................................................................ 20

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
   886 F.3d 803 (9th Cir. 2018) ................................................................ 36

*Nat. Res. Def. Council v. U.S. Forest Serv.*,
   421 F.3d 797 (9th Cir. 2005) ................................................................ 28

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*,
   137 F.3d 1372 (9th Cir. 1998) .............................................................. 37

*Or. Nat. Desert Ass'n v. Rose*,
   921 F.3d 1185 (9th Cir. 2019) .............................................................. 17

*Or. Nat. Res. Council Fund v. Goodman*,
   505 F.3d 884 (9th Cir. 2007) ................................................................ 17

*Pollinator Stewardship Council v. U.S. Envtl. Prot. Agency*,
   806 F.3d 520 (9th Cir. 2015) ................................................................ 35

*S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*,
   588 F.3d 718 (9th Cir. 2009) ................................................................ 39

*Seattle Audubon Soc'y v. Evans*,
   771 F. Supp. 1081 (W.D. Wash. 1991) .................................................. 39

*Sierra Club v. U.S. Forest Serv.*,
   843 F.2d 1190 (9th Cir. 1988) .............................................................. 38

*Siskiyou Reg'l Edu. Project v. U.S. Forest Serv.*,
   565 F.3d 545 (9th Cir. 2009) ................................................................ 33

*Stein v. Barton*,
   740 F. Supp. 743 (D. Alaska 1990) .................................... 5, 6, 15, 16, 17

*W. Oil & Gas Ass'n v. U.S. Envtl. Prot. Agency*,
633 F.2d 803 (9th Cir. 1980) ............................................................ 36

*WildEarth Guardians v. Mont. Snowmobile Ass'n*,
790 F.3d 920 (9th Cir. 2015) ................................................. 15, 17, 20, 28

## STATUTES

5 U.S.C. § 706(1) ............................................................................ 14

5 U.S.C. § 706(2)(A) ................................................................... 14, 35

5 U.S.C. § 706(2)(D) ........................................................................ 14

16 U.S.C. § 1604 .............................................................................. 5

16 U.S.C. § 1604(a) ......................................................................... 31

16 U.S.C. § 1604(e) ......................................................................... 31

16 U.S.C. § 1604(f) ..................................................................... 31, 34

16 U.S.C § 1604(i) ........................................................................... 31

16 U.S.C. § 3112(a) ......................................................................... 28

16 U.S.C. § 3120(a) ............................................................... 7, 29, 30, 31

16 U.S.C. § 3120(b) ......................................................................... 29

42 U.S.C. § 4332(2)(C) ............................................................. 4, 14, 15

## REGULATIONS

36 C.F.R. § 218.7(b) ........................................................................ 19

36 C.F.R. § 218.8 ............................................................................ 19

36 C.F.R. § 218.11(b)(1) ................................................................... 19

36 C.F.R. § 218.12(a) ....................................................................... 19

*Southeast Alaska Conservation Council et al. v. U.S. Forest Service et al.*,
Case No. 1:19-cv-00006-SLG

vi

36 C.F.R. § 219.13(b)(2) ................................................................................ 34

40 C.F.R. § 1502.9(a) .................................................................................... 18

40 C.F.R. § 1502.9(b) .................................................................................... 18

40 C.F.R. § 1502.14 .................................................................................. 18, 28

40 C.F.R. § 1502.16 .................................................................................. 15, 18

40 C.F.R. § 1502.20 ...................................................................................... 18

40 C.F.R. § 1503.4 ........................................................................................ 18

40 C.F.R. § 1505.2 ........................................................................................ 18

40 C.F.R. § 1506.10(c) .................................................................................. 18

40 C.F.R. § 1508.8 .................................................................................... 15, 18

40 C.F.R. § 1508.28 ...................................................................................... 18

## FEDERAL REGISTER NOTICES

Appeals Reform Act of 1992, Pub. L. 102-381, Tit. III, § 322, 106 Stat. 1419,
   16 U.S.C. § 1612 note,
    78 Fed. Reg. 18,481 (March 27, 2013) ...................................................... 19

*Southeast Alaska Conservation Council et al. v. U.S. Forest Service et al.,*      vii
Case No. 1:19-cv-00006-SLG

# INTRODUCTION

This action challenges the Final Environmental Impact Statement (FEIS) and Record of Decision (ROD) for the Prince of Wales Landscape Level Analysis Project (Project), a Forest Service decision authorizing 15 years of logging on Prince of Wales Island and smaller surrounding islands in the Tongass National Forest. The Project is the biggest timber sale decision authorized anywhere on the national forest system in 30 years. *See* Doc. 1 at 12, ¶27; Doc. 9 at 5, ¶27. It would cut up to 42,635 acres of mostly old-growth forest and build up to 164 miles of new roads. *See* 833_2426 at 000440 (ROD at 1) (selecting Alt. 2); 833_2167 at 001481 (FEIS at 23, Tbl. 2 (Alt. 2)). Yet, the Forest Service prepared an environmental impact statement (EIS) for the Project that does not disclose where any of this logging or road construction would take place and, therefore, does not contain any site-specific analysis of impacts or alternatives. 833_2167 at 001692 (FEIS at 234). The agency made clear that, despite the lack of location-specific information, its environmental analysis was complete—there will be no subsequent EISs to provide the missing site-specific analysis. 833_2169 at 002078 (FEIS, Appendix B at B-1). This approach violates the National Environmental Policy Act (NEPA), section 810 of the Alaska National Interest Lands Conservation Act (ANILCA), and the agency's own forest management plan adopted under the National Forest Management Act (NFMA).

The Ninth Circuit long ago rejected this approach when the Forest Service attempted to authorize large-scale Tongass logging pursuant to a 50-year pulp mill contract without providing site-specific information.  *City of Tenakee Springs v. Block*, 778 F.2d 1402, 1408 (9th Cir. 1985) ("It is impossible to determine where and when harvesting will occur on the 750,000 acres of land.").  Nevertheless, the Forest Service is now reviving that approach in the Prince of Wales Project, burnishing it only with a new name:  "condition-based analysis."  833_2167 at 001443 (FEIS at i).

In short, then, the Forest Service is using this EIS to test whether the courts will now uphold an approach rejected decades ago.  They should not.  Subsequent case law is entirely consistent with *City of Tenakee Springs v. Block*.  Site-specific details remain an essential requirement of an EIS, and they are important for this EIS in particular.

## FACTS

I.    **The Tongass National Forest is a rare and globally significant temperate rainforest that has been depleted by decades of old-growth logging.**

At 16.7 million acres, the Tongass is the largest national forest in the country. 833_0404 at 063052 (2016 Plan); *id.* at 063407.  It is part of a coastal temperate rainforest spanning from northern California to Alaska's Cook Inlet and provides habitat for over 300 species of birds and mammals, as well as robust fish stocks.  833_2079 at 0071191-92 (2016 Plan FEIS at 3-7 to 3-8).  Coastal temperate rainforests are rare in the world, *id.* at 071196 (2016 Plan FEIS at 3-13) ("covering less than 0.5 percent of the earth's total forested area"), and southeast Alaska includes 19 percent of them.  *Id.*  This

resource is globally significant in several respects. These forests sequester vast amounts of carbon, with the result that "Southeast Alaska plays an important role in the global climate and carbon cycle" and "stores more forest carbon than any other national forest in the United States." *Id.*; *see also id.* at 071194-99, 071202-05 (2016 Plan FEIS at 3-11 to 3-16, 3-19 to 3-22). The Tongass also contains productive and globally significant karst soils, *id.* at 071211-16 (2016 Plan FEIS at 3-33 to 3-38), and is a hotspot for endemism, including species or subspecies restricted to islands or groups of islands that are sensitive to human activity and "highly susceptible to extirpation and eventual extinction." *Id.* at 071430 (2016 Plan FEIS at 3-247). Communities around Southeast Alaska rely on the Tongass for a variety of uses, including subsistence, recreation, tourism, and fishing. *Id.* at 071540-42, 071600, 071660, 07682-85 (2016 Plan FEIS at 3-357 to 3-359, 3-417, 3-477, 3-499 to 3-502).

Over the last century, parts of the Tongass have been heavily logged for commercial timber production. 833_0404 at 063408 (2016 Plan at Appendix B, 2); 833_2077 at 069553-55 (2008 Plan FEIS at 3-331 to 3-333). Timber sales have focused on the biggest trees offering the highest timber values and the most valuable wildlife habitat. *Id.* at 069359-60, 069371-76 (2008 Plan FEIS at 3-137 to 3-138, 3-149 to 3-154). Most of this logging took place under two 50-year timber sale contracts for pulp mills in Ketchikan and Sitka that operated from the 1950's to the 1990's. *See id.* at 069553-55 (2008 Plan FEIS at 3-331 to 3-333). The single most heavily logged part of

the Tongass is Prince of Wales Island, 833_2079 at 071378 (2016 Plan FEIS at 3-195),[1]

which was part of the sale area for the Ketchikan pulp mill contract. 833_2167 at 001750

(FEIS at 292).

In 1969, when the era of pulp mill logging was near its peak, Congress passed

NEPA. *See* 833_2077 at 069553 (2008 Plan FEIS at 3-331); 833_2074 at 065957 (1997

Plan FEIS at 3-259, Tbl. 3-73). This presented the Forest Service with the challenge of

how to provide the huge volumes of timber required by those contracts while preparing

the "detailed" statement of impacts required by the new law. 42 U.S.C. § 4332(2)(C). In

its early attempts, the Forest Service prepared five-year operating plans, each authorizing

hundreds of millions of board-feet of timber over the vast contract areas, with a single

EIS for each plan. *See City of Tenakee Springs v. Block*, 778 F.2d at 1404. These

ambitious EISs contained little or no site-specific information: "It is impossible to

determine where and when harvesting will occur on the 750,000 acres of land." *Id.* at

1408. When the City of Tenakee Springs and others challenged this approach, the Ninth

Circuit held it inadequate for lack of site-specific detail. *Id.*; *see also City of Tenakee

Springs v. Courtright*, No. J86-024-CIV, 1987 WL 90272 at *4 (D. Alaska June 26,

1987) ("generic discussions of fish and wildlife values should be supplemented by text or

---

[1] The cited plan EIS refers to the "North Central Prince of Wales biogeographic province." This province occupies most of Prince of Wales Island and of the project area in this case. *See* 833_2079 at 071369 (2016 Plan FEIS at 3-186, Fig 3.9-1); 833_2167 at 001461 (FEIS at 3, Fig. 1).

*Southeast Alaska Conservation Council et al. v. U.S. Forest Service et al.*,                    4
Case No. 1:19-cv-00006-SLG

maps showing how these considerations were or were not factored into routing and design decisions").

To comply with these court holdings, the Forest Service began preparing site-specific EISs containing "comprehensive, detailed quantitative and qualitative descriptions of the logging and roading plans for each harvest unit" proposed for sale. *See, e.g.*, *Stein v. Barton*, 740 F. Supp. 743, 748-49 (D. Alaska 1990). Only then did the courts uphold the EISs. *Id.*

Following *Stein v. Barton*, the Forest Service formalized a site-specific analysis requirement in its 1997 revised forest plan for the Tongass. NFMA requires the Forest Service to prepare a programmatic land and resource management plan for each national forest. 16 U.S.C. § 1604. Subsequent site-specific projects, such as timber sales, must be consistent with the plan. *See, e.g.*, *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1067-68, 1070-71 (9th Cir. 1998). The 1997 revised Tongass plan required the agency to prepare "unit cards" in NEPA documents for site-specific timber sales: "Unit cards should document mitigation and protection measures displayed and documented in NEPA documents." 833_2076 at 068765 (1997 Plan at 4-98 (TIM114.XII.A)). A unit card includes a map of each cutting unit in the timber sale and a list of resource attributes and prescriptions specific to that unit. *See, e.g.*, 833_2084 at 061276, 061278-85 (sample unit cards from Kuiu timber sale). The Forest Service updated this requirement in a 2008 amendment: "The unit cards, including a map with relevant resource features, will be

included in NEPA documents." 833_2078 at 070798 (2008 Plan at 4-71 (TIM4.I.C)). In 2016, the agency updated the requirement again, to require including unit cards electronically with the NEPA documents: "Timber harvest unit cards will document resource concerns and protection measures. The unit cards, including a map with relevant resource features, will be provided electronically when Draft or Final NEPA documents and decisions are published." 833_0404 at 063265 (2016 Plan at 4-68 (TIM3.I.C)).

When followed, the unit card requirement in the forest plan helps facilitate compliance with NEPA's requirement for site-specific detail. In the decades following *Stein v. Barton* and the adoption of the forest plan unit card requirement, the Forest Service has followed this practice successfully, until now.

## II.  In the Prince of Wales Project, the Forest Service adopted the planning approach of the defunct long-term contracts.

In the Prince of Wales Project, the Forest Service prepared an EIS like those used for the long-term contract operating plans of the 1970's and 1980's: It covers a vast project area of 1.8 million acres, 833_2167 at 001460-61 (FEIS at 2-3); it includes a volume of timber—656 million board-feet (mmbf), *id.* at 001481 (FEIS at 23, Tbl. 2 (Alt. 2))—that has not been attempted in a single EIS since the pulp mill era; and it contains no unit cards or other site-specific information about the location of logging or new roads. *Id.* at 001692 (FEIS at 234). Accordingly, the agency acknowledged "it is not possible to determine all of the direct, indirect, or cumulative impacts to wildlife

*Southeast Alaska Conservation Council et al. v. U.S. Forest Service et al.*,   6
Case No. 1:19-cv-00006-SLG

habitat or connectivity that could result from this project before implementation." 833_2171 at 002200 (FEIS, Appendix D, at D-58). Nevertheless, the Forest Service was clear that there will be no further NEPA analysis following the ROD. 833_2169 at 002078 (FEIS, Appendix B at B-1). Nor does the agency intend to conduct any further subsistence hearings or findings under ANILCA section 810(a)(2)-(3), 16 U.S.C. § 3120(a)(2)-(3). *See* 833_2426 at 000461-62, 000469 (ROD). Instead of providing site-specific information in the FEIS or any subsequent NEPA process, the Forest Service will make these decisions on a rolling basis as it implements the Project. 833_2167 at 001459 (FEIS at 1).

The Forest Service packaged the Project as a landscape level analysis that includes "vegetation management activities" (the category for timber sales) as well as road construction, watershed restoration, and recreation improvements. 833_2167 at 001464-65 (FEIS at 6-7). The agency released a draft EIS (DEIS) in April 2018. 833_1198 at 002255. Plaintiffs and others submitted comments arguing that the DEIS was inadequate for failure to provide site-specific analysis, resulting in inadequate assessment of impacts to wildlife and subsistence, among other problems. 833_1603. The Forest Service issued the FEIS together with a draft ROD in October 2018. 833_2167; 833_2174. In December 2018, Plaintiffs and others filed timely objections under agency regulations, raising essentially the same issues. 833_2387. The Forest Service rejected these objections on March 1, 2019, 833_2440, and signed the final ROD on March 16, 2019.

833_2426 (ROD).  The ROD selected the alternative that would log the greatest volume

of timber, including the most old growth.  833_2426 at 000449 (ROD at 10); 833_2167 at

001481 (FEIS at 23, Tbl. 2 (Alt. 2)).  Plaintiffs filed this case on May 7, 2019.  Doc. 1.

## III.    Prince of Wales Island and the surrounding areas contain vital old-growth habitat relied upon by many communities.

Prince of Wales Island is the fourth biggest island in the United States.  833_2167

at 001750 (FEIS at 292).  Its habitat supports many species dependent on old-growth

forest ecosystems, such as black bears, spruce grouse, Queen Charlotte goshawks,

Alexander Archipelago wolves, Sitka black-tailed deer, and small endemic mammals.  *Id.*

at 001633 (FEIS at 175).  The island is also home to 12 communities that depend heavily

on the island for hunting, fishing, and gathering, including subsistence practices and

commercial fishing.  *Id.* at 001462, 001750 (FEIS at 4, 292).

Industrial-scale logging began on Prince of Wales in the 1950's, *id.* at 001750

(FEIS at 292), and over the ensuing decades made the island the most heavily logged part

of the Tongass.  *See supra* pp. 3-4.  Logging converts old-growth habitat to young-

growth, which is of lesser quality for most wildlife species.  833_2167 at 001541 (FEIS

at 83).  There are seven wildlife analysis areas in the project area with only 30 to 50% of

their pre-1954 old-growth habitat remaining.  *Id.* at 001656 (FEIS at 198, Tbl. 41).  There

are about 30 watersheds in the project area with known restoration needs.  833_2167 at

001483 (FEIS at 25).

Because this area has been so heavily targeted by past logging, it has the lowest

remaining percent of intact watersheds in the Tongass, both by number of watersheds

(22%) and by acreage (15%). 833_2079 at 071395 (2016 Plan FEIS at 3-212 (Tbl.

3.9-15)).[2] It also has the lowest remaining percent of productive old growth (POG)

(63%), *id.* at 071400 (2016 Plan FEIS at 3-217 (Tbl. 3.9-16)) and of the particularly

valuable high-volume old growth (52%). *Id.* at 071401 (2016 Plan FEIS at 3-218 (Tbl.

3.9-17)). *See generally id.* at 071372 (2016 Plan FEIS at 3-189) (explaining old growth

characteristics). Intact large-scale blocks of this habitat type have all but disappeared.

833_2037 at 053975 (Albert & Schoen at 782) ("93.5% of [the island's] highest volume

landscape-scale blocks of old growth had been logged"); *see id.* at 053974 (Figs. 3(a) &

3(b)). The extensive network of logging roads built to remove all this timber has also

created the highest mean road density in southeast Alaska. 833_2064 at 445 (81 Fed.

Reg. 435, 445 (Jan. 6, 2016)).[3]

The extensive past logging and roadbuilding has placed significant stress on

wildlife populations. This province has the lowest remaining percent of deer habitat

capability (54%) of any in the Tongass. 833_2079 at 071471 (2016 Plan FEIS at 3-288,

Tbl. 3.10-16). The Forest Service describes the impacts of the Project to deer as

---

[2] As discussed above, the North Central Prince of Wales Biogeographic Province
occupies most of the island and most of the project area. *See supra* note 1.

[3] This notice refers to the roads in "GMU 2." 833_2064 at 445. That means Game
Management Unit 2, an area defined by the Alaska Department of Fish and Game that
encompasses the project area, i.e., Prince of Wales and surrounding islands. 833_2079
at 071420 (2016 Plan FEIS at 3-237).

"Moderate to Major" in light of this substantial pre-existing loss of habitat. 833_2426 at 000454 (ROD at 15). For this reason, the agency also found a "significant possibility of a significant restriction" to subsistence uses of deer. 833_2167 at 001557 (FEIS at 99).

Because deer are the principal prey of the Alexander Archipelago wolf, and because wolves are also threatened by the substantial road network on the island, the agency also predicts a "Moderate to major" impact on this species. 833_2426 at 000452-53 (ROD at 13-14). This probably understates the risk. The FEIS notes that "[i]n 2016, the U.S. Fish and Wildlife Service (USFWS) concluded there was reasonable risk that wolves could be significantly reduced, or perhaps even extirpated from Prince of Wales Island…" 833_2167 at 001681 (FEIS at 223). Due to alarming declines in wolf populations in the project area, Forest Service leadership in 2016 convened a team of specialists from the Forest Service, the Alaska Department of Fish and Game, and the U.S. Fish and Wildlife Service to develop a Wolf Habitat Management Program for the area, as called for in the forest plan. 833_0847 at 046473; *see* 833_0404 at 063288 (2016 Plan at 4-91). This blue-ribbon panel produced a report with detailed recommendations for habitat, roads, and other needs. 833_0847. Yet the Forest Service declined to follow any of these recommendations, selecting instead the Project alternative that maximized timber production, despite the impacts to wolves. *See* 833_2167 at 001567-68, 001629-30 (FEIS at 109-10, 171-72); 833_2426 at 000449, 000455-56 (ROD at 10, 16-17).

Prince of Wales Island also hosts two endemic subspecies unique to the project area: The Prince of Wales flying squirrel and the Prince of Wales spruce grouse. 833_2079 at 071432-33 (2016 Plan FEIS at 3-249 to 3-250). Both are associated with old-growth forests, *id.*, and have therefore been affected by extensive past logging. *Id.* at 071472 (2016 Plan FEIS at 3-289). Many experts are concerned about the continuing viability of the flying squirrel, arguing that the existing habitat reserves on the island are insufficient. *Id.* at 071432-33 (2016 Plan FEIS at 3-249 to 3-250). Spruce grouse are also prey for goshawks and marten, and their decline would potentially affect those species adversely. *Id.* at 071433 (2016 Plan FEIS at 3-250).

IV.     **The Forest Service has begun implementation of the Project and plans to proceed with a timber sale this fall.**

The agency record filed in this case ends with the ROD and includes no information about subsequent implementation. For purposes of establishing standing and irreparable harm only, Plaintiffs note that the Forest Service has begun to implement the Project by publicly releasing materials about a potential timber sale this year. The materials included a map indicating that 50 mmbf of old-growth timber could be offered from four areas in the northern half of the island. *See* Ex. 2 at 5. Subsequently, Plaintiffs learned from counsel for Defendants that the Forest Service intends to offer a 35-mmbf sale in mid- to late-August 2019, with ground-disturbing activities beginning as early as September 27, 2019. Doc. 6 at 3-4, ¶5. On or about July 11, 2019, just before the filing of this brief, the Forest Service posted on its web site "revised draft unit cards" for the

*Southeast Alaska Conservation Council et al. v. U.S. Forest Service et al.*,      11
Case No. 1:19-cv-00006-SLG

"Twin Mountain Timber Sale," which appears to be the sale planned for this year. *See* U.S. Forest Serv., Prince of Wales Landscape Level Analysis Project Twin Mountain Timber Sale Draft Unit Cards, https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd641767.pdf (last visited July 12, 2019). The Forest Service has issued no notice to the public or to Plaintiffs about the Twin Mountain sale.

## ARGUMENT

### I. Plaintiffs have standing.

Plaintiffs have standing to bring this case because their members have standing in their own right, the interests at stake are germane to Plaintiffs' organizational purposes, and the lawsuit does not require the participation of their individual members. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 181 (2000).

Members of these Plaintiff organizations use Prince of Wales Island and the surrounding areas. This includes the north end of the island in the Staney, Naukati, North End, and Neck Lake areas indicated as areas proposed for the first timber sale under this project. Ex. 2 at 5. They use the project area for subsistence and commercial hunting, fishing, and gathering. Ex. 1 at 2-3, ¶¶3-4; Ex. 2 at 2, ¶3; Ex. 7 at 1-5, ¶¶4, 10, 11; Ex. 12 at 1,10, ¶¶3, 20. They also use the area for recreation, education, photography, and wildlife viewing. Ex. 1 at 5-6, ¶¶6-7; Ex. 2 at 2-3, ¶¶3, 5-7; Ex. 4 at 1, 6-7, ¶¶4, 13-14; Ex. 5 at 2-3, ¶¶6, 14; Ex. 12 at 3-4, 6-7, 9, ¶¶4-7, 13, 16; Ex. 13 at 8, ¶¶17-19. They

value the area for its aesthetic qualities, tranquility, community, and spiritual benefit. Ex. 1 at 7-8, 14-15, 18-19, ¶¶8, 17, 22; Ex. 4 at 6, ¶13; Ex. 5 at 3-7, ¶¶8, 10, 12; Ex. 7 at, 8, ¶14; Ex. 12 at 6-10, ¶¶12-13, 17, 19. Plaintiffs' members intend to continue their uses of the project area. Ex. 1 at 13, 19-20, ¶¶15, 24-25; Ex. 2 at 3-4, ¶¶9-10; Ex. 4 at 2, 5, 8-9, ¶¶5, 11, 18; Ex. 5 at 7, ¶14; Ex. 7 at 4, 9, ¶¶7, 8, 16; Ex. 12 at 8-10, ¶¶15-17, 20; Ex. 13 at 8-9, ¶20.

As discussed above, this Project would cause further habitat loss in an area that has already been heavily logged. *See supra* pp. 3-4, 8-11. Despite the existing impacts from past logging, the project area remains important for old-growth dependent species and for the interests of the people who use them. Ex. 5 at 4-5, ¶10. Plaintiffs' members fear their interests in Prince of Wales, including their aesthetic enjoyment, will be harmed if this Project proceeds. Ex. 1 at 8-17, ¶¶9-14, 17-18, 20; Ex. 2 at 4, ¶11; Ex. 4 at 4-7, ¶¶9-15; Ex. 5 at 5-7, ¶¶11-12, 14; Ex. 7 at 4-6, 7, ¶¶7-11, 14; Ex. 12 at 5-6, 10-11, ¶¶11, 19, 21; Ex. 13 at 9-10, ¶¶21, 23. The Forest Service's decision to authorize this Project without complying with NEPA, ANILCA, and NFMA also harms Plaintiff members' interests in being informed about agency plans and having the opportunity to participate meaningfully in agency decisionmaking. Ex. 2 at 3, ¶8; Ex. 4 at 9-10, ¶19; Ex. 5 at ¶¶10, 11; Ex. 7 at 6-7, ¶¶12.

These imminent harms constitute concrete injury in fact, are fairly traceable to the actions taken by the Forest Service challenged in this litigation, and are redressable by

the relief sought.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992);

*Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000).

## II.     Standard of review.

This challenge arises under the Administrative Procedure Act, which directs courts to "set aside" agency decisions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law."  5 U.S.C. § 706(1), (2)(A) & (D).  An agency action is arbitrary if the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

## III.    The Forest Service violated NEPA by failing to provide site-specific information in the EIS.

The Forest Service violated NEPA by failing to provide site-specific information or analysis in the draft or final EIS.  The agency's failure to analyze the impacts of the Project or its alternatives resulted in an uninformed decision, and its failure to disclose where any logging or road building will take place made it impossible for the public to participate meaningfully in the process.

### A.     NEPA requires site-specific information be provided in an EIS before the agency makes its decision.

NEPA requires agencies to prepare a "detailed statement"—the statute's term for an EIS—for agency actions with significant environmental impacts.  42 U.S.C. §

*Southeast Alaska Conservation Council et al. v. U.S. Forest Service et al.*,                    14
Case No. 1:19-cv-00006-SLG

4332(2)(C). An EIS must assess the direct, indirect, and cumulative impacts of the proposed action and of alternatives to it. *Id.*; 40 C.F.R. §§ 1502.16, 1508.8. The EIS must provide site-specific information and analysis to serve two purposes: 1) to ensure agencies are making informed decisions before acting; and 2) to ensure the public is given a meaningful opportunity to participate in those decision-making processes. *WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 922-25 (9th Cir. 2015); *Stein*, 740 F. Supp. at 749.

*City of Tenakee Springs v. Block* controls this case. There, the Forest Service had lumped five years of logging within a 750,000-acre project area under one of the pulp mill contracts into a single EIS, which purported to be the site-specific analysis. 778 F.2d at 1404, 1407-08. However, neither the draft nor final EIS "gave any indication of its overall plan for timber harvesting in the Baranof Islands and Chichagof Island. It is impossible to determine where and when harvesting will occur on the 750,000 acres of land." *Id.* at 1408. The court found this fatal: "As the record now stands, the Alaska Lumber & Pulp final EIS is inadequate." *Id.*

The Forest Service did exactly the same thing in the FEIS at issue here for an even bigger area—1.8 million acres. The FEIS candidly states that the agency "proposes to harvest timber and build roads under all action alternatives, but it is unknown at this time where on the landscape this would occur." 833_2167 at 001692 (FEIS at 234). Accordingly, it is impossible for the agency to explain—or for the public to provide input

on—the site-specific environmental impacts of any of these activities, or of potential alternatives to them. *City of Tenakee Springs v. Block* held this unlawful and applies fully here. *See also Stein*, 740 F.Supp. at 749 (describing NEPA's site-specificity requirements).

The Forest Service attempts to justify this lack of information by citing the unprecedented size, duration, and multi-activity nature of the Project. Comparing the Project to a typical site-specific timber sale EIS, the agency asserts, "[I]t is difficult to look at a landscape level analysis for various types of activities with a process that is generally set for one resource in a shorter amount of time that [sic] 15 years." 833_2171 at 002157 (FEIS at Appendix D, D-15). That was the exact argument the court rejected in *City of Tenakee Springs v. Block*: "Although the agency does have discretion to define the scope of its actions…such discretion does not allow the agency to determine the specificity required by NEPA." 778 F.2d at 1407 (citing *California v. Block*, 690 F.2d 753, 765 (9th Cir. 1982)). Here, the Forest Service created a daunting task for itself by choosing to implement 15 years of multiple activities over a vast area in a single project decision. But as the courts have consistently held, this choice does not allow the agency to shirk its duty under NEPA to provide site-specific disclosure. *Id.*

*City of Tenakee Springs v. Block* and *Stein v. Barton*, though decided decades ago, rely on foundational NEPA principles that remain in effect today. As the court held in *Stein*, NEPA requires site-specificity to fulfill two basic purposes: 1) to ensure agencies

are making informed decisions prior to acting and 2) to ensure the public is given a meaningful opportunity to participate in those decision-making processes. *Stein*, 740 F. Supp. at 749; *see also City of Tenakee Springs v. Block*, 778 F.2d at 1407 (reasoning that an EIS must give decisionmakers sufficient data). These are the same touchstone criteria the Ninth Circuit applies today in evaluating whether an EIS is adequately site-specific. *See WildEarth Guardians*, 790 F.3d at 921-25 (holding EIS inadequate for failure to disclose location of moose range); *see also Or. Nat. Desert Ass'n v. Rose*, 921 F.3d 1185, 1189, 1190-91 (9th Cir. 2019) (holding environmental analysis violated NEPA by failing to establish "the physical condition" of roads and trails and authorizing activity without assessing the actual baseline conditions);. Merely disclosing the existence of particular geographic or biological features is inadequate—agencies must discuss their importance and substantiate their findings as to the impacts. *Or. Nat. Res. Council Fund v. Goodman*, 505 F.3d 884, 892 (9th Cir. 2007) (holding EIS inadequate for failure to evaluate in detail impacts of ski area expansion to acknowledged biological corridor); *Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 995 (9th Cir. 2004) (holding numeration of logging acres and road miles insufficient to describe actual environmental effects). For the same reasons the EIS in *City of Tenakee Springs v. Block* was inadequate 34 years ago, the FEIS here is inadequate today.

## B. "Condition-based" management does not save the FEIS.

The Forest Service fares no better in its attempt to defend the Project by invoking "condition-based" management. The agency states that it can comply with NEPA by

*Southeast Alaska Conservation Council et al. v. U.S. Forest Service et al.*,      17
Case No. 1:19-cv-00006-SLG

responding to conditions on the ground with requirements specified in "Activity Cards" and an implementation plan. 833_2171 at 002157 (FEIS at Appendix D, D-15). "Activity Cards" are not location-specific but provide general direction on how to implement categories of activities in the Project. 833_2426 at 000482-85, 000553-62, 000575-84 (ROD at 43-46, 114-23, 136-45). That approach might be permissible if the agency were going to prepare a subsequent EIS fulfilling the requirements of NEPA. *See* 40 C.F.R. §§ 1502.20, 1508.28 (allowing "tiering"). The Forest Service was clear and explicit, though, that there will be no additional NEPA analysis. 833_2426 at 000692 (ROD at 253).

The subsequent non-NEPA process for implementation cannot make up for the lack of an adequate FEIS. To ensure its purposes of informed decisions and meaningful public participation are met, NEPA contains myriad requirements that will not apply to the implementation plan here. NEPA requires a detailed, site-specific analysis of the direct, indirect, and cumulative impacts of the proposed action and—importantly—of alternatives to it, including the alternative of no action. 40 C.F.R. §§ 1502.14, 1502.16, 1508.8. It requires a draft EIS that discloses "all major points of view" on these impacts. *Id.* § 1502.9(a). It requires a minimum of 45 days for members of the public, other agencies, tribes, and state and local agencies to submit comments on the draft. *Id.* § 1506.10(c). It requires the Forest Service to respond to comments in a final EIS that discusses "any responsible opposing view." *Id.* §§ 1502.9(b), 1503.4. It requires the

agency to explain the reasons for its final choice in a ROD. *Id.* § 1505.2. Forest Service regulations require the agency to issue a draft ROD and to provide an opportunity for interested parties to file objections to the decision. 36 C.F.R. §§ 218.7(b), 218.8. The reviewing officer must submit a written response to the objections before signing a final ROD. *Id.* §§ 218.11(b)(1), 218.12(a). The objection procedure is required by the Appeals Reform Act of 1992, Pub. L. 102-381, Tit. III, § 322, 106 Stat. 1419, 16 U.S.C. § 1612 note. *See generally* 78 Fed. Reg. 18,481, 18,482 (March 27, 2013).

The implementation plan for the Project provides none of these assurances. It promises a 30-day public comment period following a workshop and a draft "Out-year Plan" that is to include unit cards. 833_2426 at 000693 (ROD at 254). This process misses essential attributes of an EIS. It offers no analysis of site-specific impacts of the proposed timber sale or of any alternatives, no alternative of "no action," no analysis of competing points of view, a shorter comment period than required by NEPA, no obligation to respond to comments, no ROD, and no objection process. Even the site-specific disclosure in the so-called unit cards as described in this process will be inadequate, as the implementation plan calls for fieldwork and consultation on the units only after the short public comment period and after the agency has approved the Out-year Plan. *Id.* at 000693-95 (ROD at 254-56). The unit cards will thus be unverified and lack vital information at the time of public comment and decision. Moreover, even this

limited procedure is unenforceable, as the implementation plan "is meant to be a 'living' document and may need to be adjusted…." *Id.* at 000469 (ROD at 30).

The Ninth Circuit has held that ascertaining baseline information during implementation is inconsistent with NEPA's purposes because "an agency cannot carefully consider information about significant environmental impacts" and "the public is deprived of their opportunity to play a role in the decision-making process." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1085 (9th Cir. 2011). Indeed, proposing "to increase the risk of harm to the environment and then perform [] studies…has the process exactly backwards." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 733 (9th Cir. 2001), *abrogated on other grounds by Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010).

In short, the implementation plan is no substitute for a NEPA-compliant EIS. It fails to achieve NEPA's core purposes of ensuring informed decisions and meaningful public participation. *See, e.g.*, *WildEarth Guardians*, 790 F.3d at 921-25.

### C. The impacts of logging and road construction on Prince of Wales Island will vary greatly depending on where the activities are located.

On Prince of Wales Island, as elsewhere, site-specific information in an EIS is essential for a meaningful analysis of impacts and alternatives. In the project area and in the Tongass generally, all forest stands are not created equal. They have different attributes, different habitat values, different spatial relationships to other habitats (including previously logged stands), different proximity to communities, and different

*Southeast Alaska Conservation Council et al. v. U.S. Forest Service et al.*,                    20
Case No. 1:19-cv-00006-SLG

use by people, among many other variations.  The FEIS admits this:  "Measures of habitat area may be insufficient to predict the effects of habitat loss, because habitat loss has different effects on populations, depending on where the habitat loss occurs.  Species interactions also influence responses to habitat loss."  833_2167 at 001631 (FEIS at 173).  The attributes influencing the value of a particular forest stand for habitat and other resources—and the divergent impacts of logging those stands or building roads to them—are too numerous to catalog fully, but following are some examples.

### 1.    The landscape varies.

Few attributes are more important than forest structure.  "Forest structure is important because it reflects the complex spatial and temporal interactions between plant growth (e.g., dispersal and competition), environmental gradients (e.g., geology, soils, slope, aspect, elevation, and climate), and disturbance (e.g., wind and logging)."  833_2079 at 071372 (2016 Plan FEIS at 3-189).  Accordingly, scientists have developed a model based on tree size and density in the Tongass, grouping them in seven categories.  Those with the highest density of large trees are most productive and most important for biodiversity.  *Id.* at 071372-73 (2016 Plan FEIS at 3-189 to 3-190).

Elevation is also key.  "Lower elevation stands (at or below 800 feet) hold the highest value for many wildlife species because they remain relatively accessible during winter."  *Id.* at 071374 (2016 Plan FEIS at 3-191).

Connectivity and fragmentation of forest stands can have a major impact on some wildlife species.  *Id.* at 071381-82 (2016 Plan FEIS at 3-198 to 3-199).  "Populations may

*Southeast Alaska Conservation Council et al. v. U.S. Forest Service et al.*,                21
Case No. 1:19-cv-00006-SLG

become isolated, and therefore at greater risk of local extirpation, if fragmentation hinders movement of individuals between subpopulations. The degree to which this occurs depends on species-specific dispersal capabilities, the distance between habitat patches, and conditions within the matrix between habitat patches." *Id.* at 071382 (2016 Plan FEIS at 3-199).

Karst soils in southeast Alaska are uniquely productive for forest growth, have high values for wildlife and the region's unique cave systems, are unevenly distributed, and are especially vulnerable to logging. *Id.* at 071211-19 (2016 Plan FEIS at 3-28 to 3-36). The forest plan, therefore, requires highly site-specific analysis in timber sale project planning. *Id.* at 071217 (2016 Plan FEIS at 3-34).

Logging has a big impact on stream runoff with much local variation. "Many factors influence how timber harvest and clearing of forest for road construction may affect runoff, and most are site-specific." *Id.* at 071234 (2016 Plan FEIS at 3-51). They include hillslope gradient, topography, soil type, rainfall, and the proportion of the watershed previously logged. *Id.* at 071235 (2016 Plan FEIS at 3-52). The forest plan intended, therefore, that site-specific project planning would evaluate these and other variables. *Id.* at 071258 (2016 Plan FEIS at 3-75).

Logging and road construction may damage wetlands by "altering hydrology, changing nutrient pathways, removal of nutrients, increased sedimentation (which can diminish water quality), increased soil temperature, alteration in water yield and stream

flow patterns, change of plant species composition and growth, and reductions in available wildlife habitat." *Id.* at 071275-76 (2016 Plan FEIS at 3-92 to 3-93). Accordingly, "project-level analysis and planning would be used to avoid construction in wetlands, and would provide site-specific plans to minimize effects." *Id.* at 071275 (2016 Plan FEIS at 3-92).

Two resources that are particularly location-specific, vulnerable to logging, and unknown before surveying include rare plants, *id.* at 071338 (2016 Plan FEIS at 3-155), and cultural resources, *id.* at 071616-31 (2016 Plan FEIS at 3-433 to 3-448).

### 2. Use of the landscape—by humans and by wildlife—varies.

Subsistence use of the forest—a critical concern to the residents of Prince of Wales Island—varies greatly across the forest and is strongly affected by both logging and roads. Subsistence take varies substantially from one community to another, both by per capita harvest and by species mix. *Id.* at 071606-07 (2016 Plan FEIS at 3-423 to 3-424). "Each of the communities in Southeast Alaska has a distinct home range where concentrated use occurs, with a wide range of use typically occurring on a less concentrated scale outside the normal home range." *Id.* at 071607 (2016 Plan FEIS at 3-424). History and clan relationships also give rise to local customary rules about use areas. *Id.* at 071607 (2016 Plan FEIS at 3-424). Subsistence users naturally focus on the areas that are most accessible, with the result that road construction has greatly changed where people go, *id.*, and brought in more competition, particularly on Prince of Wales Island. *Id.* at 071602 (2016 Plan FEIS at 3-419).

*Southeast Alaska Conservation Council et al. v. U.S. Forest Service et al.*,     23
Case No. 1:19-cv-00006-SLG

Each wildlife species has its own unique habitat needs. Sitka black-tailed deer, a species particularly important for subsistence hunting and as prey for wolves, are limited primarily by the availability of low-elevation old growth needed in winter. *Id.* at 071413 (2016 Plan FEIS at 3-230). When an old-growth stand is first logged, the resulting clearcut provides non-winter forage for about 25 years, but then grows over and creates poor habitat for 150 years. *Id.* at 071416, 071445-46 (2016 Plan FEIS at 3-233, 3-262 to 3-263).

The Alexander Archipelago wolf, in turn, preys on deer and is therefore strongly affected by deer habitat conditions. *Id.* at 071421 (2016 Plan FEIS at 3-238). In addition, roads—especially at low elevation—have a strongly negative effect of wolves, because they facilitate trapping. *Id.* at 071421-22, 071459 (2016 Plan FEIS at 3-238 to 3-239, 3-276).

The Queen Charlotte goshawk forages in mature and old-growth forest stands, with high-volume old growth providing optimal nesting and foraging. *Id.* at 071441 (2016 Plan FEIS at 3-258). Logging these stands can cause portions of the landscape to become "marginal or unsuitable for goshawks." *Id.*

American marten—a furbearer valuable for trapping—favor large- and medium-size old-growth forests, particularly in the beach fringe and in riparian areas below 1500 feet in elevation. *Id.* at 071441, 071453 (2016 Plan FEIS at 3-235, 3-270). They are vulnerable to fragmentation and, because they are trapped, to roads. *Id.*

Black bears—a species important for hunting, tourism, and recreation—"will use habitats from sea level to the alpine but appear to prefer estuarine, riparian, and forested coastal habitats." *Id.* at 071417 (2016 Plan FEIS at 3-234). "[D]ense young-growth stands provide poor habitat for black bears…." *Id.* They are also vulnerable to roads because of increased contacts with humans. *Id.*; *see also id.* at 071450-51 (2016 Plan FEIS at 3-267 to 3-268).

The Prince of Wales flying squirrel is endemic to the project area. *Id.* at 071432 (2016 Plan FEIS at 3-249). These unusual squirrels require old-growth forests with low levels of fragmentation. Their limited gliding ranges require a high level of connectivity, because they can become isolated by clearcuts and young forests. *Id.*; *see also id.* at 071467 (2016 Plan FEIS at 3-284). Existing reserves in the forest plan may be too far apart to protect this subspecies. *Id.* at 071432-33 (2016 Plan FEIS at 3-249 to 3-250).

The Prince of Wales spruce grouse—another endemic subspecies—uses a wider variety of habitats, including not only old growth but muskegs, scrub, and young growth with a well-developed middle story. *Id.* at 071433 (2016 Plan FEIS at 3-250). However, they avoid recent clearcuts, which can block dispersal for a small grouse that prefers walking. *Id.* They are also a game bird and "are particularly vulnerable to hunting along road systems," where they are susceptible to overexploitation. *Id.* They are important prey for goshawks and marten, and their abundance could affect those species. *Id.*; *see also id.* at 071468 (2016 Plan FEIS at 3-285).

In short, while all of these species depend to some degree on old growth, the extent of that dependence varies, and they have different needs respecting forest structure, elevation, proximity to beaches and streams, proximity to roads, prey availability, and fragmentation of their habitat. For all these reasons and more, the specific locations proposed for new logging and road construction matter a great deal for wildlife, for hunters, and for other people who use and enjoy the forest.

### D. Lacking site-specific information, the FEIS contains no meaningful analysis of impacts and alternatives.

Without information about the location of proposed logging and roads within the vast, 1.8 million-acre project area, the FEIS is unable to provide the detailed assessment of impacts NEPA requires. For example, the FEIS acknowledges that logging in areas with extensive past logging would have greater effects on species with limited dispersal capabilities. 833_2167 at 001674 (FEIS at 216). "Proposed activities that could result in less than 50 percent remaining by [wildlife analysis area] would have greater effects if these [wildlife analysis areas] were adjacent to each other or on islands." *Id.* at 001636 (FEIS at 178). The FEIS also lists wildlife analysis areas by percent of high-volume old-growth habitat remaining and indicates that the Project could leave two of these with less than 15 percent of their pre-1954 habitat. *Id.* at 001656 (FEIS at 198, Tbl. 41). However, because the Forest Service has not decided where logging or roadbuilding will take place, it cannot analyze what the impacts from any actual timber sales or roads will be.

The lack of location-specific information also results in a meaningless comparison of alternatives. The FEIS describes four alternatives: no action (Alternative 1), the selected alternative (Alternative 2), and two additional action alternatives (Alternatives 3 and 5). *Id.* at 001445 (FEIS at iii). The alternatives differ in the restoration and recreation activities authorized and in the volume of logging allowed over the 15-year life of the Project. *Id.* However, the impact analyses for many resources contain identical text with variations only in the projected numeric measures, reflecting the Forest Service's inability to identify and analyze the impacts of different alternatives in any geographic detail. For example, for the direct and indirect effects of roads, the FEIS states as to each action alternative:

> If all 122 miles of new road were to be constructed in this alternative effects to aquatic resources are expected to range from minor to moderate. The 122 miles of new road are made up of small segments spread across the entire project area as opposed to long continuous segments within a floodplain. Where these segments do occur near fish habitat, there is a higher risk of sediment related impacts to aquatic habitat.

*Id.* at 001614, 001619, 001622 (FEIS at 156, 161, 164). The only variation is that Alternative 5 is 118 miles instead of 122. *Id.* at 001622 (FEIS at 164). *See also id.* at 001718-20 (karst), 001746-47 (scenery), 001781-84 (landslides) (FEIS at 260-62, 288-89, 323-26). For other resources, the FEIS simply lumps the analysis of the impacts of different alternatives in a single section with little or no analysis of the differences between them. *See, e.g., id.* at 001649 (legacy standards), 001653-56 (high-volume old

growth), 001662-64 (deep snow habitat), 001670-72 (large tree habitat), 001699 (rare plants), 001704-05 (cultural resources) (FEIS at 191, 195-98, 204-06, 212-14, 241, 246-47). Nowhere does the FEIS compare actual impacts of actual alternative timber sales, because the agency has not yet decided where within the vast project area to offer them. This is a conspicuous and unlawful omission for what is supposed to be "the heart" of the EIS. 40 C.F.R. § 1502.14; *see, e.g.*, *Nat. Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 813-14 (9th Cir. 2005).

For these reasons, location of the logging and roads matters. The lack of any information or analysis about where 15 years of logging will occur over a vast project area renders the FEIS inadequate. It fails to achieve NEPA's core purposes of ensuring informed decisions and meaningful public participation. *See, e.g.*, *WildEarth Guardians*, 790 F.3d at 922-25.

## IV. The failure to include site-specific information violates section 810 of ANILCA.

The lack of site-specific information in the FEIS violates not only NEPA, but also section 810 of ANILCA. Congress enacted this law to "cause the least adverse impact possible on rural residents who depend upon subsistence uses of" federal public lands in Alaska. 16 U.S.C. § 3112(a); *see Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 725 (9th Cir. 1995). Section 810 contains procedural requirements parallel to NEPA's: It requires federal land agencies to evaluate the effects of, and alternatives to, any disposition of federal public land on subsistence uses and

*Southeast Alaska Conservation Council et al. v. U.S. Forest Service et al.*,          28
Case No. 1:19-cv-00006-SLG

needs. 16 U.S.C. § 3120(a). ANILCA, though, imposes additional requirements beyond the NEPA-like disclosures and analysis. Where the disposition of the land may significantly restrict subsistence uses, the agency must conduct hearings in the project vicinity and make certain findings justifying the restriction. *Id.* § 3120(a)(2)-(3). When an EIS is required, the agency is required to include the hearing and the findings in the EIS. *Id.* § 3120(b).

In Alaska, significant actions on federal public lands typically have impacts both on subsistence uses and on the environment, and agencies address both in the same EIS. *See id.* Because of the parallel procedural requirements in both statutes, the courts have found NEPA's requirements—including those for site-specificity—to apply to the section 810 subsistence evaluations. *See*, *e.g.*, *City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1310-13 (9th Cir. 1990) (evaluating adequacy of alternatives and cumulative impacts under NEPA and ANILCA together); *Alaska Wilderness*, 67 F.3d at 731 (holding failure to consider alternatives violated both NEPA and ANILCA); *City of Tenakee Springs v. Clough*, 750 F.Supp. 1406, 1422-23 (D. Alaska 1990) (applying NEPA case law to ANILCA analysis for site-specificity), *rev'd on other grounds*, 915 F.2d 1308 (9th Cir. 1990).

An analysis of impacts on subsistence uses under section 810 should be at least as site-specific as that for the environmental impacts under NEPA. Subsistence is an inherently location-specific activity rooted not only in access to resources, but in human

geography, history, and clan relationships. *See supra* p. 23. Attempting to evaluate the impacts of logging on a community's subsistence uses without knowing where the logging will occur is an empty exercise.

Section 810's hearing requirements—an obligation not in NEPA—reinforce this conclusion. Where impacts are significant, the agency is required to hold "a hearing in the vicinity of the area involved," 16 U.S.C. § 3120(a)(2), reflecting Congressional recognition of the local nature of subsistence practices. The project area contains 12 communities spread over 2.3 million acres, 1.8 million of which are in the national forest. 833_2167 at 0014560-62 (FEIS at 2-4). The Forest Service conducted subsistence hearings in six of these communities. 833_2426 at 000461 (ROD at 22). Without knowing where the logging would occur, though, it was not possible to convey meaningful information about how the Project would affect them.

Similarly, site-specific information is needed to make meaningful findings, as required in section 801(a)(3). 16 U.S.C. § 3120(a)(3). Under that section, the agency may authorize the action only after determining that:

> (A) such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of the public lands,
>
> (B) the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other disposition, and
>
> (C) reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from such actions.

*Id.* Here, the Forest Service made these findings before deciding the specific location or extent of logging or road construction over the next 15 years. 833_2426 at 000461-62 (ROD at 22-23). In essence, this was a finding that, no matter what future choices the agency makes, they will be necessary, use the minimal amount of public lands, and include reasonable steps to minimize impacts. Such a broad, generic finding, without the benefit of any location-specific information, mocks the statute.

For these reasons, the absence of site-specific information in the FEIS violates section 810 of ANILCA.

## V. The Forest Service violated its forest plan, and hence NFMA, by failing to provide unit cards with the EIS.

NFMA requires the Forest Service to prepare land and resource management plans for each national forest. 16 U.S.C. § 1604(a), (e)-(f). Thereafter, projects must be consistent with the plan. *Id.* § 1604(i). The courts will strike down a timber sale project decision that fails to comply with a forest plan. *See*, *e.g.*, *Friends of Southeast's Future*, 153 F.3d at 1067-69 (holding unlawful a timber sale approved without following the procedures of the forest plan).

The Forest Service violated the forest plan requirement to include unit cards with the draft or final EISs for the Prince of Wales Project. The forest plan states: "Timber harvest unit cards will document resource concerns and protection measures. The unit cards, including a map with relevant resource features, will be provided electronically when Draft or Final NEPA documents and decisions are published. (Consult Tongass

National Forest Supplement 1909.15-2015-1.)." 833_0404 at 063256 (*Id.* at 4-68

(TIM3.I.C)). A unit card typically includes a map of the cutting unit and narrative

information about it including volume strata, stand conditions, silvicultural prescriptions,

logging methods, roads, and concerns about fish, wildlife, vegetation, scenery, karst,

wetlands, and heritage resources. *See*, *e.g.*, 833_2084 at 061276, 061279-85 (sample unit

cards from Kuiu timber sale).

Unit cards help attain compliance with the requirements of NEPA and ANILCA to

provide site-specific information and analysis in an EIS. The unit card requirement first

appeared in the 1997 forest plan revision, following a series of court decisions addressing

the adequacy of site-specific analysis, or lack thereof, in Tongass timber sale EISs. *See*

*supra* pp. 4-6; 833_ 2076 at 068765-66 (1997 Plan at 4-98 to 4-99 (TIM114.XII.A)).

Here, the Forest Service failed to provide unit cards with the draft or final EISs.

The agency advances two justifications, neither of which withstands scrutiny.

First, in response to comments on the DEIS, the Forest Service asserted that its

post-NEPA implementation process would comply with the "intent" of this requirement.

833_2171 at 002149 (FEIS at Appendix D, D-7). It is axiomatic, though, that "agencies

must comply with their own regulations," *Confederated Tribes & Bands of Yakima*

*Indian Nation v. F.E.R.C.*, 746 F.2d 466, 474 (9th Cir. 1984), not with some unstated

intent. There is no ambiguity in the language of the unit card requirement. In this

situation, "there is no plausible reason for deference…Deference in that circumstance

would 'permit the agency, under the guise of interpreting a regulation to create *de facto* a new regulation.'" *Kisor v. Wilkie*, 588 U.S. ___, 139 S. Ct. 2400, 2415 (2019); *see also Siskiyou Reg'l Edu. Project v. U.S. Forest Serv.*, 565 F.3d 545, 555 (9th Cir. 2009) (stating that there is no call for deference to the agency's legal interpretation where neither the scope nor the effect of the regulation in question is ambiguous.).

Moreover, the record contains no evidence to support the agency's bald assertion regarding the intent of the standard. The record shows that the unit card requirement formalized a planning approach the Forest Service adopted following court losses for failure to comply with NEPA's requirements for site-specific information and analysis in the EIS. Developing the unit cards in a post-EIS implementation process is no substitute, for all the reasons discussed above. *See supra* pp. 18-20.

Second, in response to objections to the draft ROD, the Forest Service attempted another justification. The agency stated that a guidance document cited in the unit card requirement (Tongass National Forest Supplement 1909.15-2015-1) had been rescinded by the Forest Service Chief, rendering the timing provision inapplicable. 833_2440 at 0000204.

This argument fails first because the Chief's rescission of the guidance document did not rescind the requirement to include unit cards in EISs. The document merely provided guidance on how to format and issue unit cards. 833_2526 at 074727-32. The requirement to actually provide them with NEPA documents is separate and stands on its

own in the plan. *See* 833_0404 at 063256 (2016 Plan at 4-68 (TIM3.I.C)). The plan cites the guidance document only in a parenthetical directing the Forest Service to "consult" the document in implementing the standard. *Id.*

If, contrary to any indication in the record, the Chief intended rescission of the guidance to repeal the plan's requirement to include unit cards with EISs, that intent was ineffective. The agency has not undergone a lawful process of amending or revising the plan. NFMA and associated regulations require public notice and opportunity for public participation to amend or revise forest plans. 16 U.S.C. § 1604(f)(4); 36 C.F.R. § 219.13(b)(2); *see Lands Council v. Martin*, 529 F.3d 1219, 1227 (9th Cir. 2008) ("'Significant' amendments require a lengthy and detailed amendment process; otherwise a simpler notice and comment process suffices."). Here, the Forest Service undertook no public process—simple or otherwise—to amend the unit card requirement. Thus, it remains fully in effect.

The failure to follow the forest plan's unit card requirement prevented the public from having the opportunity to review the cards and provide input before the Project decision. It also prevented any meaningful analysis of site-specific impacts or alternatives, as NEPA and ANILCA require.

## RELIEF

## I. The Court should vacate the portions of the ROD authorizing vegetation management and road construction.

Plaintiffs request that the Court issue a judgment: declaring that the FEIS violates NEPA, section 810 of ANILCA, and NFMA; vacating those portions of the ROD authorizing vegetation management and new road construction, *see* 833_2426 at 000441-44 (ROD at 2-5); and vacating any contracts that may have been entered before judgment to implement those parts of the ROD. Plaintiffs do not request vacatur of those portions of the ROD authorizing watershed improvement, restoration, or sustainable recreation management, *id.* at 000443-44 (ROD at 4-5), because in the absence of timber sales and roads those activities generally do not have significant impacts on the environment and therefore do not generally require an EIS.

Vacatur is the normal remedy for unlawful agency actions. The Administrative Procedure Act provides that the reviewing court "shall…set aside" agency action that is arbitrary or not in accordance with law. 5 U.S.C. § 706(2)(A). The court will "order remand without vacatur only in 'limited circumstances'" and "'leave an invalid rule in place only 'when equity demands.'" *Pollinator Stewardship Council v. U.S. Envtl. Prot. Agency*, 806 F.3d 520, 532 (9th Cir. 2015) (quoting *Cal. Cmties. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) and *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir.1995)); *see also Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010) (stating remand without vacatur is granted only "in rare

*Southeast Alaska Conservation Council et al. v. U.S. Forest Service et al.,*      35
Case No. 1:19-cv-00006-SLG

circumstances"). The Ninth Circuit has found these rare circumstances only where vacatur would thwart the objective of the statute at issue or trigger disastrous large-scale consequences. *See, e.g.*, *Cal. Cmties Against Toxics*, 688 F.3d at 993-94 (denying vacatur where remedy would trigger economically disastrous blackouts across California's south coast basin); *W. Oil & Gas Ass'n v. U.S. Envtl. Prot. Agency*, 633 F.2d 803, 813 (9th Cir. 1980) (denying vacatur where the remedy would frustrate the aims of the Clean Air Act, under which plaintiffs sued).

No such circumstances exist here. Leaving the ROD in place, however, would have highly adverse impacts, because it authorizes a vast amount of logging and roads in habitat vital to both wildlife and human communities.

## II. In the alternative, the Court should issue a permanent injunction against the vegetation management activities and road construction in the ROD.

If this Court declines to vacate the agency actions requested, Plaintiffs alternatively request a permanent injunction against any of the vegetation management activities and road construction authorized in the ROD, pending compliance with NEPA, section 810 of ANILCA, and the forest plan. Plaintiffs seeking a permanent injunction must show that: 1) they are likely to suffer irreparable injury in the absence of an injunction; 2) remedies available at law are inadequate to compensate for that injury; 3) a remedy in equity is warranted considering the balance of hardships between the plaintiffs and defendants; and 4) the public interest would not be harmed by a permanent injunction. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010); *Nat'l*

*Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 817 (9th Cir. 2018). Plaintiffs satisfy all four factors.

### A.      Plaintiffs will suffer irreparable injury if the Project proceeds.

Courts consistently characterize the harms to plaintiffs' interests from proposed logging operations as irreparable. *See Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1299 (9th Cir. 2003) (citing cases); *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) ("[Preventing] the use and enjoyment…of 1,652 acres of the forest…is hardly a de minimus injury."); *Conservation Cong. v. U.S. Forest Serv.*, 803 F. Supp. 2d 1126, 1132 (E.D. Cal. 2011) (irreparable harm likely because of "loss of over 500 acres of habitat" from proposed logging project). Old-growth habitat cannot be replaced in our lifetime. *Neighbors of Cuddy Mountain v. U.S. Forest Serv.,* 137 F.3d 1372, 1382 (9th Cir. 1998). Indeed, the FEIS describes the logging of old growth as an "irretrievable commitment," because old-growth characteristics would not return "for 150 years or more." 833_2167 at 001519 (FEIS at 3-61).

The ROD authorizes logging of up to 42,665 acres (mostly old growth) and construction of 164 miles of new roads. 833_2426 at 000440 (ROD at 1) (selecting Alternative 2); 833_2167 at 001600, 001634 (FEIS at 3-142, 176). Plaintiffs and their members use the project area—particularly the areas containing old-growth forest—for subsistence and commercial fishing and gathering, recreation, research, wildlife viewing, and spiritual and aesthetic enjoyment. They rely on the integrity of the old-growth

ecosystem to support these uses and would be harmed if the timber sales or road construction authorized were to take place. *See supra* pp. 8-13.

## B. The remedies at law are inadequate.

Plaintiffs have no adequate remedy at law. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987). More specifically, with regard to old-growth logging, "[t]he logging of mature trees…cannot be remedied easily if at all. Neither the planting of new seedlings nor the paying of money damages can normally remedy such damage." *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014).

## C. The balance of hardships supports an injunction.

The Ninth Circuit has held that "when environmental injury is 'sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment.'" *Idaho Sporting Cong. v. Alexander*, 222 F.3d 562, 569 (9th Cir. 2000) (quoting *Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190, 1195 (9th Cir. 1988) (quoting *Amoco Prod. Co.*, 480 U.S. at 545)). That is true here.

The Project would harm Plaintiffs' members and last longer than their lifetimes. *See supra* pp. 12-13. With neither vacatur nor an injunction, Plaintiffs would have no effective remedy. There is no countervailing harm to Defendants so significant that it

would warrant depriving Plaintiffs of effective relief for serious, fundamental violations of applicable law.

### D. An injunction would serve the public interest.

"The public interest in preserving nature and avoiding irreparable environmental injury outweighs economic concerns…." *All. for the Wild Rockies*, 632 F.3d at 1138. The Ninth Circuit has also "recognized the public interest in careful consideration of environmental impacts before major federal projects go forward, and…[has] held that suspending such projects until that consideration occurs 'comports with the public interest.'" *Id*. (quoting *S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 728 (9th Cir. 2009)). This interest is especially heightened when applied to a forest that will take hundreds of years to regain its old-growth characteristics. *Seattle Audubon Soc'y v. Evans*, 771 F. Supp. 1081, 1096 (W.D. Wash. 1991), *aff'd in part and rev'd in part on other grounds*, 952 F.2d 297 (9th Cir. 1991). The public also has an overarching interest in its government abiding by the laws and regulations governing it. *See, e.g. East Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219 (9th Cir. 2018); *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1167 (9th Cir. 2011).

## CONCLUSION

For these reasons, Plaintiffs request that the Court enter judgment in their favor and grant the requested relief.

Respectfully submitted this 12th day of July, 2019.

s/ Thomas S. Waldo
Thomas S. Waldo (AK Bar No. 9007047)
Olivia Glasscock (AK Bar No. 1809072)
EARTHJUSTICE

*Attorneys for Southeast Alaska Conservation Council; Alaska Rainforest Defenders; Center for Biological Diversity; Sierra Club; Defenders of Wildlife; Alaska Wilderness League; National Audubon Society; and Natural Resources Defense Council.*

*Southeast Alaska Conservation Council et al. v. U.S. Forest Service et al.,* 40
Case No. 1:19-cv-00006-SLG

## CERTIFICATE OF COMPLIANCE WITH WORD LIMIT

I certify that this brief contains 9,998 words, excluding items exempted by Local

Civil Rule 7.4(a)(4), and complies with the word limit of Local Civil Rule 7.4(a)(1).

Respectfully submitted this 12th day of July, 2019.

*s/ Thomas S. Waldo*
Thomas S. Waldo

# TABLE OF EXHIBITS

| Exhibit No. | Description |
| --- | --- |
| 1 | Declaration of David Beebe |
| 2 | Declaration of Robert Claus |
| 3 | Declaration of Susan Culliney |
| 4 | Declaration of Natalie Dawson |
| 5 | Declaration of Liz Dodd |
| 6 | Declaration of Larry Edwards |
| 7 | Declaration of Don Hernandez |
| 8 | Declaration of Adam Kolton |
| 9 | Declaration of Robert E. Lindekugel |
| 10 | Declaration of Peter Nelson |
| 11 | Declaration of Dan Ritzman |
| 12 | Declaration of Elsa Sebastian |
| 13 | Declaration of Robin D. Silver, M.D. |
| 14 | Declaration of Gina Trujillo |

*Southeast Alaska Conservation Council et al. v. U.S. Forest Service et al.*,       i
Case No. 1:19-cv-00006-SLG