IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SOUTHEAST ALASKA CONSERVATION COUNCIL; ALASKA RAINFOREST DEFENDERS; CENTER FOR BIOLOGICAL DIVERSITY; SIERRA CLUB; DEFENDERS OF WILDLIFE; ALASKA WILDERNESS LEAGUE; NATIONAL AUDUBON SOCIETY; and NATURAL RESOURCES DEFENSE COUNCIL,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES FOREST SERVICE; UNITED STATES DEPARTMENT OF AGRICULTURE; DAVID SCHMID, in his official capacity as United States Forest Service Region 10 Regional Forester; and EARL STEWART, in his official capacity as Forest Supervisor for the Tongass National Forest,<br><br>*Defendants*. | Case No. 1:19-cv-00006-SLG |

**DECLARATION OF DAVID BEEBE**

I, David Beebe, hereby declare as follows:

1.  I am a current member of Alaska Rainforest Defenders (ARD), formerly the Greater Southeast Alaska Conservation Community (GSACC), and Center for Biological Diversity (the Center). I have been a member of ARD since I co-founded GSACC in 2011. I have been a member of the Center on and off for many years. I rely on ARD and the Center for their uncompromising defense of wildlife and ecosystem integrity in the Tongass National Forest (Tongass) and elsewhere. Their defense of intact, thriving marine and terrestrial ecosystems are very important to me, as they are central to my livelihood and well being, as well as the entire planet.

2.  I live in Petersburg, Alaska, located on Mitkof Island. I have lived in or near Petersburg since 1984. Prior to moving to Petersburg, in 1983, I spent a summer Dungeness crab fishing out of Wrangell and vicinity in Southeast Alaska.

3.  Throughout my time in Southeast Alaska, I have been a self-employed fisherman. I currently own and operate the F/V Jerry O. Among my principal means of support is fishing a 300-pot limited entry permit for Dungeness crab. In addition to crab fishing, I also own commercial halibut longlining Individual Fisherman Quota Shares. I have commercially fished for crab and halibut, dove for sea cucumber and abalone, and harvested macrocystis kelp and herring roe in the waters of and

*Southeast Alaska Conservation Council et al. v. U.S. Forest Service et al.,*     1
Case No. 1:19-cv-00006-SLG

adjacent to Prince of Wales Island since the mid-1980s during the spring, summer, and fall seasons.

4.  As a rural resident, I also subsistence hunt, fish, and gather. Subsistence foods are an important part of my diet, my way of life, and my spiritual grounding. Depending on the season, from early spring through late summer and fall, I hunt for Sitka black-tailed deer and grouse, and fish for salmon, crab, shrimp, and halibut, and gather berries, fungi, Devil's club, and other intertidal and terrestrial plants.

5.  Long-standing, and persistent land management failures by the Petersburg Ranger District have resulted in prioritizing industrial clearcutting and roadbuilding over ecosystem integrity. This history of "getting the cut out" has decimated habitat central to maintaining sufficient hunt-able populations of Sitka black-tailed deer on Mitkof Island. Mitkof Island was once widely recognized for its abundant, trophy deer population, and an ADFG region-wide deer use survey in 1961 documented Petersburg hunters having the highest level of success and dependence upon subsistence harvest of Sitka black-tail deer. Following the decimation of the island deer winter habitat, and two successive winters of deep snow events, the deer population crashed on Mitkof Island. ADFG then closed the island to deer hunting for 17 years, and ever since, has had the most severe restrictions on bag limit (1 buck) and shortened hunting season (2 weeks) in all of Southeast Alaska.

These restrictions now extend by emergency order since 2013 to nearby Lindenberg Peninsula. Consequently, I am forced to depend on seeking alternative areas for my small boat-based subsistence hunting activities. Having been forced to hunt elsewhere during seasonally inclement weather, reducing my exposure to heavy weather is an important priority. Finding opportunities for safe anchorages also constitutes an extremely important consideration for me. The extraordinary, extended, maze of weather-protected passages in the Prince of Wales Landscape Level Analysis Project (the Prince of Wales Project) area represents a lifesaver beyond measure for a small boat-dependent mariner's remote itinerant subsistence activities. The only alternative to these protected waterways is traversing an open-ocean route with many hours of exposure to heavy weather, adverse tidal currents, rock-strewn headlands, and ocean swells that build over hundreds and thousands of miles from the North Pacific and the Gulf of Alaska. Consequently, the protected waterways of Shakan Strait, El Capitan Passage, Tonowek Narrows, Snow Pass, Red Bay, Tuxekan Passage, inner (east) Sea Otter Sound, and their adjacent and connected waterways, have been vitally important areas for my early-spring and late summer through fall subsistence activities. These include hunting for deer and grouse, and fishing for salmon, crab, shrimp, halibut, as well as the gathering of berries, fungi, Devil's club and other terrestrial and intertidal plants. Due to

winter freezing events, these several narrow and shallow water stretches are rendered impassable and unsafe to anchor because of thick ice formation. The difficulties that impede safe travel to the above-mentioned areas in winter intensifies the time restrictions and seasonality of all other activities, including logging.

6.   From early spring through summer and into fall, I use the Prince of Wales Project area for the purposes of camping; hiking; kayaking; avian, marine, and terrestrial wildlife viewing; spelunking; and sharing educational trips in natural and cultural history with family, friends, and visitors. The Prince of Wales Project area has afforded many exceptional and memorable encounters with inhabitant megafauna including bear, otter, wolf, deer, and avian species. I have routinely accessed the waterways identified in the Prince of Wales Project maps as well the shoreline beach fringe and inland streams, lakes, trail systems, portages, and forests. The area's unique plant and animal composition, abundance, and diversity specific to karst geology and its prior history as an ice age refugia is regarded as world class and unique even to the other areas of the Tongass National Forest as a whole. The Prince of Wales Project area once provided the largest expanse of big tree old growth forest habitats of the Tongass. These features were crucial to the once abundant and reliably-productive fish and wildlife populations dependent upon high biological-value, terrestrial and riparian old growth habitats.

*Southeast Alaska Conservation Council et al. v. U.S. Forest Service et al.*,    4
Case No. 1:19-cv-00006-SLG

7.      When visiting Prince of Wales Island, I often combine photography, audio record-

ing and videography with my several existing categories of pursuit—those being,

commercial fishing, subsistence activities, and recreational activities. My photog-

raphy focuses on the pristine wild landscapes and resident wildlife which people

seek from all over the world to personally experience. What I look for are wildlife

subjects in their natural habitats. These include —avian: Queen Charlotte

goshawk, bald eagle, peregrine falcon, merlin, sharp-shined hawk, osprey; great

horned, barred, grey, and boreal owls; marbled murrelet, warblers, flycatchers,

sandpipers, oystercatchers;  marine: humpback, orca, gray, minke, and sperm,

whales; harbor, Dall's, and pacific white-sided porpoises; harbor, and elephant

seals, Steller sea lions, and river and sea otters; littoral: Echinodermata, mollusks,

crustaceans; riparian: all 5 species of salmon, steelhead, dolly varden, cutthroat

trout;  and terrestrial species: black and brown bears, marten, mink, deer, wolves,

river otter within and/or adjacent to "unmanaged," or intact old-growth, landscape

settings. I seek natural visual and audio soundscapes and viewscapes with wildlife

and untouched forest settings because they are regarded as quite rare, yet extreme-

ly interesting and enjoyable by much of the human population in general. They as

well create the opportunity for visitors to be able to share with family and friends

their newfound knowledge and personal experiences with intact old-growth

*Southeast Alaska Conservation Council et al. v. U.S. Forest Service et al.,*      5
Case No. 1:19-cv-00006-SLG

**Exhibit 1, page 6 of 21**

forests. I record the resident and avian migratory populations in their seasonal environments to demonstrate the species' relationships to the places which sustain their old growth-dependent communities. I select for these circumstances and subjects because that is what the public and art critics alike, expect and prefer to see in my work, and that is what I prefer to depict. These opportunities are becoming increasingly difficult to find as the habitat of highest biological value is disproportionally targeted for industrial exploitation. This is especially a predicament for me when I photograph natural subjects (from hummingbirds to whales) amidst "intensively managed" landscapes. Such visual elements of clearcuts and logging roads severely detract from the image I am trying to create, and distract the viewer from the main subjects and intentions of my imagery.

8. I live and work in Southeast Alaska because of the relatively intact marine and terrestrial ecosystems extant here. They are fundamental to my personal livelihood and revenue streams, being essential to sustainable local economies; and they are fundamental to a high quality of life for myself and all present and future residents. I enjoy the beauty and bounty of the mountains, forests, and waterbodies, and I appreciate living near wild and unspoiled places. The fishing, subsistence hunting and gathering, and other activities I pursue here cause me to feel directly connected to the natural world both physically and spiritually. Because of this

connection, I am especially sensitive to industrial scale logging and other forms of so called development that disrupt, undermine, and destroy the structure, function, and composition of intact old growth dependent ecosystems.

9.  I am concerned about the potential impacts on crabs from the logging and road building authorized under the Prince of Wales Project. I have read many peer-reviewed research papers studying the long term effects of large-scale organic deposition of bark and woody debris associated with log storage and log transfer facilities on the degradation of benthic habitats critical to the survival of crab and their prey species. Degradation of bottom sediments in shallow bays and estuaries occurs due to depositions of bark and woody debris. The debris overwhelms the waterbodies' natural capacities to maintain sufficient oxygen levels within and proximate to mud substrates (the preferred habitats for *Cancer magister*, the Dungeness crab.) My understanding is that the resulting depletion of dissolved oxygen levels leads to anoxic conditions resulting in highly acidic, sticky mud that reeks of 'rotten egg' and sewage odors. The acidified mud is known to significantly reduce crab larvae survival on female abdominal egg clutches. Egg clusters of female crab remain attached to female crab abdomens for weeks before hatching. The eggs are thus exposed to prolonged, direct contact with the acidic mud and sand substrates, which can be lethal. Additionally, crab dactyls (toes, and leg seg-

ments) exposed to acidic substrates are often found discolored, or entirely missing, necrotic, and chemically dissolved. Given such impediments and weakened states of health, these crab are reduced to a persistent state of being referred to as "skip molts" in which no growth occurs, and epibionts cover their carapace. This reduced state of vitality and health limits the skip molts' abilities for locomotion and feeding. This compromised habitat also fails to support abundance and diversity of Dungeness crab prey species. I have seen a high incidence of diseased crab while fishing over the course of several years in the southwestern terminus of Port Camden, El Capitan Passage, and other bays of the Prince of Wales Project area. These areas have been heavily impacted by runoff from roads and clearcuts. These areas are often shallow with insufficient tidal exchange necessary to prevent "dead bottom habitat" from occurring.

10. I have personally documented formerly commercially productive crab habitat suffering degradation and crab depletion in the aftermath of industrial log storage and log transfer facilities; and I have caught, photographed, and released countless diseased crab in the waters of log storage areas and log transfer facilities. I am worried that the Prince of Wales Project will further harm and degrade crab habitat, crab prey species and resident crab populations.

*Southeast Alaska Conservation Council et al. v. U.S. Forest Service et al.*,      8
Case No. 1:19-cv-00006-SLG

**Exhibit 1, page 9 of 21**

11.    Roads from past logging operations have routinely suffered deferred maintenance, further exacerbating the effects of road-building, including runoff pollution and siltation of anadromous gravel spawning beds, through landslides, debris torrents, and blockage of fish passages, and thus resulting in the general degradation of marine, estuarine, and riparian habitats for crab, salmon, and other species I rely upon for commercial and subsistence harvest.  I am concerned that when watersheds in the Prince of Wales Project are logged, the sudden, as well as persistent, runoff of organic matter reaching culverts by running over clearcut hillsides and roadbeds will reach fresh and saltwater environments and will further degrade crab habitat and compromise the area's crab population.  If the estuarine habitats on Prince of Wales Island were to be further affected by logging operations and road-building activities, my economic dependence on Dungeness crab and other marine species as a primary livelihood would be harmed.

12.    Over the past three decades, I have lost scores of crab pots due to log raft towing operations. When crabbing in the bays and waterways of Prince of Wales Island and elsewhere in Southeast, I have experienced thefts of both crab and the crab pots themselves.  These thefts, based on my personal experiences, occur with greater frequency in proximity to both temporary floating and shore based log

camps. I am concerned that I will continue to lose crab pots and crabs due to logging operations authorized under the Prince of Wales Project.

13. I am worried that the Prince of Wale Project will threaten my subsistence interests in Sitka black-tailed deer and other wildlife species. I believe that the decades of logging operations on Prince of Wales Island has resulted in the depletion and degradation of terrestrial habitat with high biological productivity essential to maintaining old growth dependent species and forest communities, and these effects are both cumulative and compounding over time. I believe that the timber industry practice of thinning, originally intended to increase volume per acre, has been misleadingly rebranded to the public in the Prince of Wales Project as "stewardship" to "improve wildlife habitat." I also believe that recent testimony from business-aligned groups have seized upon this public deception to argue for more old growth logging. From what I understand, improvements in understory browse are minimal, seasonal and temporary. The resulting slash from thinning impedes passage of both subsistence species such as deer and hunters. These "habitat improvements" persist as physical impediments for 10-15 years. My understanding is that commercial thinning must then be repeated every 15-25 years as stem exclusion inexorably ensues, and thus the 'wildlife improvement benefits" provide little meaningful benefit to old growth forest communities and their old growth-depen-

*Southeast Alaska Conservation Council et al. v. U.S. Forest Service et al.,*     10
Case No. 1:19-cv-00006-SLG

dent wildlife species. My understanding is that road building activities exclude the benefits of canopy interception and functionally fragment high value winter habitat during winter snow conditions. These conditions render deer more vulnerable to predation, and force higher caloric outputs undermining deer capacity for winter survival. In other times of the year, Prince of Wales Island's already extensive road systems create "predator trap" conditions by facilitating easy travel for both deer and predators often adjacent to high value habitat. As a result of logging operations and road-building activities, subsistence harvesters like myself are increasingly forced to compete with each other for the diminishing deer resources on Prince of Wales Island. This competition includes nonresident sport and residential personal uses for increasingly smaller populations of fish and wildlife. I believe that industrial-scale logging degrades old growth forest composition, structure, and function crucial to maintaining sustainably hunt-able and harvestable subsistence resources. I am concerned that the logging and road building authorized under the Prince of Wales Project will contribute to the further reduction in the abundance and diversity of deer and other wildlife and fish populations, threatening my subsistence interests.

14. Logging authorized under Prince of Wales Island Project also threatens my subsistence interest in salmon. I am worried that elevated organic nutrient levels, in-

*Southeast Alaska Conservation Council et al. v. U.S. Forest Service et al.,*  11
Case No. 1:19-cv-00006-SLG

**Exhibit 1, page 12 of 21**

creasing stream temperatures, and sediment loading from runoff in logging units may adversely affect our salmon, including salmon I depend on for food. This is particularly worrisome to me at a time when our salmon runs are already experiencing major sudden declines in the commercially-important wild king salmon and pink salmon populations due to hatchery production, anthropogenic climate change, ocean warming, toxic algal blooms, and ocean acidification.

15. I have enjoyed, and hope to continue to enjoy, the unique maze of geographically-complex, biologically rich, and weather-protected inland waterways, islands and islets adjacent to Port Protection, Red Bay, near Whale Pass, and Naukati, areas of old growth forest the Forest Service intends to offer for logging and road-building in 2019 and beyond. I am concerned that the Prince of Wales Project is being planned by the Forest Service, despite decades of "intensive management activities" on Prince of Wales Island, without a thorough understanding of the possible effects of additional even age management clearcutting, and selective high-grading of old-growth spruce and cedar furthering habitat fragmentation and degradation at a watershed and landscape-level scale.

16. I grew up in a Navy family and enlisted during the Vietnam war era and have seen a lot of North America and Europe as a result. I have an intimate awareness of how development leads to devolved or completely degraded and permanently al-

*Southeast Alaska Conservation Council et al. v. U.S. Forest Service et al.,*　12
Case No. 1:19-cv-00006-SLG

tered landscapes. To me the landscapes of the roadless areas of the Tongass show all the signs of a relatively biologically intact area with thriving, diverse populations still evolving and following their natural courses. Southeast Alaska consists of one of the more spiritually inspiring landscapes on the planet. Roadbuilding and clearcutting destroys the structure, function and composition of old growth forest communities. It is always disappointing to see a landscape denuded—especially, knowing that the area was once heavily forested and knowing that according to a consensus of temperate rainforest biologists and ecologists, it will take up to three centuries to return to the same productive state of old growth conditions, a state capable of supporting old-growth dependent species. I believe that Prince of Wales Island, which has seen extensive logging in the past, needs healing, not more logging.

17. I know by personal experience, active industrial logging activities have high sensory and psychic impacts, and are impossible to ignore while recreating. Logging and roadbuilding activities significantly undermine my (and countless others') access and availability to the increasingly rarified esthetic, biological, physical, and psycho-spiritual qualities of Prince of Wales Island's coastal temperate rainforest settings that feature intact old-growth stands. I have read peer-reviewed studies that demonstrate the importance of access to, and time spent within, unaltered wild

places as a component to maintaining mental and physical health. Conversely, I am aware of historical evidence of so-called "timber-dependent" rural communities that demonstrates elevated crime rates associated with devastated clear-cut landscapes. There is a myriad of documentation of social dysfunction within these rural communities. The data include elevated rates of suicide, drug abuse, domestic violence, thievery, poaching and petty crimes and other economic, and socio-cultural consequences. I am worried that the Prince of Wales Project will only contribute to these increased negative social, environmental and economic consequences.

18. I am concerned that logging operations authorized by the Prince of Wales Project will result in stand conversion, destroying forest stand composition, and additional roading. I am worried these activities will imperil the already fractionated wildlife, bird, and fish populations that depend upon what remains of the high-quality biological habitat. These remnants of habitat, nonetheless, still possess highly unique recreational, biological, natural historical, anthropological and myriad educational values and opportunities for me, my family and friends, the public, and other rural residents. These uses support our rural dependencies on subsistence resources while simultaneously providing revenues generated from such non-destructive activities as sustainable inputs to our regional economy.

19. I believe that the temporary wage-generating, yet heavily subsidy-dependent logging activities, such as those that will be authorized under the Prince of Wales Project, are unsustainable and brief (the activities are relatively short-lived in duration, typically less than a decade), but result in centuries-long impacts. I believe that industrial-scale logging activities are incompatible with the purposes and objectives of the temperate rainforest-specific recreation that I and others enjoy. In many historical examples of extractivism on the Tongass, the industry logging impacts constitute functionally-permanent degradation and depletion of finite old growth forest on a landscape level of magnitude. I believe that unlike logging, the non-destructive recreational uses of old-growth forests on Prince of Wales Island provide sustainable revenues to our regional economy while simultaneously supporting our rural dependencies on subsistence resources.

20. The positive recreational qualities of intact old growth ecosystems, such as can be found on Prince of Wales Island, are sought by international and national clients of ecotourism. This includes the burgeoning sport fish chartering, self-guided, and guided ecotourism sectors, as well as the other old growth dependent uses vital to the economic health of Southeast Alaska. My understanding is that the recreation sector contributions alone, easily eclipse any properly accounted income of the deficit-laden, subsidy-dependent timber industry to the regional economy for the

*Southeast Alaska Conservation Council et al. v. U.S. Forest Service et al.,*     15
Case No. 1:19-cv-00006-SLG

**Exhibit 1, page 16 of 21**

last several decades. I am concerned that logging will discourage people from visiting Prince of Wales Island, and harm the regional economy.

21. As climate change alters established weather regimes normally found in coastal temperate rainforests, record warm temperatures and drought conditions have become more frequent. I worry about the effects of climate change on our fish and wildlife populations. These elevated stream temperatures coincide and get magnified by low water conditions which often occur during crucial salmon spawning time periods (between middle and late summer) which have resulted in annually recurring, massive fish kills. I believe that buffer strips on Class 1 and 2 streams, required by the Tongass Timber Reform Act, have proven to be insufficient protections in the face of climate change. My understanding is that unbuffered Class 3 and 4 streams, which feed into the Class 1 and 2 streams, contribute significant quantities of warm water and are responsible for elevating anadromous stream temperatures. More logging and road building in the Prince of Wales Project area will further add to the myriad stressors many of these fish and wildlife populations are already experiencing. I also expect that further logging of Tongass old-growth, which has an unusually high capacity to sequester carbon, will further contribute to climate change driving extreme weather events. In terms of temporal scale, I understand that once old-growth forests are removed, their carbon sink capacities

will not be replaced by the trees that grow back in a meaningful timeframe sufficient to avert further and more extreme climate disruptions and will fail to prevent the triggering of positive feedbacks resulting from anthropogenic climate disruptions. Given these considerations, it is my view that we should preserve all remaining Tongass old-growth trees as carbon sinks and stored carbon.

22.     The intact, old growth landscape of the Tongass is, for me, an essential element of why I live here and central to my relationship to community, friends, and family. Old growth forests are also central to what many visitors to Southeast Alaska hope to experience while here. I have watched friends and family, or other visitors I have interacted with, personally respond to these landscapes. There is an undeniable personal understanding creating a relationship to place that becomes a life-changing event for them and becomes an enhanced relationship-building experience for me. The diversity and abundance of the plant and animal communities thriving in an intact old growth temperate rainforest ecosystem represents to me one of the finest community models for our civil society to aspire to and emulate. Old growth forest communities constituted the template of Native cultures here for millennia and is equally essential to the long-term sustainability of our present day communities. In the areas that I have explored, we have an irreplaceable wealth of biological, spiritual, cultural, and geological treasures that stand to be irrevocably

damaged with continued logging and roadbuilding on Prince of Wales Island. Any further logging of Tongass old-growth will eliminate world class volumes of stored carbon and degrade future carbon sink capacities that these old growth forests offer.

23. I have grave concerns for the ecological integrity of the terrestrial and marine ecosystems of the Alexander Archipelago as it relates to any further clear cutting of old-growth habitat within or adjacent to, designated roadless areas of the Tongass, including Prince of Wales Island. These terrestrial, riparian, lacustrine, littoral, estuarine and marine ecosystems represent an inseparable continuum that cannot be arbitrarily disengaged from one another. As a consequence, the future health of both our fisheries and old-growth-dependent species requires full protection of the remaining contiguous blocks of old-growth temperate rainforest. Closely aligned with my concerns for the ecological integrity of the Tongass, is an acute awareness of the urgency of addressing climate change and ocean acidification, which requires an abrupt suspension in any further clear cutting and roadbuilding of and within old-growth temperate rainforest of the Tongass.

24. I plan to return to Prince of Wales Island for several reasons. The restrictions on the subsistence harvest of Sitka black-tailed deer on Mitkof Island and Lindenberg Peninsula force me to hunt elsewhere and Prince of Wales Island remains an im-

*Southeast Alaska Conservation Council et al. v. U.S. Forest Service et al.,*   18
Case No. 1:19-cv-00006-SLG

portant alternative hunting ground. I have transited for the last 35 years, and will continue to transit, the protected waterways of El Capitan Passage, Tonowek Narrows, Snow Pass, Red Bay, Tuxekan Passage, inner (east) Sea Otter Sound, including adjacent and connected waterways, during my Dungeness crab (June15-August 15th) and sea cucumber diving (Oct.1st-November 15th) commercial fisheries when appropriate. I will also depend upon the month and a half time-frame between these fisheries to subsistence hunt and gather, recreate, photograph on Prince of Wales Island.

25.　When I go to Prince of Wales Island, be it for gathering, fishing, crabbing, deer hunting, photography or some other reason, I hope to find the place as it was, slowly healing from past wounds but still able to support my livelihood and my other interests in the area. If the Forest Service decides to allow more logging on Prince of Wales Island, it would hurt my use and enjoyment of the area, likely force me to go elsewhere, and also harm my interests in maintaining our public forests for their multiple values — values that far outweigh the transient market value of the timber that was once an old growth forest community.

I declare under penalty of perjury that the foregoing declaration is true and correct.

*Southeast Alaska Conservation Council et al. v. U.S. Forest Service et al.*,　19
Case No. 1:19-cv-00006-SLG

Dated: ___2 July 2019_____     By: _____

                                        David Beebe