IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SOUTHEAST ALASKA CONSERVATION COUNCIL; ALASKA RAINFOREST DEFENDERS; CENTER FOR BIOLOGICAL DIVERSITY; SIERRA CLUB; DEFENDERS OF WILDLIFE; ALASKA WILDERNESS LEAGUE; NATIONAL AUDUBON SOCIETY; and NATURAL RESOURCES DEFENSE COUNCIL, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES FOREST SERVICE; UNITED STATES DEPARTMENT OF AGRICULTURE; DAVID SCHMID, in his official capacity as United States Forest Service Region 10 Regional Forester; and EARL STEWART, in his official capacity as Forest Supervisor for the Tongass National Forest, <br><br> *Defendants*. | Case No. 1:19-cv-00006-SLG |

**DECLARATION OF ROBERT CLAUS**

I, Robert Claus, declare as follows:

1. I live in Craig, Alaska. I have lived in Alaska since 1985, and in Craig on Prince of Wales Island since 1994.

2. I am a member of the Southeast Alaska Conservation Council (SEACC). I also volunteer for SEACC and was previously, until April 30, 2014, employed by SEACC as the Forest Program Director. I rely on SEACC to represent my interests in the Tongass National Forest, including the Prince of Wales Landscape Level Analysis Project (POW LLA) on Prince of Wales Island.

3. I am familiar with the POW LLA Project area and have used the area for a number of uses, including hiking, boating, photography, wildlife viewing, and subsistence activities such as fishing and foraging, since I arrived on Prince of Wales Island in 1994.

4. I am a retired Alaska State Trooper. I was on active duty stationed at the Klawock Post on Prince of Wales Island from 1994 until 2008. My duties included patrolling the POW LLA Project area regularly. I drove the roads, big and small, in the project area several times each week I worked. I drove hundreds of thousands of miles on the road system inside the project area, often driving over 200 miles per day. I was responsible for investigating crimes or suspicious incidents as well as conducting routine activities like village visits, traffic patrols, and campground patrols inside the project area. I would regularly conduct foot patrols of recreation facilities and gated Forest system roads. I contacted motorists, hunters, fishers, trappers, berry pickers, wood cutters, and other people using the resources of the area or enjoying the peaceful solitude of the project area. I conducted several multi-day search and rescue missions in the project area, many involving missing, injured or deceased hunters in difficult terrain far off the road system. I trained a search and rescue dog to find lost people in the woods, and used the project area as a training site for individual and group training. I investigated several major crimes inside the project area, and learned in detail from many people how they used the project area in the course of those investigations. I developed a deep appreciation for this part of Prince of Wales Island, and the diversity of opportunities that it offers to all of the island communities as a nearby source of food, recreation, and solace.

5. My patrols through the project area at all times of day and night provided unparalleled opportunities to view and interact with wildlife. I saw black bears consistently from the road system near the proposed timber sale areas, as well as countless Sitka black tailed deer. I observed wolves crossing roads, wolves on frozen lakes, and wolves in alpine clearings. I saw thousands of eagles, and many rodents and weasels. I saw many birds, including geese, owls, cranes and swans, and many I am not expert enough to identify. I carried a light-action fishing rod in my trooper vehicle for use on breaks in the many fish streams in the area. These experiences enriched my life, and were a major factor in convincing me to stay on Prince of Wales Island during and after my trooper career.

6. As a private citizen, I have used the POW LLA project area for recreation several times a month since 1994. I hike or snowshoe from the end of the road system deeper into the Forest. I use the developed recreation sites regularly. I ski, hike, and mountain bike on closed Forest System roads. I have flown over the project area on both dedicated flightseeing flights and commercial air taxi operations, always remarking on the difference between the "managed" parts of the area and the unmatched natural beauty of the rest. From the air, the "managed" parts of the Forest are uniform in color, dominated by alder and berry bushes between linear buffer strips of mature trees along waterways. The clearcuts are marked by roads, landslides, rock pits, abandoned equipment, and slash piles of wood waste. The boundaries are clear, dividing the forest into regular polygons reminiscent of industrial development. The managed lands appear to be hostile and poor in resources for wildlife. In contrast, the undeveloped parts of the Forest have indistinct edges, and the clearings are irregularly shaped muskegs or alpine. There is an obvious mix of tree species and ages, with different coloration marking the diversity. The unmanaged lands appear to be ideal wildlife habitat, and places I would like to explore. I enjoy the easy access to the streams and rivers in the project area for fishing, canoeing, and wildlife viewing and to the salt water interface for kayaking,

wading and beachcombing. I often take family and guests to favorite sites in the project area. I drive the roads in an open car, enjoying the sights, sounds, and smells of the area. I look for rare flowers in alpine meadows and muskegs in the spring, berry pick and fish in the summer and fall, and enjoy the snow in the winter. I go to isolated places in the project area to view stars and auroras on winter nights, and can call to wolves and receive howling responses from nearby packs. I photograph plants, trees, animals, scenery and people using the forest.

7. In my role with SEACC, I organized informal groups through a partnership with the Forest Service called "Out in the Rain" to participate in recreational activities. Although now discontinued, Out in the Rain has taken hundreds of people on dozens of trips to places in the POW LAA Project area for activities like photography, hiking, snowshoeing, skiing, mountain biking, boating, and viewing big trees. As a SEACC staff person and later as a volunteer, I have taken conservation colleagues, journalists, photographers, filmmakers and students to specific places in the project area to demonstrate conservation concepts or to view wildlife. I work with local tourism operators including fishing, hunting, and recreational guides who do business in the area. I have worked with off-road vehicle user groups to help them work with the Forest Service to find responsible ways to use their vehicles. I maintain relationships with subsistence users of wildlife resources of the area. I have participated as a representative of SEACC and in later years as a private citizen in many public meetings and collaborative processes concerning the road system in the area, subsistence use of the area, restoration and stewardship projects in the area, and the specific management actions proposed in the current project. I have submitted numerous comments, formal and informal, on proposed Forest Service actions in and around the project area. In addition, I have participated in regional meetings and collaborations including the Tongass Futures Roundtable and the Tongass Land Management Plan 5-year Review public meetings.

8. I participated in the Prince of Wales Landscape Level Analysis Team (POW LAT) process as a member of the public, with an emphasis on recreational opportunities on Prince of Wales Island. I advocated for an integrated system of trails, cabins, and shelters throughout the Island that could serve as a draw to future full time residents and visitors interested in multi-modal adventure travel, utilizing kayaks, bicycles and foot travel supported by local businesses. These proposals rely on an intact forest complete with readily visible wildlife and a lack of industrial noise and traffic. I found the process and the result to be extremely frustrating, offering an illusion of independent collaboration and collective decision-making that, in effect, ignored the concerns of dissenting individuals and discouraged the participation of communities off the road system. I wrote detailed comments drawing on my experiences in the POW LAT process for the Environmental Impact Statement prior to the Forest Service's decision authorizing the POW LLA Project, and most recently another set of comments on the Out-year Plan, which will begin implementing logging and road-building activities. In the Out-year Plan process, the Forest Service released a map to the public displaying four general areas on Prince of Wales Island for a possible timber sale this year. See Exhibit A. I reviewed the map and other materials released by the Forest Service when writing my comments on the plan, but I could not figure what the agency planned to do based on the information provided. I found the Forest Service's map, charts, and unit cards inadequate for me to provide detailed comments on the plan and to get a true sense of where any logging or road-building activities would take place. The attached comments reflect my experience with and concerns about the Out-year plan specifically, and the POW LAA Project planning process generally. See Exhibit B. I do not think my concerns about the decision-making process and the ultimate effects of the proposed logging on the forest, its wildlife and their habitat were adequately addressed by the Forest Service.

9. The logging and road-building activities proposed by the Forest Service threaten my use and enjoyment of the POW LLA Project area as I have used and enjoyed it since 1994. I am concerned that the project will turn the area into a sea of second-growth where light cannot penetrate the forest floor and where one cannot walk nor do anything else. The logging the Forest Service contemplates in the Out-year Plan, a mix of young-growth and old-growth logging spread across Prince of Wales Island, would preclude me from using the logged areas for many of my favorite recreational uses. The noise and traffic generated by large scale logging in the project area would make it less likely that I will be able to continue to use it as I have in the past. I also worry about the effects that additional logging in this already heavily-logged region will have on wildlife. For example, I worry that the loss of essential wolf habitat and increase in the road

density will decrease my ability to see wolves or show my friends and guests wolves in the wild. I have already experienced such changes in the Logjam and Big Thorne timber sale areas: I used to see and hear wolves there regularly, but since the area was logged in the last timber sale, the wolves are no longer there. The POW LLA Project could also affect my ability to enjoy other wildlife, including deer, birds, bears, and weasels, which currently inhabits and depends on the area. Further logging in the area will also make wildlife and scenic photography more difficult or impossible in places.

10. I have made a conscious choice to live and work on the Prince of Wales Island because of the many recreational and nature-oriented opportunities it offers me. I intend to continue to live and use Prince of Wales Island into the future. If, however, my opportunities to use and enjoy the island, including areas within the POW LLA area, were severely reduced because of the Forest Service's decision let the project go forward, I would feel very differently about living here.

11. In sum, the POW LLA project will cause irreparable harm to my interests in the project area and surrounding areas. These actions will harm my ability to use and enjoy the area as I have since I moved to the Prince of Wales Island in 1994.

I declare under penalty of perjury that the foregoing declaration is true and correct.

Dated: July 5, 2019            By: _____
                                   Robert Claus

*Southeast Alaska Conservation Council et al. v. U.S. Forest Service et al.*,   1
Case No. 1:19-cv-00006-SLG



**Exhibit A**

**Exhibit 2, page 5 of 10**

Bob Claus                                                                 May 1, 2019
PO Box 986
Craig, AK 99921

M. Earl Stewart
Forest Supervisor
Tongass National Forest
648 Mission Street
Ketchikan, AK 99901

<u>Comments on the Prince of Wales Landscape Level Analysis Project Out-Year Plan</u>

Dear Supervisor Earl Stewart:

Please accept these comments on the Out-year Plan for the Prince of Wales Landscape Level Analysis Project.

I am a long term resident of Craig, Alaska, who uses the Forest on Prince of Wales and surrounding islands regularly. I am a retired Alaska State Trooper who patrolled the road systems and small villages and logging camps of Prince of Wales Island from 1994-2008, and have since participated in non-consumptive uses of the Forest such as hiking, boating, photography, and wildlife viewing on an almost daily basis in designated recreation areas and all other designated land use zones. I participate in subsistence activities on the Forest involving fishing and foraging. I have closely observed the impacts of past and current logging practices on the Forest from the perspective of a law enforcement officer noticing the social impacts of economic policies; a recreational user noticing the ebb and flow of recreational opportunity as related to industrial activity on the Forest; and a community leader as an elected member of the Craig City School Board. I have led group activities on the Forest through an informal outdoors activities program known as "Out in the Rain" that introduced people to new experiences that involve outdoors physical activity and education, with an emphasis on outreach to youth and young adults. I have participated in policy discussions and decision making about Tongass issues as a former staff member of the Southeast Alaska Conservation Council and as a private citizen, submitting numerous comment letters and offering public testimony on Forest issues in various formats up to and including testimony before the US Senate and House of Representatives. Most recently, I participated in the Prince of Wales Landscape Assessment Team process as a member of the public, with emphasis on recreational opportunities on Prince of Wales Island. I did not concur with all of the recommendations of that group. I submitted comments during the EIS process, and some of my critiques were not addressed in the decision documents to any degree of satisfaction and I believe they are still pertinent.

As a non-professional with limited time to review this Out-year plan, approaching 700 pages of text with detailed maps that are hard to understand without GIS training, and a very short comment period, I found this collection of working documents inadequate to the purpose of informing the public as to the Forest Service's intentions, especially for

**Exhibit B**
1
**Exhibit 2, page 6 of 10**
Case 1:19-cv-00006-SLG   Document 10-2   Filed 07/12/19   Page 6 of 10

the commercial timber harvest proposals. The inadequacy of the provided materials led to an inability to do any of the investigation that would be possible given a more coherent document and a longer comment period.

There is no plan presented here. This collection of maps, charts, and unit cards in no way forms a coherent "plan" in any commonly understood sense of the term. There is no indication of who will do what where or when, or how any of these activities might be funded. There is no mention of the contracting method to be employed, whether a traditional timber sale or an integrated contract that would include the restoration and recreation components of the proposal. There is no information provided that would allow a reader to determine how the Forest Service will prioritize the hundreds of logging units specified, although the recreation and restoration aspects of the project appear to be at least selected for the next three fiscal years. The lack of specificity in the working papers provided is reflected in the lack of specificity in the comments below.

I believe that the long term mission of the Forest Service demands that carbon sequestration for forest health be prioritized over short term economics. Standing old growth forest is an important world resource, not just from an esthetic perspective or a habitat perspective, but from a carbon storage perspective, and should not be included as a piece of this plan.

This plan proposes an unconscionable level of logging. USFS officials in public meetings have suggested it contains 50 mmbf, not specifying amounts of old growth or young growth or the time period in which that 50 mmbf are to be logged. Current industry is incapable of absorbing this amount of timber. As an example, there are out of state log trucks working on Prince of Wales today to service ongoing operations. There is no surplus of loggers, laborers, or truckers, logging equipment or trucks, or the support facilities needed to feed and house them on Prince of Wales. These would have to be imported or built from scratch to support this level of logging at great social and economic cost to the communities on the Island.

Industry representatives have consistently stated that they cannot harvest and process young growth profitably, and will rely on old growth as long as the Forest Service makes it available. I believe industry will bid only on old growth for the foreseeable future.

Old growth forest is a finite, rare, and valuable resource that belongs to all Americans and should be passed on to future generations, not destroyed now for short term profit that benefits only a few. I don't accept the premise that old-growth harvest is required for community economic health. No evidence has been presented to support the assertion that old growth harvest from National Forest Service land is needed to support local communities. I believe it is unwise to revisit the industry-centered economy of the 1980s and 90s and the social and environmental disruption that it brought to the communities of Prince of Wales Island.

Old growth is too valuable to log, and industry cannot make a profit without logging old growth. It is time for the Forest Service to discontinue promotion of logging of old growth

2

**Exhibit B**
**Exhibit 2, page 7 of 10**
Case 1:19-cv-00006-SLG   Document 10-2   Filed 07/12/19   Page 7 of 10

and support of this antiquated industry, starting with this project and with every unit in it that is designated for old growth harvest.

I recently commented on the Draft EIS that preceded this project: "I am concerned about the lack of geographic specificity in the proposed actions. Each of the alternatives appears to be a cafeteria-style range of options spread out over non-specified locations. As a participant in many past environmental analyses, I do not understand how a manager can take the required good hard look to professional standards when the area to be impacted has not been identified in specificity. Reference to the activity cards in the text of the DEIS would seem to promise more specificity, but they are punishingly vague boilerplate as well."

The vagueness remains in the maps and unit cards in the current collection of documents. Over 200 units are proposed, but there is no information provided about which units are to be prioritized or scheduled in which order. It is clear that not all of these units can be logged in 2019, if ever, even if the required technical surveys can be completed in a timely fashion given agency resources. There is no mention of commercial timber harvest in FY 2020 and 2021 in the chart of activities called the Out-year Plan. If there is a timeline or "plan" of what is proposed to be done when, it is not apparent in the documents provided.

One could speculate that the old growth closest to existing road systems and most economically loggable would be cut first, creating one set of environmental problems, or that other silvicultural concerns like species mix would call for more helicopter logging which would create a whole different set of environmental concerns. Neither of these possibilities or the many other combinations possible in this project area have been addressed.

Prince of Wales Island is a big place with varied terrain, vegetation, and animal life. Logging in one place can create vastly different concerns than logging in another. Considerable scientific effort has been made over time to identify wildlife migration corridors, high quality habitat, water flow, karst resources and other important resources, and it does not appear that this information was applied in any organized way to this proposal.

Unofficially, the process of public input through the POWLAT was described as a way to shortcut or streamline NEPA analysis ("Do all the NEPA at once, and then decide"). I do not believe it is reasonable to shortcut NEPA analysis by neglecting to specify the location or timing of major activity. I do believe that the Forest Service is duty bound to do the analysis first, then make a reasoned and scientifically justified project proposal presented in a coherent way to the interested public.

The unit cards are egregiously vague, or as they say in school, not done yet. They do not provide the specific information that any reasonable person would require to understand the impact of the project.

An example card, Unit 6, is typical. VCU unit numbers are provided, and a spur road is numbered on the pocket map, but even the informed observer is left in the dark as to where this is. The VCU numbers and USFS road numbering system are not commonly understood geographic information, such as latitude and longitude, road names or even community names. A GIS specialist was able to label and locate this unit, but it was not apparent from the materials provided.

Unit 6 Silvicultural "Surveys have not been completed. All resource-specific information, protections and mitigations will be determined before harvest activities are implemented." This is not enough information to provide the basis of an informed comment, much less a commercial harvest plan. Do the surveys first, then ask for comments and formulate a plan.

The controlling language about how old growth will be handled is presented as an option-we will do it this way or we will do it that way. This is not good enough. Determine, for each unit, how the agency intends to deal with old-growth habitat based on the existing guidelines before proposing harvest activities.

Unit 6 does specify that it is a ground based shovel logging system, a remarkable level of specificity for this document, but then proposes a temporary road of 400 feet that involves a stream crossing, again with "Surveys have not been completed…." language, which is repeated for scenery and recreation. I have no particular scenery or recreation concerns for this unit, but the short comment period and lack of understandable geographic information makes it impractical to form an opinion on each of the proposed units.

This unit was selected as a typical example, and a quick scan shows many of the hundreds of units are similarly incomplete and vague. "Surveys have not been completed…" is not an adequate basis to push forward with disruptive and destructive activities on the Forest.

The maps in the plan paint an even more unacceptable picture, of a logging mobilization on first one major section of the Island and then moving on to the next, leaving disrupted fish and wildlife habitat and subsistence opportunity behind. The old practice of developing camps to intensively log an area before moving on to the next is suggested by the clustering of units. There is no information provided to suggest which of these clusters-North POW? Naukati? Staney Creek? Polk Inlet? Kosiusko?-will be first to be logged and which the last. This is essential information for one to make an informed judgement or comment about the plan as a whole, and it is not provided.

There is no information provided about the location or composition of the camps that will be needed to log these remote units. History shows us that temporary logging camps are environmental disasters, with documented and highly visible poor handling of hazardous waste, human sewage, and household and industrial shop garbage. The camps are notable as well for the local over-harvest and poaching of fish and wildlife caused by an influx of workers with no sense of responsibility to local resources. Each camp site

4

**Exhibit B**
**Exhibit 2, page 9 of 10**
Case 1:19-cv-00006-SLG   Document 10-2   Filed 07/12/19   Page 9 of 10

should require an extensive environmental review, impossible if the sites are not identified. The requirement for these camps ought to give community leaders pause about the purported economic benefit to local towns. If out of state workers occupy temporary camps near remote worksites, what benefits do they bring to local economies?

This proposal, rather than representing a positive step forward in community involvement, is a throwback to the agency and industry-driven policymaking of the past. Industry makes up a target that they would like to harvest and the Forest Service tries to meet that number, focusing logging effort on the best of what's left after over a century of timber-centric management. The idea that Prince of Wales Island is a sacrificial island for the agency to develop as it sees fit, without adequate public input or oversight is an old one, dating to before statehood, and should form no part of modern decision making.

I personally feel ashamed for allowing myself to be a part of the POWLAT discussions, fooling myself into thinking that the detailed discussions about recreation and restoration proposals marked a change in agency direction. I recall being concerned during the discussions about the lack of detail and specificity in the timber proposals, and being mollified by the assurances of the Forest Service staff that the work was being done, and that it would be presented in a comprehensible format at a future date before the decision and implementation of such a big project for our island.

With the current set of inadequate documents described as the Out-year Plan, my concerns are proven to be well-founded. The rushed and incomplete work done to date is in no way sufficient to support the level of activity contemplated.

Thank you for your attention to these comments.


Bob Claus
Craig, Alaska