LAWRENCE VANDYKE
Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

Erika Norman, CA Bar # 268425
Trial Attorney
Natural Resources Section
4 Constitution Square
150 M Street, NE, Suite 2.900
Washington, DC 20004
Phone:  (202) 305-0475
Fax:  (202) 305-0506
Erika.Norman@usdoj.gov

*Attorneys for all Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| SOUTHEAST ALASKA CONSERVATION COUNCIL; ALASKA RAINFOREST DEFENDERS; CENTER FOR BIOLOGICAL DIVERSITY; SIERRA CLUB; DEFENDERS OF WILDLIFE; ALASKA WILDERNESS LEAGUE; NATIONAL AUDUBON SOCIETY; and NATURAL RESOURCES DEFENSE COUNCIL, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES FOREST SERVICE; UNITED STATES DEPARTMENT OF AGRICULTURE; DAVID SCHMID, in his official capacity as United States Forest Service Region 10 Regional Forester; and EARL STEWART, in his official capacity as Supervisor for the Tongass National Forest, <br><br> Defendants | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 1:19-cv-00006-SLG |

**DEFENDANTS' PRINCIPAL BRIEF IN OPPOSITION TO SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................. 1

II.     BACKGROUND ................................................................................. 3

III.    LEGAL FRAMEWORK ....................................................................... 12

        A.      Review of Agency Action Under the Administrative Procedure Act. ........ 12

        B.      National Environmental Policy Act. .......................................... 13

        C.      Alaska National Interest Lands Conservation Act. ...................... 14

        D.      National Forest Management Act. ............................................. 15

IV.     ARGUMENT ................................................................................... 16

        A.      The Project Complies With NEPA Because There Is Sufficient Site-Specific Information To Evaluate Impacts And Alternatives. ................... 16

                1.      There Is No NEPA Requirement To Pre-Determine the Exact Layout of Every Timber Sale. ............................................. 17

                2.      The Service Identified Where Harvest And Road Activities Would Take Place. ..................................................... 20

                3.      The Service Analyzed the Maximum Environmental Impact of Timber Harvest By Alternative. ...................................... 22

                4.      The EIS Provides a Sufficient Analysis of Alternatives. ................ 24

        B.      The Service Has Complied With ANILCA's Requirements. .................... 27

                1.      The Service Analyzed the Maximum Potential Effects of the Project On Subsistence Uses. ........................................ 28

                2.      The Service Held Seven Subsistence Hearings ............................ 29

                3.      The Service Made the Requisite Determinations ........................... 31

        C.      The Service's Decision Is Consistent with the Forest Plan and Complies with NFMA. .................................................. 33

                1.      The Service Complied with TIM3.I.C. ....................................... 33

*SEACC, et al. v. U.S. Forest Service, et al.,*                                                    i
1:19-cv-00006-SLG

2.     Plaintiffs Were Not Prejudiced by the Lack of "Unit Cards." ......... 37

D.     Remedy, If Any, Should Be Addressed After the Court Issues a
Decision on the Merits. ............................................................................ 39

V.    CONCLUSION ...................................................................................... 41

*SEACC, et al. v. U.S. Forest Service, et al.,*        ii
1:19-cv-00006-SLG

# TABLE OF AUTHORITIES

## CASES

*Alliance for the Wild Rockies v. Savage*,
    375 F. Supp. 3d 1152 (D. Mont. 2019) ......................................................................... 40

*Alliance for the Wild Rockies v. Weber*,
    979 F. Supp. 2d 1118 (D. Mont. 2013) ......................................................................... 17

*Amoco Prod. Co. v. Village of Gambell*,
    480 U.S. 531 (1987) ......................................................................................................... 27

*Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*,
    126 F.3d 1158 (9th Cir. 1997) ....................................................................................... 22

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*,
    462 U.S. 87 (1983) ........................................................................................................... 12

*Cal. Communities Against Toxics v. U.S. EPA*,
    688 F.3d 989 (9th Cir. 2012) ......................................................................................... 40

*Cal. Wilderness Coal. v. U.S. Dep't of Energy*,
    631 F.3d 1072 (9th Cir. 2011) ....................................................................................... 38

*Chevron U.S.A. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) ......................................................................................................... 36

*Cheyenne Tribe v. Norton*,
    503 F.3d 836 (9th Cir. 2007) ......................................................................................... 38

*Citizens for Better Forestry v. U.S. Dep't of Agric.*,
    341 F.3d 961 (9th Cir. 2003) ......................................................................................... 15

*City of Tenakee Springs v. Block*,
    778 F.2d 1402 (9th Cir. 1985) ................................................................................ 18, 19

*City of Tenakee Springs v. Courtright*,
    No. J86-024, 1987 WL 90272 (D. Alaska June 26, 1987) ................................ 19, 20, 21

*Cmtys. Found. v. Jewell*,
    No. 13CV575, 2014 WL 1364453 (S.D. Cal. Mar. 25, 2014) ....................................... 23

*Drakes Bay Oyster Co. v. Jewell*,
    747 F.3d 1073 (9th Cir. 2014) ....................................................................................... 38

*Earth Island Inst. v. U.S. Forest Serv.*,
    697 F.3d 1010 (9th Cir. 2012) ....................................................................................... 15

*Ecology Ctr. v. Castaneda*,
   574 F.3d 652 (9th Cir. 2009) ........................................................................ 15

*Forest Guardians v. U.S. Forest Serv.*,
   329 F.3d 1089 (9th Cir. 2003) ..................................................................... 15

*Greenpeace, Inc. v. Cole*,
   50 F. Supp. 3d 1158 (D. Alaska 2014) ....................................................... 40

*Hoonah Indian Association v. Morrison*,
   170 F.3d 1223 (9th Cir. 1999) ..................................................................... 32

*In re Big Thorne Project*,
   93 F. Supp. 3d 1134 (D. Alaska 2015) ....................................................... 13

*In re Big Thorne*,
   857 F.3d 968 (9th Cir. 2017) ....................................................................... 13

*Inland Empire Pub. Lands Council v. Schultz*,
   807 F. Supp. 649 (E.D. Wash. 1992) .......................................................... 13

*Kisor v. Wilkie*,
   139 S. Ct. 2400 (2019) ........................................................................... 36, 37

*Lands Council v. McNair*,
   537 F.3d 981 (9th Cir. 2008) ................................................................. 12, 16

*Lands Council v. Powell*,
   395 F.3d 1019 (9th Cir. 2005) ............................................................... 15, 22

*League of Wilderness Defs. Blue Mountains Biodiversity Project v. Allen*,
   615 F.3d 1122 (9th Cir. 2010) ..................................................................... 13

*League of Wilderness Defs. Blue Mountains Biodiversity Project v. U.S. Forest Serv.*,
   549 F.3d 1211 (9th Cir. 2008) ..................................................................... 12

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ........................................................................................ 12

*Native Ecosystems Council v. U.S. Forest Serv.*,
   418 F.3d 953 (9th Cir. 2005) ....................................................................... 14

*Native Ecosystems Council v. Weldon*,
   697 F.3d 1043 (9th Cir. 2012) ..................................................................... 15

*Ninilchik Traditional Council v. United States*,
   227 F.3d 1186 (9th Cir. 2000) ..................................................................... 15

*Ohio Forestry Ass'n, Inc. v. Sierra Club,*
    523 U.S. 726 (1998) ..................................................................................... 15

*Or. Nat. Desert Ass'n v. BLM,*
    625 F.3d 1092 (9th Cir. 2010) .................................................................... 22

*Pollinator Stewardship Council v. U.S. EPA,*
    806 F.3d 520 (9th Cir. 2015) ...................................................................... 40

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332 (1989) ......................................................................... 13, 14, 23

*Shinseki v. Sanders,*
    556 U.S. 396 (2009) ..................................................................................... 38

*Siskiyou Reg'l Educ. Project v. U.S. Forest Serv.,*
    565 F.3d 545 (9th Cir. 2009) ...................................................................... 15

*State of California v. Block,*
    690 F.2d 753 (9th Cir. 1982) ...................................................................... 14

*Stein v. Barton,*
    740 F. Supp. 743 (D. Alaska 1990) ....................................................... 17, 18

*Swanson v. U.S. Forest Serv.,*
    87 F.3d 339 (9th Cir. 1996) ........................................................................ 14

*WildEarth Guardians v. Conner,*
    920 F.3d 1245 (10th Cir. 2019) ....................................................... 17, 23, 24

**STATUTES**

5 U.S.C. § 706(2)(A) ......................................................................................... 12

42 U.S.C. § 4332(C) .......................................................................................... 13

42 U.S.C. § 4332(c)(ii) ...................................................................................... 17

42 U.S.C. §§ 4321 ............................................................................................. 13

16 U.S.C. § 1601(d)(1) ........................................................................................ 6

16 U.S.C. § 1604(a) ........................................................................................... 15

16 U.S.C. § 1604(g)(1) ...................................................................................... 15

16 U.S.C. § 1604(i) ............................................................................................ 15

16 U.S.C. § 3120(a) ..................................................................................... 14, 29

16 U.S.C. § 3120(a)(1)-(3) ................................................................................ 29

*SEACC, et al. v. U.S. Forest Service, et al.,*                                                    v
1:19-cv-00006-SLG

16 U.S.C. § 3120(a)(2) ................................................................................ 28

16 U.S.C. § 3120(a)(2)-(3) ......................................................................... 15

16 U.S.C. § 3120(a)(3) ......................................................................... 31, 32

16 U.S.C. § 528 ............................................................................................ 6

16 U.S.C. § 539d(a) .................................................................................. 5, 6

**REGULATIONS**

36 C.F.R. §§ 219.13 .................................................................................. 40

**OTHER AUTHORITIES**

Prince of Wales Landscape Level Analysis Project Out-year Plan,
    https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd622075.pdf. ................. 12

Prince of Wales Landscape Level Analysis Project Twin Mountain Timber Sale,
    https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd641767.pdf. ................. 12

*SEACC, et al. v. U.S. Forest Service, et al.,*                                    vi
1:19-cv-00006-SLG

## TABLE OF ACRONYMNS

| ANILCA | Alaska National Interest Lands Conservation Act |
| --- | --- |
| APA | Administrative Procedure Act |
| EIS | Environmental Impact Statement |
| GIS | Geographic Information System |
| HPOG | High-Volume Productive Old-Growth |
| LUD | Land Use Designation |
| MMBF | Million Board Feet |
| NEPA | National Environmental Policy Act |
| NFMA | National Forest Management Act |
| NFS | National Forest System |
| POW LAT | Prince of Wales Landscape Assessment Team |
| ROD | Record of Decision |
| WAA | Wildlife Analysis Area |

# I.  INTRODUCTION

This action challenges the Prince of Wales Landscape Level Analysis Project (the "Project") in the Tongass National Forest under the National Environmental Policy Act ("NEPA"), the Alaska National Interest Lands Conservation Act ("ANILCA"), and the National Forest Management Act ("NFMA").  The United States Forest Service (the "Service") collaborated with the Prince of Wales Landscape Assessment Team – an independent, diverse group of local citizens and governments – and members of the general public over the course of three years to develop the Project.  In addition to satisfying the requirements for public involvement under NEPA, the Service held seven hearings in subsistence communities in the vicinity of the Project Area in accordance with ANILCA.  The Project authorizes forty-six interconnected activities, each described on an Activity Card, which will be implemented across 1.8 million acres of National Forest System lands on the Tongass National Forest ("Tongass") over a fifteen-year period.  Plaintiffs seek to vacate or enjoin the vegetation management (*i.e.*, timber harvest) and new road construction activities authorized under the Project while leaving the other Project activities unenjoined – but unfunded.  Pls.' Opening Br. 35-36, ECF No. 10 ("Pls.' Br.").

The crux of Plaintiffs' challenge is that they believe the Service was required to prepare a "unit card" for each timber harvest unit when the Service prepared the Project Environmental Impact Statement ("EIS").  "Unit cards" contain a map and narrative description of a specific area of forested land from which timber will be harvested.

Plaintiffs claim that without these cards, the Service's EIS does not disclose a site-specific analysis of impacts or alternatives and therefore violates NEPA, ANILCA, and NFMA.

The fundamental premise of Plaintiffs' action is wrong, and their claims must fail. While the Service previously prepared unit cards for site-specific projects, there was no requirement to do so and in any event the Service rescinded the guidance document that described the content and use of unit cards. In place of the old unit cards, the Service has adopted a superior method to analyze the environmental effects of multi-year, landscape level analyses such as this one. The Project-specific analysis conducted here identifies suitable timber stands for harvest and maps areas of potential old-growth and young-growth harvest on a Commercial Vegetation Management Map (the "Map"). The Service made the Map available for public comment and revised it at multiple stages of the NEPA process. During implementation of the Project, the Service will identify exact timber sale boundaries and the public will have another opportunity to comment, but those harvest units will be drawn within those areas already identified as suitable for harvest on the Map.

The Project EIS analyzes the worst-case environmental impacts, including impacts on subsistence uses, across three different action alternatives by assuming that activities would be undertaken at the maximum level of intensity permitted under that alternative. In analyzing impacts from timber harvest activities in particular, the Service assumed that the maximum acres of harvest authorized under each alternative would be harvested by

the most impactful clear-cut harvest methods and that the maximum miles of road would be built, to ensure that all possible effects were considered.

The Service's approach to analyzing environmental impacts was site-specific and comprehensive, and satisfies NEPA's "hard look" requirement. The Service's approach satisfies ANILCA's requirement to analyze the maximum impacts of the Project on subsistence resources across alternatives. The Project complies with NFMA because the Map and Activity Cards contain the substantive information specified in the Forest Plan. The Court should deny Plaintiffs' motion for summary judgment and grant judgment in favor of Defendants.

## II. BACKGROUND

The Project Area is located on the Thorne Bay and Craig Ranger Districts on Prince of Wales Island and the surrounding islands in southeast Alaska:



Case 1:19-cv-00006-SLG   Document 12   Filed 08/12/19   Page 12 of 50

833_2427 at 000781.[1]  The vast majority of the Project Area – about 1.8 million acres out of a total of 2.28 million acres – is National Forest System ("NFS") lands on the Tongass. 833_2167 at 001460-61.

The 2016 Land and Resource Management Plan for the Tongass ("Forest Plan") uses Land Use Designations ("LUDs"), which are broad geographic zones that allow for different uses or activities.  *Id.* at 001466.  The Project Area includes fifteen LUDs in three groups: Wilderness; Natural Setting; and Development (which includes Timber Production).  *Id*.  Timber Production comprises 572,018 acres – about 31% – of the NFS lands in the Project Area.  *Id.* at 001466-67.  Not all of this acreage can be harvested: The Forest Plan identifies 477,895 acres of suitable timber harvest lands on the Tongass and imposes restrictions on timber harvest activities.  833_0404 at 063392-97.

The Project has three primary objectives: (i) improve forest ecosystem health, (ii) support community resiliency, and (iii) support economic development.  833_2167 at 001462.  These objectives are consistent with the multiple-use goals and objectives of the Forest Plan, which expressly include production of saw timber and other wood products from suitable lands on an even-flow, long-term sustained yield basis.  *Id.* at 001462-63; 833_0404 at 063062.  The Forest Plan's timber goals and objectives reflect – and are essential to fulfilling – certain statutory mandates, including those contained in the Tongass Timber Reform Act, 16 U.S.C. § 539d(a), which requires the Service to provide

---

[1] The Administrative Record in this case was lodged on July 1, 2019.  Notice of Lodging, ECF No. 8.

*SEACC, et al. v. U.S. Forest Service, et al.,*
1:19-cv-00006-SLG

5

a supply of timber which meets the annual market demand for timber from the Tongass and for each ten- to fifteen-year planning cycle. 16 U.S.C. § 539d(a); 833_0404 at 063362. *See also* Multiple Use-Sustained Yield Act, 16 U.S.C. § 528; National Forest Management Act, 16 U.S.C. § 1601(d)(1).

The Project authorizes four categories of activities to be implemented across the Project Area over a fifteen-year period, including vegetation management. 833_2167 at 001443. The Project includes many other activities besides commercial timber harvest, *e.g.*, invasive plant treatments, precommercial thinning, riparian and wildlife vegetation treatments, salvage of dead, dying, and damaged timber, watershed improvement and restoration, and sustainable recreation management. *Id.* at 001443, 001464-65. The Project defines what activities can occur and where, but allows the Service to select specific activities and discrete locations in a given year based on ground and market conditions, new scientific information, and input from the public. *Id.* at 001459, 001560.

The forty-six activities authorized under the Project are described on Activity Cards. 833_2427 at 000848-001030. The Activity Cards describe each potential activity and the related resource considerations, including information about the objectives, methods and equipment used, and resource-specific mitigation measures. 833_2167 at 001492. To create the cards, resource specialists used on-the-ground inventories, Geographic Information System ("GIS") data, and aerial photographs to assess Project Area conditions and resource-specific concerns, describing on the cards how these concerns would be mitigated (if not completely avoided) for each activity. *Id.* Activity

Cards Nos. 13 and 14, for example, relate to commercial old-growth timber harvest and Activity Card 19 relates to temporary road construction. 833_2427 at 000895-99 (Card No. 13); *id.* at 000900-04 (Card No. 14); *id.* at 000922-26 (Card No. 19).

The Service considered in detail three action alternatives (Alternatives 2, 3, and 5) in addition to a no-action alternative.[2] The alternatives vary by the amount of old-growth and young-growth timber to be offered for sale under the Project, the schedule for offering old-growth and young-growth timber, and in how particular resource issues are to be addressed. The Selected Alternative (Alternative 2) proposes 23,269 acres of old-growth harvest and 19,366 acres of young-growth harvest, and 164 miles of road construction across the Project Area over the life of the Project.[3] 833_2167 at 001481. The amount of old-growth timber in Alternative 2 (235 million board feet ("MMBF") over 15 years) is equal to about 2.8 percent of the total productive old-growth acreage within the Project Area, meaning that even if all 23,269 acres proposed for harvest were harvested over the fifteen-year life of the Project, 791,643 acres of productive old-growth within the Project Area – more than 97% – would remain untouched. 833_2171 at 002184.

---

[2] The Service considered but eliminated from detailed study four additional action alternatives. 833_2167 at 001492-94.

[3] In the Final ROD, the Forest Supervisor decided to eliminate commercial old-growth harvest in the area "North of the 20 Road" shown on the Map and within VCU 5280. *See* 833_2178 at 001429 (ROD Map); 833_2427 at 000787.

*SEACC, et al. v. U.S. Forest Service, et al.,*                                          7
1:19-cv-00006-SLG

The Forest Supervisor selected Alternative 2 because that alternative "provides the best mix of activities across the landscape." 833_2427 at 000798. Additionally, because Alternative 2 would offer the most timber and the most old-growth, it would afford the Service "the most flexibility . . . to design the size of potential timber offers" and "support the most local manufacturing and milling job opportunities" while the industry transitions to young growth. *Id.* at 000791. In addition to timber production from suitable lands, the selected alternative authorizes various watershed improvement and restoration activities, invasive plant treatments, and sustainable recreation management, including construction of up to fifty miles of new trails and three new cabins and twelve new shelters for recreational use. *Id.* at 000785.

The Project does, in fact, define where timber harvest will occur. The Service created a Logging System and Transportation Analysis ("LSTA") for the Project to identify potential stands for harvest as well as the transportation network needed to access those stands. 833_2167 at 001480. The Project LSTA used GIS data, aerial photos, and information from the Forest Activity Tracking System database[4] to identify 48,140 acres of potential old-growth harvest and 77,389 acres of potential young-growth harvest within the Project Area. *Id.* at 001481, 001562. These harvest areas are shown on the Map, along with potential new temporary and NFS roads, and other resource features. 833_2178 at 001429 (ROD Map); 833_1202 at 002939 (DEIS Map). The

---

[4] This database includes field data recorded by the Service during previous ground-level trips in the Project Area.

action alternatives propose varying amounts of old-growth and young-growth harvest from within the Project LSTA.  833_2167 at 001481.

The Service's approach guarantees that any individual treatment units will fall physically within the Map boundaries, and within the maximum effects analyzed and disclosed in the final EIS and Record of Decision ("ROD").  The Service's analysis of environmental effects was conservative in three principal respects.  First, the Service assumed that all acres proposed for harvest under each alternative would be harvested and all roads would be built.  833_2167 at 001629, 001635, 001639, 001642, 001683, 001685.  Second, the Service assumed that all acres would be harvested using clear-cut methods.  *Id.* at 001450.  Third, for purposes of analyzing effects to different wildlife habitats, the Service assumed that each Wildlife Analysis Area ("WAA")[5] within the Project Area would be harvested up to the maximum acreage available under each alternative.  *Id.* at 001500; 833_2111 at 055282.  The Service made these assumptions to display "maximum effects."  833_2167 at 001639.

The public has been involved in the development of the Project since the beginning.  In May 2016, the independent, local community-based group, Prince of Wales Landscape Assessment Team ("POW LAT"), was formed to assist in developing and providing proposed project activities.  *Id.* at 001468.  On June 5, 2017, POW LAT

---

[5] WAAs are land divisions used by the Alaska Department of Fish and Game for wildlife analysis and regulating wildlife populations.  833_2167 at 001514.  The Project Area includes thirty-two WAAs.  *Id.*

*SEACC, et al. v. U.S. Forest Service, et al.,*                                           9
1:19-cv-00006-SLG

submitted a project list and recommendations to the Service, including a table with twenty-nine projects and associated locations. 833_1345. The selected alternative incorporates the majority of POW LAT's recommendations. 833_2167 at 001766.

On November 30, 2016, the Service published a notice of intent to prepare an environmental impact statement and the agency published a corrected notice on July 6, 2017, incorporating additional project details from the project list and recommendations submitted by POW LAT. *Id*. at 001468; 833_1345 at 011392-011417. During scoping, the Service published draft Activity Cards (reflecting activities proposed by POW LAT) and maps showing where Project activities would occur. 833_0086 at 003648 (Vegetation Management Map). The Service subsequently produced a Corrected Map when it published Draft Issue Statements and Alternatives in December 2017, which showed "planned roads" in addition to harvest locations. 833_1336 at 00370 (Commercial Vegetation Management Map).[6] The Service further refined the Map when it published the draft EIS for public comment in April 2018, adding "potential new temporary and NFS roads" and outlining the "area 'North of the 20 Road.'" 833_1202 at 002939 (DEIS Map). The Map was published again with the draft ROD. 833_2178 at 001429 (ROD Map).

---

[6] The Service produced similar maps for other Project activities. *E.g.,* 833_1337 at 003571 (Precommercial Vegetation Management Map); 833_1339 at 003573 (Sustainable Recreation Management); 833_1341 at 003575 (Watershed Map).

In addition to efforts to solicit public input through outreach letters, meetings, presentations, and requests for comment that spanned the time period from October 2016 until March 2018, (833_2167 at 001468-69), the Service held seven hearings in subsistence communities to accept testimony from subsistence users on how the proposed activities within the Project Area may potentially affect them. *Id.* at 001470. Additional public workshops and comment periods to address subsistence and other issues are planned during Implementation. 833_2427 at 001035.

Implementation is an integral part of the Project's design. 833_2167 at 001459. The Implementation Plan sets forth a nine-step process, including checking the proposed activity against the Activity Card(s), conducting field work and consultation to ensure treatments are consistent with the NEPA analysis, and preparing draft unit and road cards. 833_2427 at 001034, 001037, 001041. The process involves multiple opportunities for public input and involvement, including annual public workshops to discuss specific activities and locations for the coming year. *Id.* at 001038. Draft unit and road cards are made available for public comment as part of an "Out-Year Plan." *Id.* at 001039-40. Since the ROD was issued in March 2019, there has been continued public involvement as provided in the Implementation Plan. The Service held a public implementation workshop on April 6, 2019, to review proposed activities for Fiscal Years 2019-2021. The "Out-Year Plan," including proposed harvest units and draft unit cards for a proposed timber sale in Fiscal Year 2019, was released for public comment on April

9, 2019.[7]  The Service published revised unit cards in mid-July.[8]  Plaintiffs' assertion that

they had "no notice" of a timber sale in 2019 is untrue.  Pls.' Br. at 12.

## III.  LEGAL FRAMEWORK

### A.  Review of Agency Action Under the Administrative Procedure Act.

To prevail under the Administrative Procedure Act ("APA"), Plaintiffs must show

that the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law."  5 U.S.C. § 706(2)(A); *Lands Council v. McNair*, 537 F.3d

981, 987 (9th Cir. 2008) (en banc).  The scope of review is narrow and a court is not to

substitute its judgment for that of the agency.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v.

State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).  Agency decisions should be set

aside only if an agency "relied on factors Congress did not intend it to consider, entirely

failed to consider an important aspect of the problem, or offered an explanation that runs

counter to the evidence before the agency or is so implausible that it could not be

ascribed to a difference in view or the product of agency expertise."  *League of

Wilderness Defs. Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 549 F.3d

1211, 1215 (9th Cir. 2008) (internal quotations and citation omitted).  Agency action

must be upheld where the agency has considered the relevant factors and articulated a

rational connection between the facts found and choice made.  *Balt. Gas & Elec. Co. v.

Nat. Res. Def. Council*, 462 U.S. 87, 105 (1983).

---

[7] *See* https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd622075.pdf.

[8] *See* https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd641767.pdf.

*SEACC, et al. v. U.S. Forest Service, et al.,*                                                    12
1:19-cv-00006-SLG

A court reviewing a challenged environmental action pays the "highest deference . . . to the [Service]'s technical analyses and judgments within its area of expertise." *League of Wilderness Defs. Blue Mountains Biodiversity Project v. Allen*, 615 F.3d 1122, 1131 (9th Cir. 2010) (internal citation omitted). "Forest management is fairly viewed as the sort of technical field where courts should defer to the findings of specialized administrative agencies." *Inland Empire Pub. Lands Council v. Schultz*, 807 F. Supp. 649, 652 (E.D. Wash. 1992) (citation omitted); *see In re Big Thorne Project*, 93 F. Supp. 3d 1134, 1141 (D. Alaska 2015) (The Service "has recognized expertise and discretion in predicting timber demand"). The Service's judgments "often require trade-offs among worthy objectives . . . Congress left such judgments to a politically responsive agency with relevant expertise." *In re Big Thorne*, 857 F.3d 968, 976 (9th Cir. 2017).

### B. National Environmental Policy Act.

NEPA requires agencies to carefully consider the impacts of, and alternatives to, federal actions significantly affecting the environment. 42 U.S.C. §§ 4321, 4331. Its purpose is to ensure that federal agencies take a "hard look" at the environmental consequences of their proposed actions before deciding to proceed by, for example, preparing a "detailed statement" known as an EIS for "major Federal actions significantly affecting the quality of the human environment." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349-51 (1989); 42 U.S.C. § 4332(C). "NEPA itself does not mandate particular results, but simply prescribes the necessary process" by which

agencies must consider the environmental impacts of their actions. *Methow Valley*, 490

U.S. at 350.

The court reviewing a NEPA challenge applies a "rule of reason" and makes a

"pragmatic judgment whether the EIS's form, content and preparation foster both

informed decision-making and informed public participation." *Native Ecosystems*

*Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005) (quoting *Cal. v. Block*,

690 F.2d 753, 761 (9th Cir. 1982)).  Courts "need not 'fly-speck' the document and 'hold

it insufficient on the basis of inconsequential, technical deficiencies.'" *Swanson v. U.S.*

*Forest Serv.*, 87 F.3d 339, 343 (9th Cir. 1996).  Only a "reasonably thorough discussion

of the significant aspects of the probable environmental consequences" is required.

*Block*, 690 F.2d at 761 (citation omitted).

**C.     Alaska National Interest Lands Conservation Act.**

Section 810 of ANILCA provides that prior to taking action to permit the use of

public lands, the agency must "evaluate the effect of such use . . . on subsistence uses and

needs."  16 U.S.C. § 3120(a).  If the agency determines that the action "would

significantly restrict subsistence uses," the agency may not proceed until the agency

holds "a hearing in the vicinity of the area involved," and makes the following

determinations:

> (A) such a significant restriction of subsistence is necessary,
> consistent with sound management principles for the
> utilization of the public lands, (B) the proposed activity will
> involve the minimal amount of public lands necessary to
> accomplish the purposes of such use, occupancy, or other
> disposition, and (C) reasonable steps will be taken to minimize

*SEACC, et al. v. U.S. Forest Service, et al.,*                                    14
1:19-cv-00006-SLG

> adverse impacts upon subsistence uses and resources resulting
> from such actions.

16 U.S.C. § 3120(a)(2)-(3).  An agency's compliance with ANILCA is reviewed under the APA.  *Ninilchik Traditional Council v. U.S.*, 227 F.3d 1186, 1193 (9th Cir. 2000).

### D.  National Forest Management Act.

NFMA requires the Service to "develop, maintain, and, as appropriate, revise land and resource management plans" for the National Forests.  16 U.S.C. § 1604(a); *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 728-29 (1998).  Forest plans are broad, long-term planning documents that "operate like zoning ordinances, defining broadly the uses allowed in various forest regions, setting goals and limits on various uses . . . ." *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 966 (9th Cir. 2003); 16 U.S.C. § 1604(g)(1), (3).

Once a forest plan is approved, site-specific actions taken by the Service must be "consistent" with that plan.  16 U.S.C. § 1604(i); *Lands Council v. Powell*, 395 F.3d 1019, 1033 (9th Cir. 2005).  As a general matter, "the [Service's] interpretation and implementation of its own forest plan is entitled to substantial deference" and will not be disturbed unless "plainly erroneous."  *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012); *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1013 (9th Cir. 2012); *Siskiyou Reg'l Educ. Project v. U.S. Forest Serv.*, 565 F.3d 545, 555 (9th Cir. 2009); *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 661 (9th Cir. 2009); *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1098 (9th Cir. 2003).

This degree of deference is consistent with the intent of NFMA to "provide effective guidance . . . but [to] allow enough flexibility so that the professional foresters can do the job, rather than lawyers and judges." Joint Hearings, 94th Cong., 2d Sess. 953-54 (Comm. Print 1976). "Congress has consistently acknowledged that the Forest Service must balance competing demands in managing [NFS] lands [and], since Congress' early regulation of the national forests, it has never been the case that the national forests were . . . to be 'set aside for non-use.'" *McNair*, 537 F.3d at 990 (third alteration in original) (internal quotation marks omitted).

## IV.   ARGUMENT

### A.   The Project Complies With NEPA Because There Is Sufficient Site-Specific Information To Evaluate Impacts And Alternatives.

Plaintiffs claim they are entitled to summary judgment on their NEPA claim because the Service "fail[ed] to provide site-specific information or analysis in the draft or final EIS." Pls.' Br. at 14; Compl. ¶¶ 44-47 (Count I, NEPA). Plaintiffs are wrong. The Service identified the areas where timber harvest and road construction could occur for future timber sales. The Service then analyzed the maximum potential environmental effects of the Project. This approach gives the Service the ability to identify exact harvest units later, based on changing ground and market conditions as well as input from the public.

The Service's choice of methodology is reasonable. It retains the Service's ability to match treatments with inevitably changing conditions and meaningfully involves the public in the selection of exact locations and activities over a fifteen-year time period.

*SEACC, et al. v. U.S. Forest Service, et al.,*
1:19-cv-00006-SLG

16

By being both conservative and adaptive, the Service's approach satisfies NEPA's twin aims of fostering informed decision-making and public participation.

### 1. There Is No NEPA Requirement To Pre-Determine the Exact Layout of Every Timber Sale.

The requirement to prepare a "detailed statement" of environmental impacts under NEPA does not impose an obligation on the Service to pre-determine the exact layout of every timber sale unit it intends to offer as part of a project. NEPA contains no such requirement. *See* 42 U.S.C. § 4332(c)(ii) (requiring only a "detailed statement" of environmental effects). Where the Service has provided site-specific information on the locations of project activities, as the Service has done here, courts have rejected plaintiffs' arguments that *additional* site-specificity is required without a showing of why more details are necessary. *See, e.g.*, *Alliance for the Wild Rockies v. Weber*, 979 F. Supp. 2d 1118, 1125-26 (D. Mont. 2013) (finding the Service did not have to identify specifically where precommercial thinning will take place within fifty-foot stream buffers having provided maps showing the overall boundaries of the proposed activity); *Stein v. Barton*, 740 F. Supp. 743, 749 (D. Alaska 1990) (rejecting plaintiffs' "site-specificity objection to the disclosure of harvesting plans for each area").[9]

---

[9] *See also WildEarth Guardians v. Conner*, 920 F.3d 1245, 1258 (10th Cir. 2019) (affirming the Service's decision not to identify specific treatment sites within a more broadly-defined area in the Environmental Assessment where "it intends to select treatment units based on changing on-the-ground conditions over the 10 to 15 years of the Project."). The Tenth Circuit in *Conner* explained that the "Service used [its] discretion reasonably, assessing the Project's maximum possible effect on lynx habitat while also conserving agency resources and retaining flexibility to respond to changing conditions." *Id.*

*SEACC, et al. v. U.S. Forest Service, et al.,*
1:19-cv-00006-SLG

17

Plaintiffs' reliance on *Stein v. Barton* is particularly misplaced.  Pls.' Br. at 16-17.  The plaintiffs in that case, much like Plaintiffs here, contended "that they cannot determine from the FEIS 'where, when, and how logging and roading activities will occur on the 812,477 acres of land.'"  *Stein*, 740 F. Supp. at 749.  Rejecting Plaintiffs' "contention that NEPA requires the Forest Service to formulate its plans in greater detail before evaluating site-specific impacts," the court found the Service did not need to provide "*exact timetables and locations* on the ground for planned harvesting activities in each harvest unit."  *Id.* at 749 (emphasis added).  To prevail on such a claim, the court held, "plaintiffs must show why disclosure of more details regarding site-specific impacts is necessary in order to foster both informed decision-making and informed public participation."  *Id.* (internal quotation omitted).  Exact locations is precisely what Plaintiffs demand here.

Plaintiffs also erroneously assert that *City of Tenakee Springs v. Block* ("*Tenakee I*"), 778 F.2d 1402 (9th Cir. 1985), "controls this case."  Pls.' Br. at 15.  But that case does not hold that the Service must pre-determine the exact layout of every timber sale.  The core holding of *Tenakee I* is that the scope and specificity of an EIS are two different things, and while the Service has discretion to determine the former it lacks such discretion as to the latter.  *Tenakee I*, 778 F.2d at 1407.  Here, the Forest has provided information on where timber harvest and road construction activities may take place and

is not "attempt[ing] to justify" any lack of information (Pls.' Br. at 16), or to opt-out of any of NEPA's requirements.

*Tenakee I* is also inapposite on the facts. That case involved the location and timing of expected timber harvesting along a proposed new road in the Kadashan watershed. *See Tenakee I*, 778 F.2d at 1404 . In the project-level EIS, the Service deferred a decision on timber harvesting along the road but recommended construction of the road to prepare for future harvest. *Id.* In a narrow ruling, the *Tenakee I* court enjoined construction of the road because the EIS failed to give "any indication of [the Service's] overall plan for timber harvesting," and as a result, "[i]t is impossible to determine where and when harvesting will occur on the 750,000 acres of land." *Id.* at 1408.

Plaintiffs rely on that single, last phrase to argue that the Service did the same thing here. Pls.' Br. at 15. In fact, that is not what the Service did in *Tenakee I* and it is not what the Service is doing here. The district court in a subsequent case explained that the "750,000 acres of land" language from *Tenakee I* "may be an improperly drafted allusion to the fact that the final EIS did not reveal where and when logging would take place *along the Kadashan Road* that was the focus of *Tenakee I*," but that "the EIS *did* reveal where and when harvesting would take place in other management units of the contract area." *See City of Tenakee Springs v. Courtright*, No. J86-024, 1987 WL 90272, *3 (D. Alaska June 26, 1987) (emphasis added). In any event, here, the Service *did*

identify the areas where timber harvest and road construction would occur on the Map, as explained in the section below.

### 2. The Service Identified Where Harvest And Road Activities Would Take Place.

The Service's choice of units and roads is not the black box Plaintiffs suggest. The Service identified all potential timber harvest locations in the Project LSTA, which relied on site-specific GIS data, aerial photographs, and data collected in the field by Service personnel to identify potential harvest strands within lands determined to be suitable for timber harvest under the Forest Plan. 833_2167 at 001480, 001561-65. The Project LSTA includes more than 48,000 acres of potential old-growth timber harvest, 505 miles of potential temporary road construction, and 138 miles of permanent road construction, although no alternative would harvest every acre or build every road. *Id.* at 001481. Alternative 2, for example, includes 23,269 acres of potential old-growth timber harvest, 129 miles of potential temporary road construction, and 35 miles of permanent road construction. *Id.*

Timber harvest locations identified through the Project LSTA are shown on the Map, which has been revised and published multiple times as part of the NEPA process, including with the draft EIS. 833_2178 at 001429 (ROD Map); 833_1202 at 002939 (DEIS Map); 833_1336 at 003570 (Scoping Map). Curiously, Plaintiffs' brief does not contain a single reference to any version of that Map. Timber sale offerings under the Project will be selected from areas shaded "old growth acreage" and "young growth acreage" on the Map, with the exception of old-growth acres within the "North of the 20

*SEACC, et al. v. U.S. Forest Service, et al.,*                                     20
1:19-cv-00006-SLG

Road" area or within VCU 5280, which will not be harvested at all under the selected alternative. 833_2427 at 000787. The shaded areas (old growth and young growth together) represent approximately 5.7% of the total Project Area. *See* 833_2167 at 001481.

In addition to the Project LSTA, the action alternatives, Activity Cards, and Implementation Plan create additional parameters that limit the ultimate selection of units and activities. *First*, each action alternative contains specific design criteria and mitigation measures. *Id.* at 001485-92. For example, Alternative 2 includes timber harvest prescriptions to minimize effects on wildlife within a five-mile radius of subsistence communities. *Id.* at 001504. A map showing these communities and radii is included in the ROD. 833_2427 at 000781.

*Second,* the Service created Activity Cards for each proposed activity that provide resource-specific guidelines and mitigation measures that constrain the activity. 833_2168 at 001864-002075. The Activity Cards are site-specific to the Project Area in that they reflect analyses by resource specialists who used on-the-ground inventories, GIS data, and aerial photographs to develop them. 833_2167 at 001492. Activity Card 13, for example, includes a number of constraints on clear-cut harvesting, including limitations on the size of openings and on harvesting in areas that have less deer winter habitat. 833_2168 at 001935-39.

*Third*, the Implementation Plan sets forth a nine-step process whereby resource concerns and mitigation measures are further refined by specialists after treatment units

*SEACC, et al. v. U.S. Forest Service, et al.,*                                                        21
1:19-cv-00006-SLG

are identified.  833_2427 at 001038-42.  For example, the presence of a goshawk nest at the proposed site observed during fieldwork triggers the use of required design components to protect goshawk nests.  *Id.* at 001040.  Conducting such fieldwork during implementation, closer in time to an actual proposed treatment, makes it much more likely that the design components will be effective.

Plaintiffs argue that the Service is attempting to substitute its Implementation Plan for what Plaintiffs allege is an inadequate EIS.  *See* Pls.' Br. at 17-20.  Not true.  The "baseline" environmental information Plaintiffs allege is missing (Pls.' Br. at 20) already exists and was used to generate the Project LSTA and the Activity Cards.  As the Project proceeds, the Service will collect additional field data for each proposed unit – not to generate information it neglected to collect when it prepared the EIS – but to confirm that the environmental impacts of the Project as implemented fall within what has been disclosed and analyzed in the EIS.  833_2427 at 001040-41.  This adaptive approach is consistent with NEPA and reflects the Service's careful efforts to design and implement an effective long-term Project.

### 3.    The Service Analyzed the Maximum Environmental Impact of Timber Harvest By Alternative.

NEPA leaves substantial discretion to an agency to determine how best to gather and assess information about a project's environmental impacts and "does not require adherence to a particular analytic protocol."  *Or. Nat. Desert Ass'n v. BLM*, 625 F.3d 1092, 1121 (9th Cir. 2010) (quoting *Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1188 (9th Cir. 1997)).  The Service exercised that

discretion here, by analyzing the Project's maximum potential impacts, even though NEPA does not require a "worst-case" scenario, *Methow Valley*, 490 U.S. at 356, and even though in reality impacts would be less.[10]  Specifically, the Service assumed that the entire LSTA Project Area would be harvested by clear-cut methods and that every mile of road would be constructed up to the maximum number of harvest acres and miles of road authorized under each alternative.  833_2167 at 001449, 001634.  Applying this approach to different wildlife habitats, for example, the Service assumed that all acres of the particular habitat type as identified by the Project LSTA within each WAA would be harvested by clear-cut methods up to the maximum acres authorized by each alternative. *Id.* at 001500-01.

The Service's conservative approach fulfills NEPA's hard-look requirement.  *See Protect our Cmtys. Found. v. Jewell*, No. 13CV575, 2014 WL 1364453, at *9 (S.D. Cal. Mar. 25, 2014) (finding BLM's "conservative methodology for modeling noise emissions" complied with NEPA); *Conner*, 920 F.3d at 1258 (finding Service's conservative methodology for evaluating Project's effects on lynx that assumed all mapped lynx habitat would be treated complied with NEPA).  The Service's choice of methodology was not arbitrary and capricious, but was done to enable the agency to select a subset of units that will appraise positive from the Project LSTA based on

---

[10] For example, under Alternative 2, about fifty-seven percent of the old-growth acreage proposed for harvest would be harvested using uneven-aged harvest prescriptions, which the Service concluded should have "less effect to old-growth habitat and its associated species than clearcut harvest."  833_2167 at 001634.

*SEACC, et al. v. U.S. Forest Service, et al.,*                                                    23
1:19-cv-00006-SLG

changing ground and market conditions and in collaboration with the public over the fifteen-year-life of the Project. 833_2167 at 001443, 001448, 001560-61, 001565; 833_2171 at 002149, 002157. By mitigating risk of the agency undertaking environmental analysis on timber that cannot later be sold – something that has historically occurred on the Tongass – this approach allows the agency to better achieve the purpose of providing economic benefit to the local economy. *See* 833_2167 at 001565.

Plaintiffs argue that the Service's analysis of impacts was deficient because impacts will vary depending upon where activities are located. Pls.' Br. at 20-26. But the Service did not overlook the areas where activities would ultimately take place. Rather, where appropriate to determine certain effects, the Service analyzed impacts on "specific areas on the landscape." 833_2167 at 001631. The Service simultaneously employed a wider lens encompassing all proposed harvest lands within the Project LSTA that necessarily includes all potential future harvest units and roads. As a result, whatever units the Service ultimately selects within the constraints outlined in the alternatives, Activity Cards, and Implementation Plan, the Project will produce environmental effects that fall within those already disclosed and analyzed in the EIS. *See Conner*, 920 F.3d at 1258.

## 4. <u>The EIS Provides a Sufficient Analysis of Alternatives</u>.

Plaintiffs also argue the Project violates NEPA because the EIS contains a "meaningless comparison of alternatives." Pls.' Br. at 27. Not so. The Service analyzed

*SEACC, et al. v. U.S. Forest Service, et al.,*
1:19-cv-00006-SLG

24

five different alternatives in detail (one was later eliminated) that varied in terms of the proposed quantities and timing of old-growth and young-growth timber to be harvested, restrictions on harvest, and required mitigation measures. *See* 833_2167 at 001445, 001479-80; *id.* at 001501-11. The Service then analyzed the environmental impacts of each of the four alternatives across five specific issues identified during the NEPA process: (i) invasive plant management, (ii) subsistence, (iii) timber supply and timber sale economics, (iv) watershed function, and (v) wildlife habitat and connectivity. *Id.* at 001527-001695; 833_2427 at 000788. The Service also considered and evaluated impacts to other additional resources. 833_2167 at 001696-001826. The Service's analysis of impacts and comparison of alternatives assumed the maximum intensity of each activity permitted under each alternative.

Plaintiffs' allegation that the Service was unable to sufficiently differentiate between alternatives likewise has no merit. *See* Pls.' Br. at 26-28. The Service's analysis of impacts to high-volume productive old-growth habitat ("HPOG")[11] – one example Plaintiffs cite in their brief – shows why. To analyze impacts to HPOG across alternatives, the Service started with the maximum acres of HPOG that could be harvested under each alternative. Then, for each WAA, the Service assumed that the maximum acres of HPOG under each alternative would be harvested within that WAA, limited by the number of HPOG acres actually present in the WAA. The results of this

---

[11] High-volume old-growth habitat provides specific habitat required for some wildlife species, and forage, denning, and nesting habitat. 833_2167 at 001450.

*SEACC, et al. v. U.S. Forest Service, et al.,*
1:19-cv-00006-SLG

25

analysis show clear differences between the alternatives, with Alternative 2 having the greatest potential effects on HPOG – a potential 3% reduction:

| Unit of Measure | Alternative 1 | Alternative 2 | Alternative 3 | Alternative 5 |
|---|---|---|---|---|
| Acres HPOG harvested (47% POG) | Only what would occur under separate NEPA for small and micro sales | 10,936 acres | 6,116 acres | 2,992 acres |
| Qualitative discussion on literature thresholds for % remaining and acres of HPOG habitat | 379,176 acres or a 32% reduction from 1954. There are five WAAs that are currently below 50% habitat remaining | Project may result in two WAAs dropping below 50% habitat remaining and a 3% reduction in total habitat | 2% reduction in total habitat | 1% reduction in total habitat |

833_2167 at 001500 (excerpt from Table 4). The minimal effects associated with Alternative 2 mean that the other alternatives do not offer significantly different impacts.

Mitigation measures also provide a specific point of comparison between the alternatives: Alternative 2 would include mitigation measures in seven of the nine WAAs that are projected to retain fifty percent or less of their estimated original HPOG habitat, whereas under Alternatives 3 and 5 all nine WAAs would receive at least one form of mitigation. *Id.* at 001653-56. Again, however, there will not be a significant contrast in mitigation of effects where all action alternatives have minimal effects.

Plaintiffs also allege that the Service's impact analyses for roads "contain identical text" and that the Service failed to "identify and analyze the impacts of different alternatives in any geographic detail." Pls.' Br. at 27. Plaintiffs' use of roads as an example is misleading, because all action alternatives include at least 129 miles temporary road construction and 35 miles of road construction and there is little difference in mileage between Alternatives 3 and 5. 833_2167 at 001481. Fewer roads

would not meet the purpose and need of the Project to provide a stable level of forest products. It makes sense, therefore, that the Service would determine that whether the Service decided to build 129 miles of temporary roads (Alternative 2), or 175 miles of temporary roads (Alternative 3), or 180 miles of temporary roads (Alternative 5), the "effects to aquatic resources are expected to range from minor to moderate." *Id.* at 001614, 001619, 001622.

In sum, the Forest provided site-specific information regarding where timber harvest activities could occur within the Project Area. The Service analyzed the maximum possible effects of harvest across the different action alternatives. Plaintiffs argue they are entitled to *more* site specificity, *i.e.*, the exact harvest units, but Plaintiffs fail to establish that such information would have led to a more informed decision, or that the Service's decision to select harvest units during implementation was arbitrary and capricious. The Court should grant summary judgment in the United States' favor on Count I.

**B.     The Service Has Complied With ANILCA's Requirements**.

Repackaging their NEPA claim, Plaintiffs aver the Service also violated ANILCA Section 810 by not providing site-specific information about where the logging will occur. Pls.' Br. at 28-31; Compl. ¶¶ 48-51 (Count II, ANILCA). The "purpose of ANILCA § 810 is to protect Alaskan subsistence resources from unnecessary destruction." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 544 (1987). The Service fulfilled that purpose by identifying where Project activities would occur,

evaluating the maximum impacts of the Project on subsistence uses, and by taking actions to benefit subsistence uses and reduce the adverse effects of the Project on – and avoid destruction of – those uses. Plaintiffs' ANILCA claim has no merit.

      1.     **The Service Analyzed the Maximum Potential Effects of the Project On Subsistence Uses**.

The Service met ANILCA's requirement to evaluate the effects of the Project on subsistence uses and needs. 16 U.S.C. § 3120(a)(2). The Service identified twelve subsistence communities within the Project Area and an additional five communities that use the Project Area for subsistence. 833_2167 at 001542; *id.* at 001661. Based on historic levels of deer harvest within WAAs in the Project Area, the Service identified five WAAs "of concern" and explained how those areas would be subject to different amounts of proposed harvest and mitigation measures under the alternatives. *Id.* at 001550, 001553-54. The Service also evaluated the effects of road construction, *i.e.,* increased access, on subsistence uses – which can be both positive and negative – by comparing the mileage of new and temporary roads proposed by the alternatives. *Id.* at 001554, 001557.

The Service also reasonably analyzed the effects to deer habitat[12] – an "indicator" for potential effects on subsistence resources – by looking at effects to non-winter,

_____

[12] The Service also addressed other subsistence resources, but concluded that none of the alternatives would present a "'significant possibility of significant restriction' of subsistence uses for food plants, personal use timber, upland game birds and waterfowl, furbearers and marine mammals." 833_2167 at 001545. In a separate analysis, the Service made the same conclusion for aquatic subsistence resources. *Id.* at 001545-49.

*SEACC, et al. v. U.S. Forest Service, et al.,*                         28
1:19-cv-00006-SLG

average snow, and deep snow habitat across the alternatives. *See id.* at 001540, 001553, 001549-58. Taking effects to deep snow habitat as an example, because "research has shown that deep snow winter range is likely the most limiting habitat for deer" (*id.* at 001662), the Service assumed that all deep snow habitat acres would be harvested by clear-cut methods within each WAA up to the maximum deep snow acreage authorized under each alternative. In other words, for each WAA, the Service assumed harvest would be concentrated in that WAA and would occur at the maximum level. Under these assumptions, Alternative 2 may result in three WAAs dropping below 50% habitat remaining and a 1% reduction in total deep snow habitat, and Alternatives 3 and 5 would result in a less than 1% and 0% reduction in total habitat, respectively. *Id.* at 001500-01.

Taking into account the possible loss of deep snow habitat and the effects from increased access from road construction, the Service concluded that "this project *may* present a significant possibility of a significant restriction of subsistence use of deer due to potential effects on abundance and distribution, and on competition," *id.* at 001558 (emphasis added), thereby causing the Service to hold a hearing and make certain determinations under the statute before it could forward with the Project. 16 U.S.C. § 3120(a)(1)-(3).

### 2. The Service Held Seven Subsistence Hearings.

ANILCA requires that a hearing be noticed and held "in the vicinity of the area involved" before a decision is made to authorize a use of public lands that would "significantly restrict subsistence uses." 16 U.S.C. § 3120(a). Following publication of

the draft EIS in April 2018, the Service held subsistence hearings in Whale Pass, Klawock, and Hydaburg in late May 2018. 833_2167 at 001470. In response to public comments, the Service held additional subsistence hearings in Point Baker, Kasaan, Klawock, and Naukati in early September and mid-October 2018. *Id.* During Project implementation, subsistence users will have additional opportunities to provide input at annual public workshops and during comment periods. 833_2427 at 001035-36.

Plaintiffs argue that the multiple hearings could not have been "meaningful" without information about "where the logging would occur" within the 1.8 million acres of federal land that make up the Project Area. Pls.' Br. at 30. But contrary to Plaintiffs' assertion, subsistence users were apprised of where harvest and associated road activities would occur prior to the hearings. The Map released with the draft EIS in April 2018 shows the relative locations of the subsistence communities and the areas where Project activities would occur. 833_1202 at 002939 (DEIS Map). That subsistence users had "meaningful information about how the Project would affect them" (Pls.' Br. at 30) is evidenced by the fact that the Service eliminated old-growth harvest in the area "North of 20 Road" and within VCU 5280 in the final decision in response to subsistence concerns raised by users in Point Baker and Point Protection both at the subsistence hearings and throughout the NEPA process. 833_2427 at 000787; 833_2285 at 011644 (from summaries of subsistence hearings: "Area north of the 20 road had some requests for small sales, but the majority requested no timber harvests in the area. . . . VCU 5280: support for no harvest.").

*SEACC, et al. v. U.S. Forest Service, et al.,*
1:19-cv-00006-SLG

30

### 3.    The Service Made the Requisite Determinations.

Section 810(a)(3) of ANILCA requires that when a use of public lands would "significantly restrict subsistence uses," a determination must be made that (1) "such a significant restriction is necessary, consistent with sound management principles for the utilization of public lands," (2) "the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of use," and (3) "reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources."  16 U.S.C. § 3120(a)(3).   The Service made the requisite determinations.  *See* 833_2167 at 001558-59.

The Service made the requisite "necessary, consistent" determination when it found that "[a]t this time, a need exists to contribute to the economic viability of Prince of Wales area communities, in part by providing a sustainable level of forest products to help maintain the expertise and infrastructure of the timber industry."  *Id.* at 001748.  The Service determined that 58 MMBF is "the estimated volume of timber the Forest [] needs to offer to replace the volume expected to be harvested and to help build a 3-year supply of timber under contract" for the Tongass.  *Id.* at 001565.  For context, the selected alternative would offer up to an average of 25 MMBF of old-growth timber annually during the first five years of implementation (with reductions thereafter in favor of young-growth timber).  *Id.* at 001486.  In *Hoonah Indian Association v. Morrison*, the Ninth Circuit upheld a similar "necessary, consistent" determination by the Service that "a substantial component of the economy of Southeast Alaska is dependent on a viable

timber industry," and "there is a clear need" for the sale in order to "come closer to the objective of providing a three-year supply of timber to the existing dependent industry." 170 F.3d 1223, 1227 (9th Cir. 1999) (internal quotations omitted).

The Service also made the requisite "minimum" determination under Section 810(a)(3). *See* 833_2167 at 001559. The Service explained that "the entire forested portion of the Tongass is used by at least one rural community for subsistence purposes for, at a minimum, deer hunting[,] [i]t is not possible to avoid all of these areas in implementing resource use activities, such as timber harvesting and road construction, under any alternative, and attempting to reduce effects in some areas can mean increasing the use of others." *Id.* at 001559. Nevertheless, the Service strove to limit the areas where subsistence effects would be felt, by eliminating two areas from old-growth harvest in response to concerns expressed by subsistence users. 833_2427 at 000787.

Finally, the Service took "reasonable steps . . . to minimize adverse impacts upon subsistence uses and resources." 16 U.S.C. § 3120(a)(3). All alternatives include activities designed to benefit and minimize negative effects to subsistence uses, such as thinning, girdling, pruning, and slash treatment. *See, e.g.*, 833_2427 at 000868-88. The timber harvest Activity Cards contain mitigation measures designed to benefit subsistence users, *e.g.*, improvements to wildlife habitat and corridors. *Id.* at 000895-904 (Activity Cards 13 & 14). The selected alternative additionally establishes wildlife harvest prescriptions within a five-mile radius of subsistence communities in the Project Area. *See id.* at 000784-85, 000790-91.

In sum, the Service provided site-specific information about where harvest and associated road construction activities would occur to subsistence users. The Service used this information to analyze the maximum effects of the Project on subsistence uses. Although ANILCA refers to a single hearing, the Service held no less than seven public hearings in subsistence communities throughout the Project Area. Finally, in response to concerns raised by subsistence users, the Forest Supervisor eliminated old-growth timber harvest in some areas. The Court should grant summary judgment in favor of the United States on Count II.

## C.   The Service's Decision Is Consistent with the Forest Plan and Complies with NFMA.

Plaintiffs' final challenge concerns the Service's interpretation and application of its own Forest Plan. Pls.' Br. 31-34; Compl. ¶¶ 52-58 (Count III, NFMA). Specifically, Plaintiffs allege section TIM3.I.C. of the Forest Plan Standards and Guidelines requires the Service to include unit cards with the draft or final EISs for the Project. Plaintiffs seek to add language to TIM3.I.C and elevate the term "unit card" over the substantive elements of that Standard and Guideline. There is no NFMA violation here.

### 1.   The Service Complied with TIM3.I.C.

Forest Plan Standard and Guideline TIM3.I.C. states

[c]onsider the management prescription of the LUDs within the project area in project design and environmental analysis for timber activities. Timber harvest unit cards will document resource concerns and protection measures. The unit cards, including a map with relevant resource features, will be provided electronically when Draft or Final NEPA documents and decisions are published. (Consult Tongass National Forest Supplement 1909.15-2015-1.)

833_0404 at 063265.  TIM3.I.C. is silent with respect to the contents and format of unit cards, *except* that the cards "will document resource concerns and protection measures" and "include[e] a map with relevant resource features."  *Id.*

The Service complied with TIM3.I.C.  First, the Service made available this information throughout the NEPA process in the form of a comprehensive map, *i.e.*, the Map, showing relevant resource features where the activities would occur, along with Activity Cards documenting resource concerns and protection measures.[13]  833_2427 at 000802 (In discussing the Service's compliance with TIM3.I.C., "Activity Cards and maps were included with the FEIS and Draft ROD and will also be part of this Final ROD.").  The Map identifies all of the areas within the Project Area where old-growth and young-growth harvest could occur, the roads needed to access those areas, and resource features such as elevation, lakes, and wilderness areas.  833_2178 at 001429 (ROD Map); 833_1202 (DEIS Map); *see also* 833_2171 at 002149 (responding to comments that the Service violated TIM3.I.C.: "[t]he DEIS contains maps that depict the specific areas (context) where potential commercial timber harvest, recreation projects, watershed improvements, and other activities may occur.").

Second, the forty-six Activity Cards "provided electronically" with the draft and final NEPA documents "document resource concerns and protection measures" at the

---

[13] The Service has previously used the term "Activity Card" flexibly in reference to both "unit cards" and "road cards."  *See* Kuiu Timber Sale Area EIS, Appendix B, *available at* https://www.fs.usda.gov/nfs/11558/www/nepa/3332_FSPLT1_017166.pdf.

*SEACC, et al. v. U.S. Forest Service, et al.,*                                                    34
1:19-cv-00006-SLG

Project level. 833_0404 at 063265. For each activity authorized under the Project, the associated Activity Card explains "what it usually accomplishes, how it is typically implemented, what constraints and resource-specific guidelines apply, and when it would be implemented." 833_2427 at 000802. For example, Activity Card No. 13 identifies "areas that may be lacking or limited in [wildlife] habitat variability" as a resource concern and describes the protection measures to be employed in those areas, including "leaving untreated or lightly treated areas across the landscape," "increasing forage production," "incorporating leave strips," and "putting roads in storage or decommissioning." *Id.* at 000896. *See also id.* at 000900-04 (Activity Card No. 14); *id.* at 000922-26 (Activity Card No. 19).

Plaintiffs argue that TIM3.I.C. is unambiguous in its requirement to provide unit cards with the draft or final Project EIS. Pls.' Br. at 32-33. But this assertion rests on Plaintiffs' own interpretation of what a unit card is, and a reference to a rescinded guidance document. The information Plaintiffs seek – *i.e.*, "a map of the cutting unit and narrative information . . ." – is certainly not found in the Standards and Guidelines. *See* 833_0404 at 063265. And while Tongass National Forest Supplement 1909.15-2015-1 provided internal "guidance" (Pls.' Br. at 33) on the form and content of unit cards, including provisions that specifically address unit card maps and narratives, (833_2526 at 074728-32), the Chief of the Forest Service rescinded that Supplement in October 2018 and it is no longer in effect. 833_2525 at 074720 (Chief's Oct. 24, 2018 Memorandum). Thus, the cutting unit map and other extra-standard "narrative information" as defined in

*SEACC, et al. v. U.S. Forest Service, et al.,*                                        35
1:19-cv-00006-SLG

Supplement 1909.15-2015-1 that Plaintiffs demand the Service provide at the draft and final EIS stage was never mandatory, and in any case is no longer applicable. 833_2427 at 000802-03.

The Service's decision to rely on a single integrated map and forty-six Activity Cards rather than potentially hundreds of unit cards as a way to fully comply with Forest Plan Standard TIM3.I.C. was reasonable. *Id.* at 000802-03. The Map was developed using the same GIS data that would otherwise have been used to develop "unit cards," and is not the sea change from prior NEPA practice Plaintiffs suggest. *See* 833_2167 at 001475. The Service's use of Activity Cards to document resource concerns and protection measures at the Project level comports with an integral part of the Project's design – determining the exact layout of timber sales and roads during implementation. *Id.* at 001443-44, 001448, 001459; 833_2171 at 002149-50; 833_1198 at 002277. The specific requirements in TIM3.I.C. concern the substance of the cards, not what they are called. The Activity Cards and Map meet the substantive requirements.

Plaintiffs claim the Service's interpretation of TIM3.I.C "permit[s] the agency, under the guise of interpreting a regulation to create *de facto* a new regulation." Pls. Br. 33 (citing *Kisor v. Wilkie*, 588 U.S. – , 139 S. Ct. 2400, 2415 (2019)). *Kisor* reaffirmed that "a court must exhaust all the 'traditional tools' of construction" before concluding that a rule is genuinely ambiguous. *Kisor*, 139 S. Ct. at 2415 (citing *Chevron U.S.A. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984)). Because the term "unit card" is not defined in TIM3.I.C., or elsewhere – causing Plaintiffs to reach outside the

provision's language to describe what unit cards "typically" contain (*see* Pls.' Br. at 31-32) – the term is ambiguous, and the Court should defer to the Service's reasonable interpretation of what TIM3.I.C. required. The Standard does not even specifically mandate the *preparation* of "unit cards," their format, or their contents apart from the substantive requirements discussed above (which have been met). Under *Kisor*, a court may defer to an agency's reasonable interpretation of an ambiguous provision like TIM3.I.C. when that interpretation 1) is the agency's official position; 2) implicates its substantive expertise; and 3) reflects a fair and considered judgment. *Kisor*, 139 S. Ct. at 2416-2418. The markers for deference are present here. The Chief of the Forest Service rescinded the previous guidance on unit cards, 833_2525 at 074720, and the Service's interpretation of TIM3.I.C. is both stated on the record and inherent in the Project's design. Furthermore, there is no doubt that the Service's interpretation implicates its expertise or that the Service's interpretation is fair and considered. *See supra* pp. 23-24.

The crux of TIM3.I.C is that resource concerns and protection measures, and a map with relevant resource features, must be provided to the public when draft or final NEPA documents and decisions are published. As discussed above, the Map and the Activity Cards provide this information and satisfy the requirements of the Forest Plan.

## 2. <u>Plaintiffs Were Not Prejudiced by the Lack of "Unit Cards</u>."

Relief under the APA is only available for "prejudicial error." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1090-91 (9th Cir. 2014) (citing 5 U.S.C. § 706); *N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 842 (9th Cir. 2007) (same). The burden is on

the party challenging an agency decision to prove that the error caused the agency to reach its ultimate conclusion. *Shinseki v. Sanders*, 556 U.S. 396, 409-11 (2009); *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1090-94 (9th Cir. 2011). Even if Plaintiffs were to succeed on the merits, which they should not, they cannot meet their burden to prove prejudice.

Plaintiffs were provided with the substantive information required by the Standard and Guideline, and the Service based its decision on that substantive information – regardless of the form it took. Plaintiffs were not deprived of the opportunity to comment on the proposed locations of timber harvest during the NEPA process, nor did the Service lack information about proposed locations. Indeed, commenters – using the information provided – requested that two geographic areas be eliminated from the areas approved for timber harvest due to subsistence concerns and that request is reflected in the final ROD. 833_2427 at 000787. During implementation, the Service will prepare and publish unit cards, as such, for public comment as part of the "Out-Year Plan" that lay out harvest units based on the Map.[14] *Id.* at 000802, 001039-40.

Importantly, Plaintiffs also cannot demonstrate that production of unit cards, as such, would have affected the Service's ultimate decision. Plaintiffs have not identified any instance in which a lack of individual maps and narratives, rather than the Map and

---

[14] Those unit cards are now available for the first proposed units, and will be made available as further units are identified during the implementation process, as outlined in the final EIS and ROD. *See* https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd641767.pdf.

Activity Cards the Service used, would have made a material difference to the Service's evaluation of environmental impacts in this case. If anything, the Forest's approach to the Project resulted in a more conservative assessment of potential environmental impacts across the alternatives.

In sum, the Project is consistent with the Forest Plan. The Service has complied with Standard and Guideline TIM3.I.C by providing the Map and the Activity Cards containing the substantive information referred to in the Standard and Guideline. There is no NFMA violation, but even if there were, the error is harmless. The Court should grant summary judgment in favor of the United States on Count III.

###    D.    Remedy, If Any, Should Be Addressed After the Court Issues a Decision on the Merits.

For the reasons stated above, Plaintiffs' Motion for Summary Judgment should be denied in its entirety. Should Plaintiffs prevail on any claim, however, the issues of remedy and whether vacatur is appropriate should be addressed in supplementary briefing following the Court's decision on the merits. Plaintiffs have specifically requested vacatur of "those portions of the ROD authorizing vegetation management and new road construction" (Pls.' Br. at 35), but that request is premature. Even a flawed agency decision "need not be vacated." *Cal. Communities Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012). When "equity demands," courts may leave in place an agency action "while the agency follows the necessary procedures to correct" its error. *Id.* (internal quotation marks omitted). Whether an agency action should be vacated depends

*SEACC, et al. v. U.S. Forest Service, et al.,*                                    39
1:19-cv-00006-SLG

on "how serious the agency's errors are and the disruptive consequences of an interim change that may itself be changed." *Id.* (citation and internal quotation marks omitted).

Both considerations are informed by the Court's decision on the merits. In a case where the Service can remedy the error through a minor amendment to the Forest Plan, *see* 36 C.F.R. §§ 219.13, 219.15(c), 219.16(b), vacatur is not appropriate. *See Pollinator Stewardship Council v. U.S. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (vacatur requires a "fundamental flaw" that would prevent the agency from adopting the same conclusion if the matter were remanded). Courts have ordered remand without vacatur where a site-specific project does not demonstrate consistency with the Forest Plan. *See Greenpeace, Inc. v. Cole*, 50 F. Supp. 3d 1158, 1167-68, 70 (D. Alaska 2014) (ordering remand without vacatur in a case where four timber sales on the Tongass National Forest violated NFMA because the Service did not adequately explain how the sales complied with forest plan standards for deer winter habitat capability); *Alliance for the Wild Rockies v. Savage*, 375 F. Supp. 3d 1152, 1156-57 (D. Mont. 2019) (ordering remand without vacatur in a case where a large percentage of the project area geographically was unaffected by the Service's NFMA error and even within the percentage that was affected, the project authorized other work which could proceed).

The Service believes the consequences of vacatur would be extremely disruptive due to the recent low and uncertain supply of timber in Southeast Alaska, which threatens businesses in the region. Plaintiffs' particular form of vacatur that would vacate *only* the timber harvest and new road construction activities authorized under the Project while

leaving Project activities, such as watershed restoration and development of recreation facilities unaffected, would be particularly disruptive here, because the Project activities Plaintiffs do not challenge rely on funding from timber sales. The economic need for Project timber and the harm that would be caused by delaying timber harvesting activities authorized by the Project cannot be adequately addressed within the page limit for this merits brief. The Service respectfully requests an opportunity to address remedy issues, if necessary, in supplemental briefing.

## V.     CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Summary Judgment and enter judgment in favor of the United States.

Dated: August 12, 2019

LAWRENCE VANDYKE
Deputy Assistant Attorney General
U.S. Department of Justice

*/s/ Erika Norman*
ERIKA NORMAN
Trial Attorney
Natural Resources Section
4 Constitution Square
150 M Street, NE, Suite 2.900
Washington, DC 20004
Phone: (202) 305-0475
Fax: (202) 514-8865
erika.norman@usdoj.gov

*Counsel for Federal Defendants*

**CERTIFICATE OF COMPLIANCE WITH WORD LIMIT**

I certify that this brief contains 9,990 words, excluding items exempted by Local

Civil Rule 7.4(a)(4), and complies with the word limit of Local Civil Rule 7.4(a)(1).

Dated:  August 12, 2019

/s/ Erika Norman
Erika Norman
