# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

SOUTHEAST ALASKA
CONSERVATION COUNCIL, *et al.*,

              Plaintiffs,

      v.

UNITED STATES FOREST
SERVICE, *et al.*,

              Defendants.

Case No. 1:19-cv-00006-SLG

## ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

Before the Court at Docket 17 is Plaintiffs Southeast Alaska Conservation Council, Alaska Rainforest Defenders, Center for Biological Diversity, Sierra Club, Defenders of Wildlife, Alaska Wilderness League, National Audubon Society, and Natural Resources Defense Council's (collectively "Plaintiffs") Motion for Preliminary Injunction. Defendants U.S. Forest Service, U.S. Department of Agriculture, David Schmid, and Earl Stewart (collectively "Forest Service") opposed at Docket 21. Plaintiffs replied at Docket 26. Amicus curiae Alaska Forest Association filed a brief in opposition at Docket 24. Oral argument was not requested by any party and was not necessary to the Court's decision.

## BACKGROUND

The Tongass National Forest ("Tongass") is a 16.7 million-acre forest in Southeast Alaska.[1]  The nation's largest National Forest,[2] the Tongass has seen timber harvesting of varying intensity over the past 100 years.[3]  But logging in the Tongass has slowed since the 1980s in response to the termination of several long-term contracts—awarded by the Forest Service to "provide a sound economic base in Alaska through establishment of a permanent year-round pulp industry"[4]—due to market fluctuation, litigation, and other factors.[5]

Prince of Wales Island, a large island in the Alexander Archipelago, lies within the Tongass.[6]  Two large pulp mills once operated on the island, where industrial scale logging occurred in the second half of the 20th century, but both mills closed in the 1990s.[7]  There are 12 communities on the island with a total of approximately 4,300 residents, many of whom are Alaska Native.[8]  Tourism and

---

[1] Administrative Record ("AR") 833_0404 at 063052, 063054.

[2] AR 833_0404 at 063052.

[3] AR 833_2077 at 069553–55.

[4] AR 833_2077 at 069553.

[5] AR 833_2077 at 069553–55.

[6] AR 833_0404 at 063054.

[7] AR 833_2167 at 01750.

[8] AR 833_2167 at 01753; *see also* AR 833_2167 at 01751, tbl. 70 (showing population change).

Case No. 1:19-cv-00006-SLG, *SEACC, et al. v. U.S. Forest Serv., et al.*
Order Granting Motion for Preliminary Injunction
Page 2 of 26

Case 1:19-cv-00006-SLG   Document 27   Filed 09/23/19   Page 2 of 26

sport and commercial fishing are important to the local economy,[9] and many residents rely to some degree on subsistence hunting, fishing, and gathering.[10]

In late 2016, the Forest Service initiated environmental planning for the Prince of Wales Landscape Level Analysis Project ("Project").[11] The Project is "a large landscape-scale NEPA analysis that will result in a decision whether or not to authorize integrated resource management activities on Prince of Wales Island over the next 15 years."[12] The Forest Service released a final environmental impact statement ("EIS") for the Project on October 19, 2018[13] and issued a Record of Decision ("ROD") selecting the alternative proposed therein on March 16, 2019.[14]

The Project covers all land on Prince of Wales Island within the National Forest System, consisting of roughly 1.8 million acres.[15] It authorizes four categories of activities within this area: vegetation management, including timber harvesting; watershed improvement and restoration; sustainable recreation

---

[9] AR 833_2167 at 001750

[10] *See* AR 833_2167 at 00753–58 (describing different communities on the island).

[11] AR 833_2167 at 001468.

[12] AR 833_2167 at 001459.

[13] AR 833_2167 at 001437–001863 (Final EIS).

[14] AR 833_2426 at 000434–000775; *see also* 42 U.S.C. § 4332(2)(C) (requiring agencies to prepare a "detailed statement" for actions with significant environmental impacts).

[15] AR 833_2167 at 001460–61; *see also* AR 833_2426 at 000439.

Case No. 1:19-cv-00006-SLG, *SEACC, et al. v. U.S. Forest Serv., et al.*
Order Granting Motion for Preliminary Injunction
Page 3 of 26

Case 1:19-cv-00006-SLG   Document 27   Filed 09/23/19   Page 3 of 26

management; and "associated actions."[16]  The Forest Service created what it calls

an Activity Card for each of the 46 activities included in these broad categories.[17]

"The Activity Cards describe each potential activity and the related resource

considerations," but do not include maps.[18]

The Forest Service used the Activity Cards to create a flexible planning

framework intended to allow it to tailor resource management to changing

conditions on the ground.  Viewing the project area as a whole, each alternative

considered in the EIS "describe[d] the conditions being targeted for treatments and

what conditions cannot be exceeded in an area, or place[d] limits on the intensity

of specific activities such as timber harvest."[19]  But the EIS provides that "site-

specific locations and methods will be determined during implementation based on

defined conditions in the alternative selected in the . . . ROD . . . in conjunction with

the Activity Cards . . . and Implementation Plan . . . ."[20]  The Forest Service has

termed this approach "condition-based analysis."[21]

---

[16] AR 833_2167 at 001443.

[17] AR 833_2427 at 000848–001030.

[18] AR 833_2167 at 001492; *see, e.g.*, AR 833_2427 at 000848–52 (Activity Card 01).

[19] AR 833_2167 at 001459.

[20] AR 833_2167 at 001459.

[21] AR 833_2167 at 001443.

Case No. 1:19-cv-00006-SLG, *SEACC, et al. v. U.S. Forest Serv., et al.*
Order Granting Motion for Preliminary Injunction
Page 4 of 26

In the implementation plan accompanying the EIS, the Forest Service clarified that there would be no "need for additional NEPA analysis" under this framework.[22] Instead, the Project requires that the Forest Service engage in a predetermined, nine-step implementation process before taking any specific action in the project area.[23] This process includes checking the action against the relevant Activity Card, the final EIS, and the ROD, as well as engaging in "workshops and other public involvement techniques."[24]

The final EIS considered four alternatives in detail, including a no-action alternative.[25] In analyzing each alternative, the Forest Service indicated that it assumed (1) that all acres proposed for harvest within the project area would be harvested and all roads proposed by the alternative would be built[26]; (2) that all acres would be harvested using clear-cut methods[27]; and (3) that each Wildlife Analysis Area would be harvested to the maximum acreage available.[28] The

---

[22] AR 833_2169 at 002078

[23] *See* AR 833_2169 at 2081 (graphically describing process).

[24] AR 833_2169 at 2081.

[25] AR 833_2167 at 001479–1511.

[26] *See, e.g.*, AR 833_2167 at 001629 ("[A]ssumptions include that all harvest stands from the [Project-wide logging system and transportation analysis] would be harvested . . . ."); AR 833_2167 at 001789–90 (discussing road construction by alternative); *see also* Docket 12 at 31 (describing analytical approach).

[27] AR 833_2167 at 001450.

[28] *See* AR 833_2167 at 001500.

Case No. 1:19-cv-00006-SLG, *SEACC, et al. v. U.S. Forest Serv., et al.*
Order Granting Motion for Preliminary Injunction
Page 5 of 26

Case 1:19-cv-00006-SLG   Document 27   Filed 09/23/19   Page 5 of 26

Forest Service made these assumptions in order to consider the "maximum effects" of the Project.[29]

The alternative selected in the ROD—Alternative 2—included the harvest of 23,269 acres of old growth trees and 19,366 acres of young growth trees, out of 48,140 and 77,389 acres identified as potential sites of old- and young-growth harvest respectively.[30] It also included the construction of 164 miles of road.[31] But pursuant to the Project's framework, the selected alternative did not identify the specific sites where the harvest or road construction would occur.[32]

The Forest Service began implementing the Project shortly after issuing the ROD. It held a public workshop on April 6, 2019[33] and published an "Out-Year Plan" for fiscal year 2019 that included a proposed timber sale of 1,156.34 acres, known as the Twin Mountain Timber Sale.[34] The Forest Service also published

---

[29] AR 833_2167 at 001639.

[30] AR 833_2167 at 001481.

[31] AR 833_2167 at 001481; *see also* AR 833_2167 at 001485–87 (describing Alternative 2).

[32] *See* AR 833_2178 (Commercial Vegetation Map identifying potential areas of timber harvest and road construction).

[33] *See*, U.S. FOREST SERV., PRINCE OF WALES LANDSCAPE LEVEL ANALYSIS PROJECT, DEAR PLANNING AND IMPLEMENTATION PARTICIPANT LETTER, https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd622020.pdf (last visited Sept. 22, 2019).

[34] *See*, U.S. FOREST SERV., PRINCE OF WALES LANDSCAPE LEVEL ANALYSIS PROJECT, OUT-YEAR PLAN, https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd622075.pdf (last visited Sept. 22, 2019); *see also* Docket 21-1 at 2-3, ¶ 6 (providing size of sale).

Case No. 1:19-cv-00006-SLG, *SEACC, et al. v. U.S. Forest Serv., et al.*
Order Granting Motion for Preliminary Injunction
Page 6 of 26

Case 1:19-cv-00006-SLG   Document 27   Filed 09/23/19   Page 6 of 26

draft unit cards for the sale, which identify the specific locations and method of timber harvest in graphical and narrative form.[35]  The parties have stipulated that ground-disturbing activities associated with the sale could begin as early as September 27, 2019.[36]

Plaintiffs initiated this case on May 7, 2019.[37]  The Complaint is brought pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702–06, and alleges that the Project EIS violates three federal laws:  (1) the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332; (2) the Alaska National Interest Lands Conservation Act ("ANILCA"), 16 U.S.C. § 3120; and (2) the National Forest Management Act ("NFMA"), 16 U.S.C. § 1604.[38]  The Complaint seeks declaratory judgment, vacatur of the EIS and ROD, and "preliminary and permanent injunctive relief as needed to prevent irreparable harm from implementation of the [Project]."[39]  The parties recently completed briefing on the

---

[35] *See*, U.S. FOREST SERV., TWIN MOUNTAIN SALE DRAFT UNIT CARDS, https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd641767.pdf (last visited Sept. 22, 2019).  Plaintiffs have produced an area map of the proposed timber activities. *See* Docket 10-2 Ex. A at 5.

[36] Docket 6 at 3, ¶ 3 (Stipulation and Joint Motion for Entry of Scheduling Order).

[37] Docket 1.

[38] Docket 1 at 15-19, ¶¶ 47, 51, 58.

[39] Docket 1 at 19, ¶¶ 1-5.

Case No. 1:19-cv-00006-SLG, *SEACC, et al. v. U.S. Forest Serv., et al.*
Order Granting Motion for Preliminary Injunction
Page 7 of 26

Case 1:19-cv-00006-SLG   Document 27   Filed 09/23/19   Page 7 of 26

merits of the case,[40] and the Court intends to rule on the merits no later than March 31, 2020.

Plaintiffs filed the instant Motion for Preliminary Injunction on August 15, 2019.[41]

## JURISDICTION

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which "confer[s] jurisdiction on federal courts to review agency action, regardless of whether the APA of its own force may serve as a jurisdictional predicate."[42]

## LEGAL STANDARD

In *Winter v. Natural Resources Defense Council, Inc.*, the United States Supreme Court held that plaintiffs seeking preliminary injunctive relief must establish that "(1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) a preliminary injunction is in the public interest."[43] *Winter* was focused on the second element, and clarified that irreparable harm must be likely, not just possible, for an injunction to issue.[44]

---

[40] *See* Docket 10 (Plaintiffs' Motion for Summary Judgment); Docket 12 (Forest Service's Opposition); Docket 19 (Plaintiffs' Reply).

[41] Docket 17.

[42] *Califano v. Sanders*, 430 U.S. 99, 105 (1977).

[43] *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

[44] *See Winter*, 555 U.S. at 25; *see also All for the Wild Rockies v. Cottrell*, 632 F.3d

Case No. 1:19-cv-00006-SLG, *SEACC, et al. v. U.S. Forest Serv., et al.*
Order Granting Motion for Preliminary Injunction
Page 8 of 26

Case 1:19-cv-00006-SLG   Document 27   Filed 09/23/19   Page 8 of 26

Following *Winter*, the Ninth Circuit addressed the first element—the likelihood of success on the merits—and held that its "serious questions" approach to preliminary injunctions was still valid "when applied as a part of the four-element *Winter* test."[45] Accordingly, if a plaintiff shows "that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits— then a preliminary injunction may still issue if the 'balance of hardships tips *sharply* in the plaintiff's favor."[46] "Serious questions are 'substantial, difficult, and doubtful,' as to make them a fair ground for litigation and thus for more deliberative investigation."[47] They "need not promise a certainty of success, nor even present a probability of success, but must involve a 'fair chance on the merits.'"[48] All four *Winter* elements must still be satisfied under this approach,[49] but analyses of the

_____

1127, 1131 (9th Cir. 2011).

[45] *See All. for the Wild Rockies*, 632 F.3d at 1131–35.

[46] *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014) (emphasis in original) (quoting *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)).

[47] *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 422 (9th Cir. 1991) (quoting *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988)); *see also Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1273 (N.D. Cal. 2014) ("'Serious questions' refers to questions 'which cannot be resolved one way or the other at the hearing on the injunction and as to which the court perceives a need to preserve the status quo . . . .'" (quoting *Gilder*, 936 F.2d at 422)).

[48] *Gilder*, 936 F.2d at 422 (quoting *Republic of the Philippines*, 862 F.2d at 1362).

[49] *See All. for the Wild Rockies*, 632 F.3d at 1135 ("Of course, plaintiffs must also satisfy the other *Winter* factors."); *see also, e.g.*, *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 944 (9th Cir. 2013) (describing standard for preliminary injunction).

Case No. 1:19-cv-00006-SLG, *SEACC, et al. v. U.S. Forest Serv., et al.*
Order Granting Motion for Preliminary Injunction
Page 9 of 26

Case 1:19-cv-00006-SLG   Document 27   Filed 09/23/19   Page 9 of 26

last two elements—harm to the opposing party and consideration of the public interest—may merge when the government is the opposing party.[50]

Injunctive relief is an equitable remedy, and "[t]he essence of equity jurisdiction is the power of the court to fashion a remedy depending upon the necessities of the particular case."[51]

## DISCUSSION

Upon consideration of the parties' briefing and the record in this case, the Court finds as follows:

I.    *The likelihood of irreparable harm in the absence of preliminary relief*

Plaintiffs' members use areas that would be affected by the Twin Mountain Timber Sale for hunting, fishing, gathering, and recreation.[52]  They also enjoy the area's aesthetic qualities.[53]  Plaintiffs maintain that in light of these uses, the timber harvest and road construction authorized by the sale would cause them irreparable

---

[50] *Nken v. Holder*, 556 U.S. 418, 435 (2009).  The merger of the last two elements does not mean that these factors always weigh in the government's favor.  The Supreme Court recognized in *Nken* that "there is a public interest in preventing" wrongful government action.  *Id.* at 435–36.

[51] *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1022 (9th Cir. 2009) (citing *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 175 (9th Cir. 1987)).

[52] *See, e.g.*, Docket 10-1 at 3–6, ¶¶ 4–7 (Decl. of David Beebe); Docket 10-7 at 2–3, ¶ 4 (Decl. of Don Hernandez).

[53] *See, e.g.*, Docket 10-1 at 6–7, ¶ 7; Docket 10-12 at 5–6 ¶ 11 (Decl. of Elsa Sebastian).

Case No. 1:19-cv-00006-SLG, *SEACC, et al. v. U.S. Forest Serv., et al.*
Order Granting Motion for Preliminary Injunction
Page 10 of 26

Case 1:19-cv-00006-SLG   Document 27   Filed 09/23/19   Page 10 of 26

harm.[54]  The record demonstrates that Plaintiffs' members value the forests in the project area.[55]

"Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable."[56]  The Ninth Circuit has explained that the harvest of mature trees is "irreparable for the purposes of the preliminary injunction analysis" because it "cannot be remedied easily if at all."[57]  Based on the foregoing, Plaintiffs have established that they will suffer irreparable harm if the harvest—particularly of old growth trees—authorized by the Twin Mountain Timber Sale occurs.

The Forest Service does not dispute that the harvest of mature trees would constitute irreparable harm.[58]  Instead, it notes that the sale has yet to be completed, and maintains that any alleged injury is speculative until a contract is awarded and preliminary planning "indicates activities that would imminently and

---

[54] Docket 17 at 3–4.

[55] For example, one member of a plaintiff organization averred that he enjoys photographing old-growth habitat and seeks out "natural visual and audio soundscapes and viewscapes with wildlife and untouched forest settings because they are regarded as quite rare, yet extremely interesting."  Docket 10-1 at 6–7, ¶ 7.

[56] *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).

[57] *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014); *see also Portland Audubon Soc. v. Lujan*, 884 F.2d 1233, 1241 (9th Cir. 1989) ("The old growth forests plaintiffs seek to protect would, if cut, take hundreds of years to reproduce.").

[58] In fact, the EIS concluded that the "reduction in visual quality of an area due to timber harvesting would be an irretrievable commitment of resources" that would take at least 40 years to remedy.  AR 833_2167 at 001520.

Case No. 1:19-cv-00006-SLG, *SEACC, et al. v. U.S. Forest Serv., et al.*
Order Granting Motion for Preliminary Injunction
Page 11 of 26

Case 1:19-cv-00006-SLG   Document 27   Filed 09/23/19   Page 11 of 26

irreparable affect [Plaintiffs'] claimed use of the Sale area."[59] Plaintiffs' reply

identifies several cases in which courts have enjoined timber sales before a

contract was awarded.[60] And Plaintiffs, citing the Forest Service's own arguments,

maintain that a rule prohibiting preliminary injunctive relief until a sale is finalized

could compromise the integrity of the bidding process or expose the government

to contract damages.[61] The Forest Service has advertised the Twin Mountain

Timber Sale and identified where harvesting will occur.[62] It plans to review the

bids on the sale on September 24, 2019, and intends to award a contract soon

thereafter.[63] The parties have stipulated that ground-disturbing activities could

---

[59] Docket 21 at 7–8 ("Speculative possible harm is insufficient to support granting a preliminary injunction." (citing *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988))).

[60] Docket 26 at 2. *See Forest Serv. Emps. for Envtl. Ethics v. U.S. Forest Serv.*, 408 F. Supp. 2d 916, 917 (N.D. Cal. 2006) (noting earlier order "issu[ing] a preliminary injunction, enjoining the Forest Service from awarding a contract for the Sims Fire Salvage Project"); *Sierra Club v. Eubanks*, 335 F. Supp. 2d 1070, 1084 (E.D. Cal. 2004) (enjoining Forest Service from "taking any further action to implement [a restoration project], including advertising, offering timber for sale, [or] awarding any timber sale contracts").

[61] Docket 26 at 3. The Director of Forest Management for the region that includes the Project stated in a declaration that "[t]he disclosure of bids, or even the existence of bids, risks compromising the integrity of the bid process," Docket 21-1 at 3, ¶ 7 (Decl. of David Harris), and that once an award had been made, the Forest Service would face "potentially significant liquidated damages" if operations were suspended. Docket 21-1 at 5, ¶ 18.

[62] Docket 21-1 at 2–3, ¶¶ 6–7.

[63] Docket 21-1 at 3–4, ¶¶ 8, 9, 11.

Case No. 1:19-cv-00006-SLG, *SEACC, et al. v. U.S. Forest Serv., et al.*
Order Granting Motion for Preliminary Injunction
Page 12 of 26

Case 1:19-cv-00006-SLG   Document 27   Filed 09/23/19   Page 12 of 26

begin as early as September 27, 2019.[64]  Given this immediacy, the Court finds that injury to Plaintiffs is not speculative.

The Forest Service also argues that the injury to Plaintiffs is not imminent because a mobilization period of several weeks will precede any timber harvest under the sale.[65]  But the mobilization includes the construction of roads,[66] which Plaintiffs allege would itself cause irreparable harm.[67]  Indeed, according to the EIS, "[r]oad construction is an irreversible action because of the time it takes for a constructed road to revert to natural conditions."[68]  The Ninth Circuit has previously ordered the entry of a preliminary injunction against "the construction of roads for future logging" in response to deficient environmental analysis.[69]  In these circumstances, the Court therefore finds that Plaintiffs have demonstrated that they are very likely to suffer irreparable harm in the absence of preliminary injunctive relief.

---

[64] Docket 6 at 3, ¶ 3 (Stipulation and Joint Motion for Entry of Scheduling Order).

[65] Docket 21 at 8; *see also* Docket 21-1 at 4, ¶ 14 (describing mobilization process).

[66] Docket 21-1 at 4, ¶ 14 ("Mobilization includes constructing the sale-site infrastructure (including any roads, log landing sites, log transfer facilities, workers' quarters), as well as moving all necessary equipment and workers to the sale.").

[67] Docket 26 at 4.

[68] AR 833_2167 at 1519.

[69] *See City of Tenakee Springs v. Block*, 778 F.2d 1402, 1404, 1408 (9th Cir. 1985).

Case No. 1:19-cv-00006-SLG, *SEACC, et al. v. U.S. Forest Serv., et al.*
Order Granting Motion for Preliminary Injunction
Page 13 of 26

Case 1:19-cv-00006-SLG   Document 27   Filed 09/23/19   Page 13 of 26

*II. The likelihood of success on the merits*

Pursuant to NEPA, agencies must prepare an EIS before taking an action "significantly affecting the quality of the human environment."[70] Regulations issued by the Council on Environmental Quality require an EIS to include discussion of the direct and indirect effects of the action, as well as "[t]he environmental effects of alternatives."[71] "An EIS must 'reasonably set forth sufficient information to enable the decisionmaker to consider the environmental factors and make a reasoned decision.'"[72] This requirement is met if the EIS "contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences."[73]

Plaintiffs assert that the Project EIS, with its condition-based analysis, does not contain enough site-specific information or analysis to comply with NEPA.[74] They contend that this case is governed by the Ninth Circuit's decision in *City of Tenakee Springs v. Block*.[75] In that case, the Circuit reversed a district court's

---

[70] 42 U.S.C. § 4332(2)(C) (requiring a "detailed statement" analyzing "the environmental impact of the proposed action," among other things).

[71] 40 C.F.R. § 1502.16.

[72] *Alaska Ctr. for Env't v. Armbrister*, 131 F.3d 1285, 1289 (9th Cir. 1997) (quoting *Or. Envtl. Council v. Kunzman*, 817 F.2d 484, 493 (9th Cir. 1987)).

[73] *WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 924 (9th Cir. 2015) (quoting *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1206 (9th Cir. 2004)).

[74] Docket 17 at 4; *see also* Docket 1 at 16–17, ¶¶ 44–47 (Compl.); Docket 10 at 22–36 (Motion for Summary Judgment).

[75] 778 F.2d 1402 (9th Cir. 1985).

Case No. 1:19-cv-00006-SLG, *SEACC, et al. v. U.S. Forest Serv., et al.*
Order Granting Motion for Preliminary Injunction
Page 14 of 26

Case 1:19-cv-00006-SLG   Document 27   Filed 09/23/19   Page 14 of 26

decision not to enjoin "construction of an 11-mile road through the Kadashan watershed" in the Tongass.[76]  The plaintiffs had challenged the adequacy of an EIS for a five-year operating plan that would defer logging but authorized the construction of roads for future harvest activity.[77]  The Ninth Circuit rejected the trial court's conclusion that the Forest Service had discretion to determine the specificity of its environmental review.[78]  Instead, it held that "[a]lthough the agency does have the discretion to define the scope of its actions, such discretion does not allow the agency to determine the specificity required by NEPA."[79]  The Circuit explained that "[w]here there are large scale plans for regional development, NEPA requires both a programmatic and a site-specific EIS."[80]

The Circuit then ordered the entry of a preliminary injunction, in part due to its conclusion that the plaintiffs had raised serious questions about the merits of their NEPA claim.[81]  It explained that the challenged EIS did not "g[ive] any indication of its overall plan for timber harvesting" in the project area and that "it is impossible to determine where and when harvesting will occur on the 750,000

---

[76] *Id.* at 1403.

[77] *Id.* at 1404.

[78] *Id.* at 1407

[79] *Id.* (internal citation omitted).

[80] *Id.* at 1407 (citing 40 C.F.R. § 1508.28, 1502.20; *Kleppe v. Sierra Club*, 427 U.S. 390, 409–14 (1976)).

[81] *Id.* at 1407–08.

Case No. 1:19-cv-00006-SLG, *SEACC, et al. v. U.S. Forest Serv., et al.*
Order Granting Motion for Preliminary Injunction
Page 15 of 26

acres of land."[82]  The Circuit held that the EIS was inadequate, reasoning that the location and timing of logging would affect "the locating, routing, construction techniques, and other aspects of the road, or even the need for its construction."[83]

Here, Plaintiffs argue that the Project EIS is similarly deficient and that by engaging in condition-based analysis, the Forest Service impermissibly limited the specificity of its environmental review.[84]  The EIS identified which areas within the roughly 1.8-million-acre project area could potentially be harvested over the Project's 15-year period,[85] but expressly left site-specific determinations for the future.[86]  For example, the selected alternative allows 23,269 acres of old-growth harvest, but does not specify where this will be located within the 48,140 acres of old growth identified as suitable for harvest in the project area.[87]  Similar to the EIS found inadequate in *City of Tenakee Springs*, the EIS here does not include a determination of when and where the 23,269 acres of old-growth harvest will occur. As a result, the EIS also does not provide specific information about the amount

---

[82] *Id.* at 1408.

[83] *Id.* (quoting *Thomas v. Peterson*, 753 F.2d 754, 760 (9th Cir. 1985), *abrogated on other grounds by Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075 (9th Cir. 2015)).

[84] Docket 10 at 23–25.

[85] *See* U.S. FOREST SERV., ISLAND LOGGING SYS. AND TRANSP. ANALYSIS, https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd622024.pdf (last accessed Sept. 22, 2019).

[86] AR 833_2167 at 1459.

[87] AR 833_2167 at 001481.

and location of actual road construction under each alternative, stating instead that "[t]he total road miles needed will be determined by the specific harvest units offered and the needed transportation network."[88]

The Forest Service argues that the relevant phrase in *City of Tenakee Springs* was factually inaccurate, citing an unreported district court order on remand.[89] But regardless of the decision's factual accuracy, the reasoning of *City of Tenakee Springs* remains: An EIS must be specific enough to ensure informed decision-making and meaningful public participation.[90]

The Forest Service contends that the EIS provides the specificity required by NEPA because it identifies potential areas of harvest within the project area.[91] It cites *Stein v. Barton*, in which the district court concluded that an EIS need not provide "exact timetables and locations on the ground for planned harvesting activities within each harvest unit."[92] The EIS in that case "employ[ed] a

---

[88] AR 833_2167 at 001789.

[89] Docket 12 at 27. *See City of Tenakee Springs v. Courtright*, No. J86-024 CIV., 1987 WL 90272, at *3 (D. Alaska June 26, 1987) ("The [Ninth Circuit] opinion also contains puzzling language suggesting that the EIS did not state where and when harvesting would take place in the APC contract area. This may be an improperly-drafted allusion to the fact that the final EIS did not reveal where and when logging would take place along the Kadashan Road . . . .").

[90] *See also Alaska Ctr. for Env't v. Armbrister*, 131 F.3d 1285, 1289 (9th Cir. 1997) ("An EIS must 'reasonably set forth sufficient information to enable the decisionmaker to consider the environmental factors and make a reasoned decision.'" (quoting *Or. Envtl. Council v. Kunzman*, 817 F.2d 484, 493 (9th Cir. 1987))).

[91] Docket 12 at 27–28.

[92] 740 F. Supp. 743, 749 (D. Alaska 1990).

Case No. 1:19-cv-00006-SLG, *SEACC, et al. v. U.S. Forest Serv., et al.*
Order Granting Motion for Preliminary Injunction
Page 17 of 26

Case 1:19-cv-00006-SLG   Document 27   Filed 09/23/19   Page 17 of 26

combination of annotated topographic maps, textual, and tabular data to describe the project alternatives and their impacts on cognizable values within the affected areas" and contained "comprehensive, detailed quantitative and qualitative descriptions of the logging and roading plans for each harvest unit."[93] Similarly, in *Alliance for the Wild Rockies v. Weber*, the district court upheld the environmental analysis for a timber sale that "identif[ied] the project boundaries down to the township and range level" and used maps to "allow the Plaintiffs to identify where those activities will take place in relation to bull trout critical habitat."[94] Here, the Project EIS does not identify individual harvest units; by only identifying broad areas within which harvest may occur, it does not fully explain to the public how or where actual timber activities will affect localized habitats.

Moreover, the court in *Stein* rejected the plaintiffs' site-specificity claims because they had not argued that or "show[n] why disclosure of more details regarding site-specific impacts [was] necessary in order to 'foster both informed decision-making and informed public participation.'"[95] Here, Plaintiffs contend that more detailed information about the location of timber harvest under the Project is necessary to properly assess its ecological and subsistence impacts.[96]

---

[93] *Id.*

[94] 979 F. Supp. 2d 1118, 1125–26 (D. Mont. 2013).

[95] 740 F. Supp. at 749.

[96] *See* Docket 10 at 28–36. For example, Plaintiffs argue:

> [W]hile all of [the species occurring within the project area] depend to some

Case No. 1:19-cv-00006-SLG, *SEACC, et al. v. U.S. Forest Serv., et al.*
Order Granting Motion for Preliminary Injunction
Page 18 of 26

Case 1:19-cv-00006-SLG   Document 27   Filed 09/23/19   Page 18 of 26

Finally, the Forest Service argues that the EIS satisfied NEPA by analyzing the Project's maximum potential impacts.[97] For example, in discussing the potential impacts to wildlife, the EIS states that "[f]or purposes of analysis, assumptions include that all harvest stands from the [Project-wide logging system and transportation analysis] would be harvested."[98] As a result of this worst-case-scenario analysis, the Forest Service maintains that "whatever units [it] ultimately selects within the constraints outlined in the alternatives, Activity Cards, and Implementation Plan, the Project will produce environmental effects that fall within those already disclosed and analyzed in the EIS."[99] The Forest Service relies on *WildEarth Guardians v. Conner*.[100] There, the Tenth Circuit upheld an Environmental Assessment ("EA") for a tree thinning project that "evaluat[ed] the Project's effects on lynx in a worst-case scenario in which all the mapped lynx

---

degree on old growth, the extent of that dependence varies, and they have different needs respecting forest structure, elevation, proximity to beaches and streams, proximity to roads, prey availability and fragmentation of their habitat. For all these reasons . . . the specific locations proposed for new logging and road construction matter a great deal for wildlife, for hunters, and for other people who use and enjoy the forest.

Docket 10 at 33–34.

[97] Docket 12 at 30–32.

[98] AR 833_2167 at 1629.

[99] Docket 12 at 32.

[100] 920 F.3d 1245 (10th Cir. 2019).

habitat in the project area is treated."[101]  An EA is meant to determine whether an action will have a significant impact on the environment, such that an EIS is necessary.[102]  In contrast, an EIS must compare the environmental impacts of different alternatives, not just determine whether environmental impacts will occur.[103]  While the Forest Service's analysis of the Project's maximum potential impacts to wildlife may be appropriate for an EA, it may not be sufficient to meet the requirements for an EIS.

Based on the foregoing, the Court finds that Plaintiffs have shown that there are at least serious questions going to the merits of its NEPA claim.  Accordingly, the Court does not address their ANILCA or NFMA claims for the purposes of preliminary injunctive relief.[104]

### III.  Balance of equities and public interest

Although analyses of the balance of equities and public interest generally merge when the government is a party, the public interest "is better seen as an

---

[101] *Id.* at 1258.

[102] *See id.* at 1251 (describing purpose of EA).

[103] *See id.*; *see also* 40 C.F.R. § 1502.16(d) (requiring discussion of "[t]he environmental effects of alternatives including the proposed action"); 40 C.F.R. § 1502.14(a) (requiring EIS to "[r]igorously explore and objectively evaluate all reasonable alternatives").

[104] *See hiQ Labs, Inc. v. LinkedIn Corp.*, ___ F.3d ___, No. 17-16783, slip op. at 24 (9th Cir. Sept. 9, 2019) ("As that showing on the tortious interference claim is sufficient to support an injunction prohibiting LinkedIn from selectively blocking hiQ's access to public member profiles, we do not reach hiQ's unfair competition claim.").

element that deserves separate attention in cases where the public interest may be affected."[105]   Hence, the Court will consider these elements separately.

*A. The balance of hardships tips sharply in Plaintiffs' favor*

"If [environmental injury] is sufficiently likely . . . the balance of harms will usually favor the issuance of an injunction to protect the environment."[106]   If the 1,156.34 acres in the Twin Mountain Timber Sale are logged, the "recreational opportunities that would otherwise be available on that land are irreparably lost."[107] Several members of the plaintiff organizations filed declarations in which they stated that harvest activities would disrupt their use and appreciation of the affected area.[108]   The Forest Service argues that the sale implicates "a small fraction of the Project,"[109] as it consists of only 4.9% of the total old-growth acres authorized for commercial harvest.[110]   But the Ninth Circuit has characterized the logging of a similar area—1,652 acres—as "hardly a de minimis injury."[111]

---

[105] *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014) (quoting *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002)).

[106] *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987), *abrogated in part on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

[107] *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1137 (9th Cir. 2011).

[108] *See* Docket 10-1 at 6–7, ¶ 7 (Decl. of David Beebe); Docket 10-4 at 7, ¶ 14 (Decl. of Natalie Dawson); Docket 10-7 at 5–6, ¶ 10 (Decl. of Don Hernandez).

[109] Docket 21 at 10.

[110] Docket 21-1 at 3, ¶ 6.

[111] *All. for the Wild Rockies*, 632 F.3d at 1135.

On the other side of the scale, the Forest Service points to the economic harm it would suffer if the sale is enjoined. It set a minimum bid of $1.2 million on the sale,[112] and argues that this money is necessary to fund other Project activities.[113] But the Forest Service would not receive this money until harvesting is completed.[114] "[T]he operating season in the area of this sale usually ends in early November,"[115] so a preliminary injunction would only prevent roughly one month of logging and associated activities during the 2019 season. It is highly unlikely that the harvest authorized by the sale would be completed during that brief period.[116] And the Court intends to issue an order on the merits by March 31, 2020, before the normal operating season reopens.[117] Thus, the economic loss to the government caused by a preliminary injunction that would be in effect for several months is not considerable.

---

[112] Docket 21-1 at 3, ¶ 10.

[113] Docket 21 at 10–11.

[114] Docket 21-1 at 4, ¶ 15.

[115] Docket 21-1 at 4, ¶ 12. *But see* Docket 24-1 at 6, ¶ 10 (Decl. of Owen Graham) (stating that "timber sale operations routinely continue into mid-December, with operations resuming early in the following year").

[116] *See* Docket 21-1 at 4, ¶ 14 (stating that mobilization, which must occur before logging begins, typically takes at least two weeks).

[117] *See* Docket 17-2 at 2 (2004 contract indicating that the "normal operating season" runs from April 1 to October 31). *But see* Docket 24-1 at 6, ¶ 10 (Decl. of Owen Graham) (stating that "timber sale operations routinely continue into mid-December, with operations resuming early in the following year").

The Forest Service also argues that any delay to the Twin Mountain Timber Sale would pose a serious threat to local mills, potentially erasing the market for Tongass old-growth timber.[118]  Similarly, amicus curiae Alaska Forest Association asserts that the sale is "desperately needed to support the Southeast Alaska timber industry."[119]  The Court acknowledges the harm that a preliminary injunction would cause the local timber economy.  But it must consider "only the portion of the harm that would occur while the preliminary injunction is in place."[120]  The preliminary injunction that Plaintiffs request would have a relatively short duration, intended to maintain the status quo only until the Court issues a decision on the merits.  In light of this, the Court finds that the balance of harms tips sharply in Plaintiffs' favor due to the irreparable harm they would suffer in the absence of preliminary injunctive relief.[121]

---

[118] Docket 21 at 11–12.

[119] Docket 24 at 2.  *But see* Docket 26-3 at 12–16 (describing State of Alaska's upcoming timber sales in Southeast Alaska).

[120] *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014) (citing *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1023 (9th Cir. 2009)).

[121] *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 at 1137–38 (9th Cir. 2011).

Case No. 1:19-cv-00006-SLG, *SEACC, et al. v. U.S. Forest Serv., et al.*
Order Granting Motion for Preliminary Injunction
Page 23 of 26

Case 1:19-cv-00006-SLG   Document 27   Filed 09/23/19   Page 23 of 26

*B. A short-term injunction to maintain the status quo is in the public interest*

The Ninth Circuit has recognized "the well-established 'public interest in preserving nature and avoiding irreparable environmental injury.'"[122]   And "[s]uspending a project until [environmental analysis] has occurred . . . comports with the public interest," because "the public interest requires careful consideration of environmental impacts before major federal projects may go forward."[123]   The Forest Service stresses that the "selected alternative is projected to support 2,657 jobs and provide $146,620,933 in direct income," and that this economic benefit would be jeopardized if "operators are forced out of business from a lack of timber" due to delays in implementation.[124]   A preliminary injunction's impact on the local economy is certainly relevant to the public interest inquiry,[125] but the Forest Service paints the impact too broadly by focusing on the projected economic benefit for the entire 15-year Project.  As Plaintiffs point out, "permanent relief [is] not at issue in this motion,"[126] only a preliminary injunction of relatively short duration.

---

[122] *Id.* at 1138 (quoting *Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008), *overruled on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)).

[123] *S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dept. of Interior*, 588 F.3d 718, 728 (9th Cir. 2009).

[124] Docket 21 at 12–13.

[125] *See, e.g.*, *Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) (affirming denial of preliminary injunction of logging project due in part to "the public's interest in aiding the struggling economy and preventing job loss"), *overruled on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008).

[126] Docket 26 at 6 (Reply).

Case No. 1:19-cv-00006-SLG, *SEACC, et al. v. U.S. Forest Serv., et al.*
Order Granting Motion for Preliminary Injunction
Page 24 of 26

Case 1:19-cv-00006-SLG   Document 27   Filed 09/23/19   Page 24 of 26

Moreover, the Project is not the only planned source of timber in Southeast Alaska, including on Prince of Wales Island. For example, the State of Alaska has scheduled two timber sales on the island for 2020, offering a cumulative 2,141 acres of old-growth harvest.[127] And the State anticipates awarding a local company a 10-year contract that will provide roughly 50 million board feet of timber.[128] These planned projects would lessen the economic impact of a short-term preliminary injunction of the Twin Mountain Timber Sale. The Court thus finds that the "public interests that might be injured by a preliminary injunction . . . do not outweigh the public interests that will be served."[129]

## CONCLUSION

In light of the foregoing, Plaintiffs' Motion for Preliminary Injunction at Docket 17 is GRANTED.

IT IS ORDERED that Defendants are hereby enjoined from allowing any cutting of trees, road construction, or other ground-disturbing activities implementing the Twin Mountain Timber Sale authorized in the Prince of Wales Landscape Level Analysis Project Record of Decision until further order of this Court. Defendants are further enjoined from opening any bids or awarding any contracts for the Twin Mountain Timber Sale until further order of this Court.

---

[127] Docket 26-3 at 12 (Alaska Division of Forestry Five-Year Schedule of Timber Sales).

[128] Docket 26-4 at 11 (Tr. of Aug. 28, 2019 Board of Forestry Meetings).

[129] *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011).

Case No. 1:19-cv-00006-SLG, *SEACC, et al. v. U.S. Forest Serv., et al.*
Order Granting Motion for Preliminary Injunction
Page 25 of 26

This preliminary injunction is effective immediately. However, the parties have not provided the Court with sufficient information to allow the Court to determine the appropriate amount of security, if any, required by Rule 65(c), Federal Rules of Civil Procedure.[130] Therefore, within one week of the date of this order, the parties shall file, either separately or jointly, their positions on the amount of any required bond, and the Court shall promptly thereafter address this issue.

DATED this 23rd day of September, 2019 at Anchorage, Alaska.

/s/ Sharon L. Gleason
UNITED STATES DISTRICT JUDGE

---

[130] *See, e.g.*, *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1125–26 (9th Cir. 2005) (affirming district court order requiring non-profit environmental organization to pay $50,000 bond after enjoining development project); *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325–26 (9th Cir. 1985) (affirming district court order requiring no bond when non-profit environmental organization "indicate[d] it [was] unable to post a substantial bond").

Case No. 1:19-cv-00006-SLG, *SEACC, et al. v. U.S. Forest Serv., et al.*
Order Granting Motion for Preliminary Injunction
Page 26 of 26

Case 1:19-cv-00006-SLG   Document 27   Filed 09/23/19   Page 26 of 26